**THE PLAN AND THIS DISCLOSURE STATEMENT ARE BEING SUBMITTED FOR APPROVAL BUT HAVE NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION OF THE PLAN MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THE PLAN AND THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| -------------------------------------------------------- x | | |
| In re: | : | Chapter 11 |
| LIBBEY GLASS INC., *et al.*,[1] | : | Case No. 20-11439 (LSS) |
| Debtors. | : | (Jointly Administered) |
| -------------------------------------------------------- x | | |

## DISCLOSURE STATEMENT FOR
## THE JOINT PLAN OF REORGANIZATION FOR
## LIBBEY GLASS INC. AND ITS AFFILIATE DEBTORS
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

| **RICHARDS, LAYTON & FINGER, P.A.** | **LATHAM & WATKINS LLP** |
|---|---|
| John H. Knight (No. 3848) | George A. Davis |
| Russell C. Silberglied (No. 3462) | Keith A. Simon |
| Paul N. Heath (No. 3704) | David Hammerman |
| Zachary I. Shapiro (No. 5103) | Anu Yerramalli |
| One Rodney Square | Madeleine C. Parish |
| 920 North King Street | 885 Third Avenue |
| Wilmington, Delaware 19801 | New York, New York 10022 |
| Telephone: (302) 651-7700 | Telephone: (212) 906-1200 |
| Facsimile: (302) 651-7701 | Facsimile: (212) 751–4864 |

*Counsel for the Debtors and Debtors-in-Possession*

Dated: August 20, 2020

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Libbey Glass Inc. (4107), Libbey Inc. (9357), Libbey.com LLC (6913), Syracuse China Company (1904), The Drummond Glass Company (0383), LGC Corp. (6034), LGAC LLC (0497), World Tableware Inc. (1231), LGFS Inc. (0975), LGAU Corp. (5531), LGA4 Corp. (5673), and LGA3 Corp. (1505). The Debtors' address is P.O. Box 10060, Toledo, Ohio 43699-0060.

**THE VOTING DEADLINE IS 5:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER [21], 2020**

**(UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE).**

**TO BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN, THE VOTING AND CLAIMS AGENT MUST ACTUALLY RECEIVE YOUR BALLOTS/OPT-OUT FORMS ON OR BEFORE THE VOTING DEADLINE AS SET FORTH IN THE DISCLOSURE STATEMENT ORDER.**

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS ATTACHED SHOULD NOT BE RELIED UPON IN MAKING INVESTMENT DECISIONS WITH RESPECT TO THE DEBTORS OR ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THE CHAPTER 11 CASES.**

**PRESERVATION OF AVOIDANCE ACTIONS UNDER THE PLAN:**

**IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN, AND IN DETERMINING WHETHER TO VOTE IN FAVOR OF OR AGAINST, OR TO OBJECT TO CONFIRMATION OF, THE PLAN, CREDITORS, INTEREST HOLDERS AND STAKEHOLDERS SHOULD BE AWARE THAT THE PLAN PRESERVES ALL CAUSES OF ACTION (INCLUDING AVOIDANCE ACTIONS) AND THAT THE PLAN AUTHORIZES THE REORGANIZED DEBTORS TO PROSECUTE THE SAME.**

US-DOCS\115812051.19

## IMPORTANT INFORMATION FOR YOU TO READ

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY AND NEITHER THE SEC NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED TO CREDITORS WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, AND WILL INSTEAD RELY UPON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE AND SECTION 4(2) OF THE SECURITIES ACT OR OTHER APPLICABLE EXEMPTIONS. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER.  RATHER, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS OR THE REORGANIZED DEBTORS MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES. EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

US-DOCS\115812051.19

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED (UNLESS EXPRESSLY PROVIDED HEREIN).

THE DEBTORS ARE GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN SECTION VI HEREIN, "PLAN-RELATED RISK FACTORS."

US-DOCS\115812051.19

## TABLE OF CONTENTS

**Page**

**I. EXECUTIVE SUMMARY** ................................................................................................ i

    A. Purpose and Effect of the Plan.................................................................................. ii

    B. Administrative, DIP Facility, and Priority Tax Claims .............................................. iii

    C. Classification and Treatment of Claims and Interests Under the Plan ....................... vi

    D. Solicitation Procedures ............................................................................................ ix

    E. Voting Procedures.................................................................................................... xv

    F. Confirmation of the Plan...................................................................................... xviii

    G. Consummation of the Plan....................................................................................... xx

    H. Risk Factors ............................................................................................................ xx

**II. BACKGROUND TO THE CHAPTER 11 CASES** ........................................................21

    A. The Debtors' Corporate History and Structure..........................................................21

    B. Overview of the Debtors' Businesses.......................................................................22

    C. Prepetition Indebtedness .........................................................................................27

    D. Events Leading to the Chapter 11 Filing .................................................................30

**III. EVENTS DURING THE CHAPTER 11 CASE** ..........................................................39

    A. First Day Motions and Certain Related Relief..........................................................39

    B. Second Day Motions and Related Relief ..................................................................43

    C. Appointment of the Official Committee ...................................................................43

    D. Reorganization Strategy..........................................................................................44

    E. Filing of the Schedules and Establishment of the Claims Bar Date ..........................48

    F. Exclusive Period for Filing a Plan and Soliciting Votes...........................................49

    G. Anticipated Post-Emergence Capital Structure & Operations...................................50

**IV. SUMMARY OF THE PLAN** ......................................................................................52

    A. Administrative and Priority Tax Claims...................................................................52

    B. Classification and Treatment of Classified Claims and Equity Interests....................55

    C. Acceptance or Rejection of the Plan.........................................................................60

    D. Means for Implementation of the Plan.....................................................................61

    E. Treatment of Executory Contracts and Unexpired Leases ........................................71

    F. Provisions Governing Distributions..........................................................................76

| | | | |
|---|---|---|---|
| | G. | Procedures for Resolving Contingent, Unliquidated and Disputed Claims | 81 |
| | H. | Conditions Precedent to Confirmation and Consummation of the Plan | 83 |
| | I. | Release, Discharge, Injunction And Related Provisions | 85 |
| | J. | Binding Nature of the Plan | 91 |
| | K. | Protection Against Discriminatory Treatment | 92 |
| | L. | Integral Part of Plan | 92 |
| **V.** | | **CONFIRMATION AND CONSUMMATION PROCEDURES** | **93** |
| | A. | Solicitation of Votes | 93 |
| | B. | Confirmation Procedures | 93 |
| | C. | Statutory Requirements for Confirmation of the Plan | 94 |
| | D. | Consummation of the Plan | 100 |
| **VI.** | | **PLAN-RELATED RISK FACTORS** | **101** |
| | A. | Certain Bankruptcy Law Considerations | 101 |
| | B. | Additional Factors Affecting the Value of the Reorganized Debtors | 107 |
| | C. | Risk Factors That May Affect the Value of Securities to be Issued Under the Plan and/or Recoveries Under the Plan | 108 |
| | D. | Risks Relating to the Capital Structure of the Reorganized Debtors | 109 |
| | E. | Risk Factors that Could Negatively Impact the Debtors' And Reorganized Debtors' Business | 113 |
| | F. | Risks Associated with Forward-Looking Statements | 133 |
| | G. | Disclosure Statement Disclaimer | 134 |
| **VII.** | | **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** | **137** |
| | A. | Liquidation Under Chapter 7 of the Bankruptcy Code | 137 |
| | B. | Filing of an Alternative Plan of Reorganization | 137 |
| **VIII.** | | **EXEMPTIONS FROM SECURITIES ACT REGISTRATION** | **139** |
| **IX.** | | **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | **143** |
| | A. | Introduction | 143 |
| | B. | U.S. Federal Income Tax Consequences to the Debtors | 144 |
| | C. | U.S. Federal Income Tax Consequences to Holders of Certain Claims | 150 |

**RECOMMENDATION**.......................................................................................................**159**

US-DOCS\115812051.19

## EXHIBITS

EXHIBIT A   Plan of Reorganization

EXHIBIT B   Disclosure Statement Order

EXHIBIT C   Financial Projections

EXHIBIT D   Liquidation Analysis

EXHIBIT E   Valuation Analysis

EXHIBIT F   Exit Term Loan Facility Term Sheet

EXHIBIT G   New Preferred Equity Interests Term Sheet

THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.

US-DOCS\115812051.19

# I.
# EXECUTIVE SUMMARY

Libbey Inc. ("**Parent**"), a Delaware corporation with its primary headquarters in Toledo, Ohio, its wholly owned direct subsidiary Libbey Glass Inc. ("**Libbey Glass**"), and their domestic affiliates and subsidiaries, that are the debtors and debtors-in-possession (collectively, the "**Debtors**" or the "**Company**"),[2] submit this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended from time to time, the "**Bankruptcy Code**"), in connection with the solicitation of votes on the *Joint Plan of Reorganization for Libbey Glass Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* dated August 17, 2020 (the "**Plan**"),[3] which was filed by the Debtors with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  The Confirmation Hearing on the Plan is scheduled for October [1], 2020 before the Bankruptcy Court.  A copy of the Plan is attached hereto as Exhibit A.

Prior to soliciting votes on a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires debtors to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization.  As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

This Executive Summary is being provided as an overview of the material items addressed in this Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (and including all exhibits attached hereto and to the Plan), and should not be relied upon for a comprehensive discussion of this Disclosure Statement and/or the Plan.  This Disclosure Statement includes, without limitation, information about:

- the Debtors' prepetition operating and financial history;

- the events leading up to the commencement of the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**");

- the significant events that have occurred during the Chapter 11 Cases;

- the solicitation procedures for voting on the Plan;

---

[2]    The Debtors' foreign affiliates (the "**Non-Debtors**"), which consist of their operating subsidiaries in Mexico, the Netherlands, Canada, China, and Portugal, have not filed chapter 11 petitions. The Non-Debtors are also included as part the "Company."

[3]    All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan. To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern.

i

- the Confirmation process and the voting procedures that Holders of Claims who are entitled to vote on the Plan must follow for their votes to be counted;

- the terms and provisions of the Plan, including certain effects of confirmation of the Plan, certain risk factors relating to the Debtors or the Reorganized Debtors, the Plan and the securities to be issued under the Plan and the manner in which distributions will be made under the Plan; and

- the proposed organization, operations and financing of the Reorganized Debtors if the Plan is confirmed and becomes effective.

A.    **PURPOSE AND EFFECT OF THE PLAN**

1.      **Plan of Reorganization Under Chapter 11 of the Bankruptcy Code**

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code.  As a result, the confirmation of the Plan means that the Reorganized Debtors will continue to operate their businesses going forward and does not mean that the Debtors will be liquidated or forced to go out of business. Additionally, as discussed in greater detail in Section IV.J herein, titled "Binding Nature of the Plan," a bankruptcy court's confirmation of a plan binds debtors, any entity acquiring property under the plan, any holder of a claim or equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such entity voted on the particular plan or affirmatively voted to reject the plan.

2.      **Financial Restructurings Under the Plan**

The Plan contemplates certain transactions, including, without limitation, the following transactions (described in greater detail in Section IV herein):

- Each Holder of an Allowed DIP ABL Facility Claim, in full satisfaction, settlement, discharge and release of, and in exchange for such Allowed Claim, will be indefeasibly Paid in Full in Cash from the proceeds of the Exit Facilities.

- Each Holder of an Allowed DIP Term Loan Facility Claim, in full satisfaction, settlement, discharge and release of, and in exchange for such Allowed Claim, shall be paid in part in Cash or, in the case of a DIP Term Loan Lender that will be an Exit Facility Lender under the Exit Term Loan Facility Credit Agreement, if elected by such DIP Term Loan Lender, rolled into Exit Term Loan Facility Loans as part of a cashless roll of DIP Term Loan Facility Claims from the Exit Term Loan Facility Loans and paid in part by the issuance of New Preferred Equity Interests on the terms set forth in the Exit Term Loan Facility Term Sheet, which, when consummated, will result in the indefeasible Payment in Full of the DIP Term Loan Facility Claims.

- Each Holder of an Allowed Prepetition Term Loan Claim (Secured Portion) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for,

ii

US-DOCS\115812051.19

such Allowed Claim, its Pro Rata share of 100% of the New Equity Interests Pool (subject to dilution by the New Management Incentive Plan Equity).

- Each Holder of an Allowed General Unsecured Claim, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 6 Claim is an Allowed Class 6 Claim as of the Effective Date or (ii) the next Subsequent Distribution Date after the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim, its Pro Rata share of the General Unsecured Recovery Cash Pool (which equals $100,000 in the aggregate); provided that the Holders of the Prepetition Term Loan Claims (Unsecured Deficiency Portion) shall not share in the General Unsecured Recovery Cash Pool which is equal to $100,000 (with a full reservation of rights to their Pro Rata share of the General Unsecured Recovery Cash Pool in excess of $100,000, if any).

- Each Holder of an Allowed Intercompany Claim will have its Allowed Intercompany Claim reinstated, compromised, or cancelled, at the option of the relevant Holder of such Intercompany Claim with the consent of the Super-Majority Term Loan Lenders.

- Each Holder of an Allowed Old Parent Interest will have its Allowed Old Parent Interest cancelled without further notice to, approval of or action by any Entity, and each Holder of an Old Parent Interest will not receive any distribution or retain any property on account of such Old Parent Interest.

- Each Holder of an Allowed Old Affiliate Equity Interest will have its Allowed Old Affiliate Equity Interest remain effective and outstanding on the Effective Date and will be owned and held by the same applicable Person that held and/or owned such Allowed Old Affiliate Interest immediately prior to the Effective Date.

- The legal, equitable and contractual rights of each Holder of an Allowed Other Priority Claim, Allowed Other Secured Claim, Allowed Secured Tax Claim, and Allowed Prepetition ABL Claim will be unaltered by the Plan.

**B.    ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS**

The following is a summary of the treatment of Administrative and Priority Tax Claims under the Plan.  For a more detailed description of the treatment of such Claims under the Plan, please see Article II of the Plan.

1.    **Administrative Claims**

Subject to sub-paragraph (a) below, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim (other than an Allowed Professional Fee Claim) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) Cash equal to the amount of such Allowed Administrative Claim; or (ii) such other less favorable treatment as to which the Debtors (with the consent of the

iii

US-DOCS\115812051.19

Super-Majority Term Loan Lenders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Administrative Claim will have agreed upon in writing; provided, however, that Administrative Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

(a)    Bar Date for Administrative Claims

Except as otherwise provided in the Plan, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the Debtors or Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order or the occurrence of the Effective Date (as applicable) no later than the Administrative Claims Bar Date; provided that the foregoing will not apply to the Holders of Claims arising under section 503(b)(1)(D) of the Bankruptcy Code or the United States Trustee as the Holder of Administrative Claims. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date will be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors and their respective Estates and property and such Administrative Claims will be deemed discharged as of the Effective Date. All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G of the Plan. Nothing in Article II.A of the Plan will limit, alter, or impair the terms and conditions of the Claims Bar Date Order with respect to the Claims Bar Date for filing administrative expense claims arising under section 503(b)(9) of the Bankruptcy Code.

Objections to such requests for payment must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 120 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by Final Order of the Bankruptcy Court.

(b)    Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated in the Confirmation Order an application for final allowance of such Professional Fee Claim no later than the Professional Fees Bar Date; provided that the Reorganized Debtors will pay the reasonable fees, costs, and out-of-pocket expenses of the Debtors' Professionals in the ordinary course of business for any work performed after the Effective Date, including those reasonable and documented fees, costs, and expenses incurred by such Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any Debtor Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses from the Debtors and Reorganized Debtors for services rendered

iv

US-DOCS\115812051.19

before the Effective Date pursuant to the Ordinary Course Professionals Order, in each case without further application or notice to or order of the Bankruptcy Court.  Upon the Effective Date and subject to the funding of the Professional Fee Reserve as set forth in the Plan, the DIP ABL Agent, DIP ABL Lenders, DIP Term Loan Agent and DIP Term Loan Lenders will have no further obligations with respect to the Carve Out under and as defined in the DIP Orders.  If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any Professionals' post-Effective Date fees, costs, or expenses, the Debtors or Reorganized Debtors, as applicable, or the affected Professional, may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice will not be paid until the dispute is resolved.

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by no later than thirty (30) days after the Filing of the applicable final request for payment of the Professional Fee Claim.  Each Holder of an Allowed Professional Fee Claim will be paid in full in Cash by the Reorganized Debtors, including from the Professional Fee Reserve, within five (5) Business Days after entry of the order approving such Allowed Professional Fee Claim.  The Reorganized Debtors will use such funds to pay only the Professional Fee Claims, as and when allowed by order of the Bankruptcy Court (except that the Unused Professional Fee Reserve Amount may be distributed from the Professional Fee Reserve as and when provided in the Plan).  Notwithstanding anything to the contrary contained herein or in the Plan, the failure of the Professional Fee Reserve to satisfy in full the Professional Fee Claims will not, in any way, operate or be construed as a cap or limitation on the amount of Professional Fee Claims due and payable by the Reorganized Debtors.

2.  **DIP Facility Claims**

On the Effective Date, in full satisfaction, settlement, discharge and release of, and in exchange for the DIP ABL Facility Claims, such DIP ABL Facility Claims shall be indefeasibly Paid in Full in Cash from the proceeds of the Exit Facilities, any unused commitments under the DIP Financing Documents shall be deemed terminated, and the DIP ABL Facility Liens will be deemed discharged, released, and terminated for all purposes without further action of or by any Person or Entity.

On the Effective Date, in full satisfaction, settlement, discharge and release of, and in exchange for the DIP Term Loan Facility Claims, such DIP Term Loan Facility Claims shall be paid in part in Cash or, in the case of a DIP Term Loan Lender that will be an Exit Facility Lender under the Exit Term Loan Facility Credit Agreement, if elected by such DIP Term Loan Lender, rolled into Exit Term Loan Facility Loans as part of a cashless roll of DIP Term Loan Facility Claims from the Exit Term Loan Facility Loans and paid in part by the issuance of New Preferred Equity Interests on the terms set forth in the Exit Term Loan Facility Term Sheet which, when consummated, shall result in the indefeasible Payment in Full of the DIP Term Loan Facility Claims.

3.  **Priority Tax Claims**

Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as

US-DOCS\115812051.19

of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors, as applicable: (A) Cash equal to the amount of such Allowed Priority Tax Claim; (B) such other less favorable treatment as to which the Debtors (with the consent of the Super-Majority Term Loan Lenders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Priority Tax Claim will have agreed upon in writing; (C) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code or (D) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that Priority Tax Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. Any installment payments to be made under clause (C) or (D) above will be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.

C.    **CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

The following table provides a summary of the classification and treatment of Claims and Equity Interests and the potential distributions to Holders of Allowed Claims and Equity Interests under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN AND THE RISK FACTORS DESCRIBED IN ARTICLE VI BELOW. THE TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR A REVIEW OF THE PLAN AND DISCLOSURE STATEMENT IN THEIR ENTIRETY. FOR CERTAIN CLASSES OF CLAIMS, THE ACTUAL AMOUNT OF ALLOWED CLAIMS COULD BE MATERIALLY DIFFERENT THAN THE ESTIMATED AMOUNTS SHOWN IN THE TABLE BELOW.**

US-DOCS\115812051.19

**SUMMARY OF EXPECTED RECOVERIES**[4]

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 1 | Other Priority Claims<br><br>Expected Amount: N/A | Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim as of the Effective Date or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtors or Reorganized Debtors, as applicable (with the consent of the Super-Majority Term Loan Lenders): (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that Class 1 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court. | 100% |
| 2 | Other Secured Claims<br><br>Expected Amount: $1.5 million | Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim as of the Effective Date or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors or Reorganized Debtors, as applicable (with the consent of the Super-Majority Term Loan Lenders): (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 2 Claim will have agreed upon in writing; (C) the Collateral securing such Allowed Class 2 Claim; or (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that Class 2 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court. | 100% |
| 3 | Secured Tax Claims<br><br>Expected Amount: N/A | Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 3 Claim is an Allowed Class 3 Claim as of the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim, at the election | N/A |

---

[4]  The Debtors' Claims Bar Date was August 10, 2020, and the Debtors are still in the process of reconciling Claims. As such, the ranges contained in this summary may not be exact and are subject to further change. For the avoidance of doubt, this summary does not reflect contingent and unliquidated Claims that will ultimately be liquidated as part of the reconciliation process.

vii

US-DOCS\115812051.19

**SUMMARY OF EXPECTED RECOVERIES**[4]

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | | of the Debtors or Reorganized Debtors, as applicable (with the consent of the Super-Majority Term Loan Lenders): (A) Cash equal to the amount of such Allowed Class 3 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 3 Claim will have agreed upon in writing; (C) the Collateral securing such Allowed Class 3 Claim; (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code or (E) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Class 3 Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that Class 3 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. Any installment payments to be made under clause (D) or (E) above will be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Class 3 Claim. | |
| 4 | Prepetition ABL Claims<br><br>Expected Amount: $17.2 million[5] | On or prior to the Effective Date, to the extent such Prepetition ABL Claims have not been "rolled up" or otherwise refinanced pursuant to the terms of the DIP ABL Loan Documents and DIP Orders, and in addition to the reimbursement described in Article V.R of the Plan, subject to the Payoff Letter, each Holder of Prepetition ABL Claims shall receive (i) Payment in Full, in cash, of its Prepetition ABL Claims, or (ii) such other less favorable treatment as may otherwise be agreed to by such Holder and the Debtors (with the consent of the Super-Majority Term Loan Lenders). | 100% |
| 5 | Prepetition Term Loan Claims (Secured Portion) Expected Amount: $162.9 million | On the Effective Date and in addition to the reimbursement described in Article V.R of the Plan, each holder of an Allowed Term Loan Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 5 Claim, its Pro Rata share of 100% of the New Equity Interests Pool (subject to dilution by the New Management Incentive Plan Equity). | 51.1% |

---

[5]   This amount represents the contingent guarantee obligations related to the "Netherlands Obligations" (as defined in the Prepetition ABL Agreement) that was not part of the Partial ABL Roll-Up (as defined in the DIP Orders). The "Netherlands Obligations" actual amount is based in Euros and subject to foreign currency fluctuation changes through the Effective Date. As of the Petition Date, the U.S. dollar balance was $17.2M. As of July 31, 2020, based upon the aforementioned foreign currency fluctuations, the balance was approximately $18.3M.

US-DOCS\115812051.19

**SUMMARY OF EXPECTED RECOVERIES**[4]

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 6 | General Unsecured Claims[6]<br><br>Expected Amount: $210 million | Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 6 Claim is an Allowed Class 6 Claim as of the Effective Date or (ii) the next Subsequent Distribution Date after the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed General Unsecured Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim, its Pro Rata share of the General Unsecured Recovery Cash Pool (which equals $100,000 in the aggregate); provided that the Holders of the Prepetition Term Loan Claims (Unsecured Deficiency Portion) shall not share in the General Unsecured Recovery Cash Pool which is equal to $100,000 (with a full reservation of rights to their Pro Rata share of the General Unsecured Recovery Cash Pool that is in excess of $100,000, if any). | More than 0% |
| 7 | Intercompany Claims<br><br>Expected Amount: N/A | Class 7 is an Impaired Class. However, because the Holders of such Claims are Affiliates of the Debtors, the Holders of Claims in Class 7 will be conclusively deemed to have accepted the Plan. Therefore, Holders of Claims in Class 7 are not entitled to vote to accept or reject the Plan. | N/A |
| 8 | Old Parent Interests<br><br>Expected Amount: N/A | On the Effective Date, the Old Parent Interests will be cancelled without further notice to, approval of or action by any Person or Entity, and each Holder of an Old Parent Interest will not receive any distribution or retain any property on account of such Old Parent Interest. | 0% |
| 9 | Old Affiliate Interests<br><br>Expected Amount: N/A | Subject to the Restructuring Transactions, the Old Affiliate Interests will remain effective and outstanding on the Effective Date and will be owned and held by the same applicable Person(s) or Entity or Entities, as reorganized, that held and/or owned such Old Affiliate Interests immediately prior to the Effective Date. | 100% |

**D.    SOLICITATION PROCEDURES**

1.    **The Solicitation and Voting Procedures**

On August [21], 2020 the Bankruptcy Court entered the Disclosure Statement Order which, among other things, (a) approved the dates, procedures and forms applicable to the process of soliciting votes on and providing notice of the Plan, as well as certain vote tabulation procedures

---

6    General Unsecured Claims remain subject to the Claim reconciliation process being conducted by the Debtors and their advisors. The expected General Unsecured Claim amount includes Prepetition Term Loan Claims (Unsecured Deficiency Portion) of approximately $155.8 million, with the remainder of approximately $54 million constituting other General Unsecured Claims. For the avoidance of doubt, the Holders of Prepetition Term Loan Claims are not waiving their rights to any Unsecured Deficiency Claims under the Bankruptcy Code.

US-DOCS\115812051.19

and (b) established the deadline for filing objections to the Plan and scheduling the hearing to consider confirmation of the Plan.

**The discussion of the procedures below is a summary of the solicitation and voting process**. Detailed voting instructions will be provided with each Ballot/Opt-Out Form and are also set forth in greater detail in Disclosure Statement Order.

> PLEASE REFER TO THE INSTRUCTIONS
> ACCOMPANYING THE BALLOTS/OPT-OUT FORMS AND THE
> DISCLOSURE STATEMENT ORDER FOR MORE INFORMATION REGARDING
> VOTING REQUIREMENTS TO ENSURE THAT YOUR BALLOT/OPT-OUT FORM IS
> PROPERLY AND TIMELY SUBMITTED SUCH THAT YOUR VOTE MAY BE COUNTED.

2.    **The Voting and Claims Agent**

The Debtors have retained Prime Clerk LLC to, among other things, act as Voting and Claims Agent. [Docket No. 61].

Specifically, the Voting and Claims Agent will assist the Debtors with: (a) mailing Confirmation Hearing Notices (as defined in the Disclosure Statement Order); (b) mailing Solicitation Packages (as defined in the Disclosure Statement Order and as described below); (c) soliciting votes on the Plan; (d) receiving, tabulating, and reporting on Ballots/Opt-Out Forms cast for or against the Plan by Holders of Claims against the Debtors; (e) responding to inquiries from creditors and stakeholders relating to the Plan, this Disclosure Statement, the Ballots/Opt-Out Forms and matters related thereto, including, without limitation, the procedures and requirements for voting to accept or reject the Plan and objecting to the Plan; and (f) if necessary, contacting creditors regarding the Plan and their Ballots/Opt-Out Forms.

3.    **Holders of Claims Entitled to Vote on the Plan**

Under the provisions of the Bankruptcy Code, not all holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan. The following table provides a summary of the status and voting rights of each Class (and, therefore, of each Holder of a Claim or Equity Interest within such Class) under the Plan:

### SUMMARY OF STATUS AND VOTING RIGHTS

| Class | Claim/Equity Interest | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Secured Tax Claims | Unimpaired | Deemed to Accept |
| 4 | Prepetition ABL Claims | Unimpaired | Deemed to Accept |

x

US-DOCS\115812051.19

## SUMMARY OF STATUS AND VOTING RIGHTS

| Class | Claim/Equity Interest | Status | Voting Rights |
|---|---|---|---|
| 5 | Prepetition Term Loan Claims (Secured Portion) | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Impaired | Deemed to Accept |
| 8 | Old Parent Interests | Impaired | Deemed to Reject |
| 9 | Old Affiliate Interests | Unimpaired | Deemed to Accept |

Based on the foregoing, the Debtors are soliciting votes to accept the Plan only from Holders of Claims in Classes 5 and 6 (the "**Voting Classes**") because Holders of Claims in the Voting Classes are Impaired under the Plan and, therefore, have the right to vote to accept or reject the Plan.  The Debtors are **not** soliciting votes from (a) Holders of Claims or Equity Interests in Classes 1, 2, 3, 4, 7, and 9 because such parties are conclusively presumed to have accepted the Plan and (b) Holders of Equity Interests in Class 8 because such parties are conclusively presumed to have rejected the Plan (collectively, the "**Non-Voting Classes**").  In lieu of a Solicitation Package, Holders of Old Parent Interests in Class 8 will receive a Confirmation Hearing Notice.

With respect to Class 5 – Prepetition Term Loan Claims (Secured Portion), based upon the Valuation Analysis set forth in Exhibit E to this Disclosure Statement, the value of the Reorganized Debtors is less than the aggregate amount of the Claims held by the Prepetition Term Loan Lenders, which Prepetition Term Loan Claims are secured by substantially all assets of the Debtors.  Accordingly, the Prepetition Term Loan Claims are secured claims, but they are under-secured based on the current value of the Reorganized Debtors.  As a result, pursuant to section 506(a) of the Bankruptcy Code, the Prepetition Term Loan Claims must be bifurcated – they are secured claims to the extent of the value of their respective Collateral, but unsecured deficiency claims to the extent their Claims exceed the value of their respective Collateral.  In this Disclosure Statement and the Plan, the secured Claims portion of the Prepetition Term Loan Claims are defined as the "**Prepetition Term Loan Claims (Secured Portion)**" and the unsecured deficiency claims portion are defined as the "**Prepetition Term Loan Claims (Unsecured Deficiency Portion)**".  Therefore, solely for purposes of this Disclosure Statement and for voting on (but not calculating distributions under) the Plan, the Debtors have assumed the Allowed principal amount of such Claims are as set forth below:

- Prepetition Term Loan Claims (Secured Portion): $[162.9] million; and

xi

US-DOCS\115812051.19

- Prepetition Term Loan Claims (Unsecured Deficiency Portion): $[155.8] million.[7]

4.    **The Voting Record Date**

The Bankruptcy Court has approved August 20, 2020 as the voting record date (the "**Voting Record Date**") with respect to all Claims and Equity Interests.  The Voting Record Date is the date on which it will be determined: (a) which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and receive Solicitation Packages in accordance with the Disclosure Statement Order and (b) which Holders of Claims and Equity Interests in the Non-Voting Classes are entitled to receive the Confirmation Hearing Notice, including notice of such Holder's non-voting status, in accordance with the Disclosure Statement Order.

5.    **Contents of the Solicitation Package**

The following documents and materials will collectively constitute the Solicitation Package:

- a cover letter from the Debtors explaining the solicitation process and urging Holders of Claims in the Voting Classes to vote to accept the Plan;

- the Confirmation Hearing Notice, attached to the Disclosure Statement Order;

- this Disclosure Statement (and exhibits annexed thereto, including the Plan);

- the Disclosure Statement Order;

- to the extent applicable, a Ballot/Opt-Out Form and/or notice, appropriate for the specific creditor, in substantially the forms attached to the Disclosure Statement Order (as may be modified for particular classes and with instruction attached thereto); and

- such other materials as the Bankruptcy Court may direct.

6.    **Distribution of the Solicitation Package to Holders of Claims Entitled to Vote on the Plan**

With the assistance of the Voting and Claims Agent, the Debtors intend to distribute Solicitation Packages no later than August 24, 2020, and complete distribution as soon as reasonably practical thereafter (the "**Solicitation Mailing Date**").  The Debtors submit that the timing of such distribution will provide such Holders of Claims with adequate time within which to review the materials required to allow such parties to make informed decisions with respect to

---

7    To the extent the value of the Reorganized Debtors is ultimately determined to be lesser or greater than the value disclosed in the Valuation Analysis at the Confirmation Hearing, then the Allowed amount of the Prepetition Term Loan Claims (Secured Portion) and the Prepetition Term Loan Claims (Unsecured Deficiency Portion) will necessarily change as well.  In that case, promptly after conclusion of the Confirmation Hearing, the Debtors will update the Plan and file it with the Bankruptcy Court.  Thus, the Allowed amounts set forth above are merely for voting purposes under the Plan and should not be relied upon as evidence or proof of the final Allowed amount of such claims, which will only be known and determined after conclusion of the Confirmation Hearing.

US-DOCS\115812051.19

voting on the Plan in accordance with Bankruptcy Rules 3017(d) and 2002(b). The Debtors will make every reasonable effort to ensure that Holders who have more than one Allowed Claim in the Voting Classes receive no more than one Solicitation Package. If a Holder holds Claims in more than one Class and is entitled to vote in more than one Class, such Holder will receive separate Ballots/Opt-Out Forms which must be used for each separate Class of Claims.

7.    **Distribution of Notices to Holders of Claims in Non-Voting Classes and Holders of Disputed Claims**

As set forth above, certain Holders of Claims and Equity Interests are **not** entitled to vote on the Plan. As a result, such parties will not receive Solicitation Packages and, instead, will receive the appropriate form of notice as follows:

- Unimpaired Claims – Deemed to Accept. Administrative Claims, DIP Facility Claims, and Priority Tax Claims are unclassified, non-voting Claims, and Claims and Equity Interests in Classes 1, 2, 3, 4 and 9 are Unimpaired under the Plan and, therefore, are presumed to have accepted the Plan. As such, Holders of such Claims and Equity Interests will receive, in lieu of a Solicitation Package, an "Unimpaired Claims Notice" attached as Exhibit 4 to the Disclosure Statement Order.

- Impaired Claims – Deemed to Accept. Claims in Class 7 are Impaired. However, because the Holders of such Claims are Affiliates of the Debtors, the Holders of Claims in Class 7 will be conclusively deemed to have accepted the Plan. As such, Holders of Claims in Class 7 will not receive a Solicitation Package or any other form of notice.

- Impaired Claims – Deemed to Reject. Holders of Old Parent Interests in Class 8 are receiving no distribution under the Plan on account of such Equity Interests and, therefore, are conclusively presumed to reject the Plan.

- Disputed Claims.

  (a) Any Holder of a Claim for which the Debtors have filed an objection on or before August 21, 2020, whether such objection related to the entire Claim or a portion thereof, will not be entitled to vote on the Plan and will not be counted in determining whether the requirements of section 1126(c) of the Bankruptcy Code have been met with respect to the Plan. Such Holders will receive a "Notice of Non-Voting Status: Disputed Claims," attached as Exhibit 2 to the Disclosure Statement Order.

  (b) Any Holder of a Claim in any of the Voting Classes against the Debtors for which such Holder has timely filed a Proof of Claim (or an untimely Proof of Claim which has been allowed as timely by the Bankruptcy Court under applicable law on or before the Voting Record Date), which is marked as contingent, unliquidated, or disputed, and that is not subject to an objection filed by the Debtors, will have such Claim temporarily allowed for voting purposes only, and not for purposes of allowance or distribution, at $1.00. Such Holders will receive (a) a Solicitation Package that contains the applicable Ballot/Opt-Out Form, (b) a "Confirmation Hearing Notice," which notice informs such person or entity that its entire Claim

xiii

has been allowed temporarily for voting purposes only and not for purposes of allowance or distribution, at $1.00 and (c) a "Notice of Limited Voting Status to Holders of Contingent, Unliquidated or Disputed Claims for Which No Objection Has Been Filed by the Debtors," attached as Exhibit 7 to the Disclosure Statement Order.

(c)    Any Holder of a Claim in any of the Voting Classes against the Debtors for which such Holder has timely filed a Proof of Claim (or an untimely Proof of Claim which has been allowed as timely by the Bankruptcy Court under applicable law on or before the Voting Record Date), which is marked, in part, as contingent, unliquidated, or disputed, and that is not subject to an objection filed by the Debtors, will have such Claim temporarily allowed for voting purposes only, and not for purposes of allowance or distribution, in the non-contingent, liquidated, and non-disputed amount of the Claim.  Such Holders will receive (a) a Solicitation Package that contains the applicable Ballot/Opt-Out Form, (b) a "Confirmation Hearing Notice," which notice informs such person or entity that its entire Claim has been allowed temporarily for voting purposes only and not for purposes of allowance or distribution, in such non-contingent, liquidated, and non-disputed amount, and (c) a "Notice of Limited Voting Status to Holders of Contingent, Unliquidated or Disputed Claims for Which No Objection Has Been Filed by the Debtors," attached as Exhibit 7 to the Disclosure Statement Order.

If any Holder described in the preceding three subparagraphs disagrees with the Debtors' classification or status of its Claim, then such Holder MUST file and serve a motion requesting temporary allowance of its Claim solely for voting purposes in accordance with the procedures set forth in the Disclosure Statement Order.

- Contract and Lease Counterparties.  Parties to certain of the Debtors' Executory Contracts and Unexpired Leases may not have scheduled Claims or Claims based upon Proofs of Claim pending the disposition of their contracts or leases by assumption or rejection.  Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, to ensure that such parties nevertheless receive notice of the Plan, counterparties to the Debtors' Executory Contracts and Unexpired Leases will receive, in lieu of a Solicitation Package, a "Contract/Lease Party Notice" attached as Exhibit 5 to the Disclosure Statement Order.

8.    **Additional Distribution of Solicitation Documents**

In addition to the distribution of Solicitation Packages to Holders of Claims in the Voting Classes, the Debtors will also provide parties who have filed requests for notices under Bankruptcy Rule 2002 as of the Voting Record Date with this Disclosure Statement, Disclosure Statement Order and Plan.  Additionally, parties may request (and obtain at the Debtors' expense) a copy of this Disclosure Statement (and any exhibits thereto, including the Plan) by: (a) calling the Voting and Claims Agent at 877-429-7404 (US/Canada); 646-214-8836 (International); (b) writing to Libbey Glass Inc. Ballot Processing, c/o Prime Clerk LLC One Grand Central Place, 60 East 42nd

US-DOCS\115812051.19

Street, Suite 1440, New York, NY 10165 or (b) libbeyinfo@primeclerk.com; and/or (c) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/libbey/.  Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at http://www.deb.uscourts.gov.

9.     **Filing of the Plan Supplement**

The Debtors will file the Plan Supplement at least seven (7) days prior to the Plan Objection Deadline, or by September 14, 2020.  The Debtors will transmit a copy of the Plan Supplement to the Distribution List, as defined in this Section I.D.9.  Additionally, parties may request (and obtain at the Debtors' expense) a copy of the Plan Supplement by: (a) calling the Voting and Claims Agent at 877-429-7404 (US/Canada); 646-214-8836 (International); (b) writing to Libbey Glass Inc. Ballot Processing, c/o Prime Clerk LLC One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165 or (b) libbeyinfo@primeclerk.com; and/or (c) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/libbey/.  Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at http://www.deb.uscourts.gov.

The Plan Supplement will include all exhibits and Plan Schedules that were not already filed as exhibits to the Plan or this Disclosure Statement, all of which are incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, supplemented, or modified from time to time.

 As used herein, the term "**Distribution List**" means (a) the Office of the United States Trustee (the "**U.S. Trustee**"), (b) counsel to the Ad Hoc Term Lender Group, (c) counsel to the DIP Term Loan Agent and Prepetition Term Loan Agent, (d) counsel to the DIP ABL Agent and Prepetition ABL Agreement Agent, (e) Depository Trust Company (the "**Transfer Agent**"), (f) the Internal Revenue Service, (g) the Committee and counsel to the Committee, and (h) all parties that, as of the applicable date of determination, have filed requests for notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

E.     **VOTING PROCEDURES**

Holders of Claims entitled to vote on the Plan are advised to read the Disclosure Statement Order, which sets forth in greater detail the voting instructions summarized herein.

1.     **The Voting Deadline**

The Bankruptcy Court has approved 5:00 p.m. prevailing Eastern Time on September [21], 2020 as the Voting Deadline.  The Voting Deadline is the date by which all Ballots/Opt-Out Forms must be properly executed, completed and delivered to the Voting and Claims Agent in order to be counted as votes to accept or reject the Plan.

US-DOCS\115812051.19

2.    **Types of Ballots/Opt-Out Forms**

The Debtors will provide the following Ballots/Opt-Out Forms to Holders of Claims in the Voting Classes (i.e., Classes 5 and 6):

- "***Ballots/Opt-Out Forms***", the forms of which are attached to the Disclosure Statement Order as Exhibits 3-A and 3-B will be sent to Holders of Claims in Classes 5 and 6;

Each Ballot/Opt-Out Form will include an option for the applicable Holder of Claims to affirmatively opt out of the Third Party Release contained in Article X of the Plan.  Any party that opts out of the Third Party Release will not receive a Debtor Release or Third Party Release from the Releasing Parties.

3.    **Voting Instructions**

Under the Plan, Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan.  Those Holders may so vote by completing a Ballot/Opt-Out Form and returning it to the Voting and Claims Agent prior to the Voting Deadline. Each Ballot/Opt-Out Form will also allow Holders of Claims in the Voting Classes to opt-out of the Third Party Release set forth in Article X of the Plan.  Any Holder of Claims in the Voting Classes that opts out of the Third Party Release will not receive a Debtor Release or a Third Party Release from the Releasing Parties.

Where any portion of a single Claim has been transferred to a transferee, all Holders of any portion of such single Claim will be (i) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other voting and solicitation procedures set forth herein), and (ii) required to vote every portion of such Claim collectively to accept or reject the Plan.

---

**PLEASE REFER TO THE INSTRUCTIONS ATTACHED TO THE BALLOTS/OPT-OUT FORMS FOR MORE DETAILED INFORMATION REGARDING THE VOTING REQUIREMENTS, RULES AND PROCEDURES APPLICABLE TO VOTING YOUR CLAIM.**

---

**To be counted as votes to accept or reject the Plan, all Ballots/Opt-Out Forms (which will clearly indicate the appropriate return address) must be properly executed, completed, dated and delivered by following the instructions set forth on the Ballot/Opt-Out Form, so that they are actually received on or before the Voting Deadline by the Voting and Claims Agent.  If you have any questions on the procedures for voting on the Plan, please call the Voting and Claims Agent at: 877-429-7404 (US/Canada); 646-214-8836 (International).**

4.    **Voting Procedures**

This Disclosure Statement Order is accompanied by a Ballot/Opt-Out Form to be used for voting to accept or reject the Plan for those Holders of Claims entitled to vote to accept or reject the Plan.

US-DOCS\115812051.19

If you are a Holder of a Claim in Class 5 – Prepetition Term Loan Claims (Secured Portion) or Class 6 – General Unsecured Claims, you may vote to accept or reject the Plan by completing the Ballot/Opt-Out Form and returning it in the pre-addressed, postage pre-paid return envelopes provided, or via the Notice and Claims Agent's online balloting portal.

5.     **Tabulation of Votes**

---

**THE FOLLOWING IS IMPORTANT INFORMATION REGARDING VOTING THAT SHOULD BE READ CAREFULLY BY ALL HOLDERS OF CLAIMS IN THE VOTING CLASSES.**

---

- FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT/OPT-OUT FORM MUST BE PROPERLY EXECUTED, COMPLETED, DATED AND DELIVERED SUCH THAT IT IS **ACTUALLY RECEIVED** ON OR BEFORE THE VOTING DEADLINE BY THE VOTING AND CLAIMS AGENT.

- A HOLDER OF A CLAIM MAY CAST ONLY ONE VOTE PER EACH CLAIM SO HELD. BY SIGNING AND RETURNING A BALLOT/OPT-OUT FORM, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS/OPT-OUT FORMS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS/OPT-OUT FORMS HAVE BEEN CAST WITH RESPECT TO SUCH CLAIM, SUCH EARLIER BALLOTS/OPT-OUT FORMS ARE THEREBY SUPERSEDED AND REVOKED.

- **ANY BALLOT/OPT-OUT FORM THAT IS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED TOWARD CONFIRMATION OF THE PLAN UNLESS THE DEBTORS HAVE GRANTED AN EXTENSION OF THE VOTING DEADLINE IN WRITING WITH RESPECT TO SUCH BALLOT/OPT-OUT FORM.**

- **ADDITIONALLY, THE FOLLOWING BALLOTS/OPT-OUT FORMS WILL NOT BE COUNTED:**

  o     any Ballot/Opt-Out Form that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

  o     any Ballot/Opt-Out Form cast by or on behalf of an entity that does not hold a Claim in one of the Voting Classes;

  o     any Ballot/Opt-Out Form cast for a Claim listed in the Schedules as contingent, unliquidated or disputed for which the applicable bar date has passed and no proof of claim was timely filed;

  o     any Ballot/Opt-Out Form that (a) is properly completed, executed and timely filed, but does not indicate an acceptance or rejection of the Plan, or (b)

xvii

indicates both an acceptance and rejection of the Plan, or (c) partially accepts and partially rejects the Plan;

o   any Ballot/Opt-Out Form cast for a Claim that is subject to an objection pending as of the Voting Record Date (except as otherwise provided in the Disclosure Statement Order);

o   any Ballot/Opt-Out Form sent to the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent), or the Debtors' financial or legal advisors;

o   any Ballot/Opt-Out Form transmitted by facsimile, telecopy or electronic mail;

o   any unsigned Ballot/Opt-Out Form, provided that Ballots/Opt-Out Forms submitted via E-Ballot will be deemed to contain a signature; or

o   any Ballot/Opt-Out Form not cast in accordance with the procedures approved in the Disclosure Statement Order.

F.   **CONFIRMATION OF THE PLAN**

1.   **The Confirmation Hearing**

The Confirmation Hearing will take place on October [1], 2020 before the Honorable Laurie Selber Silverstein, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street North, 3rd Floor, Wilmington, DE 19801, and such hearing shall be conducted either by teleconference or videoconference via CourtCall and/or Zoom.  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

2.   **The Deadline for Objecting to Confirmation of the Plan**

The Plan Objection Deadline is September [21], 2020.  Any objection to confirmation of the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim or Equity Interest of such Entity; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Plan Objection Deadline by the parties set forth below (the "**Notice Parties**").

xviii

(a) <u>Counsel to the Debtors</u>, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022-4834 (Attn: George Davis (George.davis@lw.com); Keith Simon (Keith.simon@lw.com); David Hammerman (David.hammerman@lw.com); Anu Yerramalli (Anu.yerramalli@lw.com); Madeleine C. Parish (Madeleine.Parish@lw.com)) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: John H. Knight (Knight@RLF.com) (No. 3848); Russell C. Silberglied (Silberglied@RLF.com) (No. 3462); Paul N. Heath (Heath@RLF.com) (No. 3704); Zachary I. Shapiro (Shapiro@rlf.com) (No. 5103));

(b) <u>Counsel to the Ad Hoc Term Lender Group, DIP Term Loan Agent and Prepetition Term Loan Agent</u>, Arnold & Porter Kaye Scholer LLP, 70 West Madison Street, Suite 4200 Chicago, Illinois 60602 and 250 W. 55th Street New York, NY 10019-9710 (Attn: Michael D. Messersmith (Michael.Messersmith@arnoldporter.com); Seth J. Kleinman (Seth.Kleinman@arnoldporter.com); Sarah Gryll (Sarah.Gryll@arnoldporter.com); Lucas B. Barrett (Lucas.Barrett@arnoldporter.com)) and Young Conaway Stargatt & Taylor, LLP, Rodney Square 1000 North King Street Wilmington, Delaware 19801 (Attn: M. Blake Cleary (mbcleary@ycst.com); Kenneth J. Enos (kenos@ycst.com));

(c) <u>Counsel to the DIP ABL Agent and Prepetition ABL Agreement Agent</u>, Goldberg Kohn Ltd., 55 East Monroe, Suite 3300 Chicago, Illinois (Attn: Dimitri G. Karcazes, Esq. (Dimitri.Karcazes@goldbergkohn.com); Joseph D. Zizzo, Esq. (joseph.zizzo@goldbergkohn.com); Prisca M. Kim, Esq. (prisca.kim@goldbergkohn.com); Jenna A. Ward, Esq. (Jenna.Ward@goldbergkohn.com); Nicole P. Bruno, Esq. (Nicole.Bruno@goldbergkohn.com)) and Womble Bond Dickinson (US) LLP, 1313 North Market Street, Suite 1200, Wilmington, Delaware 19801 (Attn: Matthew P. Ward, Esq. (matthew.ward@wbd-us.com); Morgan L. Patterson, Esq. (morgan.patterson@wbd-us.com));

(d) <u>The Office of the U.S. Trustee</u>, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Benjamin A. Hackman, Esq. (Benjamin.A.Hackman@usdoj.gov)); and

(d) <u>Counsel to the Committee</u>, Brown Rudnick LLP, Seven Times Square, New York, NY 10036 (Attn: Andrew Carty (acarty@brownrudnick.com); Robert J. Stark (rstark@brownrudnick.com); and Uriel Pinelo (upinelo@brownrudnick.com)) and Bayard P.A., 600 North King Street, Suite 400, Wilmington, Delaware 19801 (Attn: Neil B. Glassman (nglassman@bayardlaw.com); Scott D. Cousins (scousins@bayardlaw.com); Erin R. Fay (efay@bayardlaw.com); and Sophie E. Macon (smacon@bayardlaw.com)).

CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

3.    **Effect of Confirmation of the Plan**

<u>Article X</u> of the Plan contains certain provisions relating to (a) the compromise and settlement of Claims, (b) the release of the Released Parties by the Debtors and certain Holders of Claims, and each of their respective Related Persons, and (c) exculpation of certain parties.  **It is**

xix

US-DOCS\115812051.19

**important to read such provisions carefully so that you understand the implications of these provisions with respect to your Claim such that you may cast your vote accordingly**.

THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

### G.    CONSUMMATION OF THE PLAN

It will be a condition to confirmation of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article IX of the Plan.  Following confirmation, the Plan will be consummated on the Effective Date.

### H.    RISK FACTORS

**PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN SECTION VI HEREIN TITLED, "PLAN-RELATED RISK FACTORS."**

## II.
## BACKGROUND TO THE CHAPTER 11 CASES

**A.    THE DEBTORS' CORPORATE HISTORY AND STRUCTURE**

The Company was originally founded as the New England Glass Company in 1818 in East Cambridge, Massachusetts.   In 1888, Edward Drummond Libbey moved the Company's operations to Toledo, Ohio, and in 1935, the Company was acquired by the Owens-Illinois Glass Company.   Parent and Libbey Glass were incorporated in Delaware in 1987, and in 1993, the Company was spun off from Owens-Illinois through an initial public offering on the New York Stock Exchange.   As of the Petition Date, the Company is a public company and files annual and quarterly reports with, and furnishes other information to, the SEC.   Prior to the Petition Date, the Parent's common stock was traded on the New York Stock Exchange American under the ticker symbol LBY.   On the Petition Date, the NYSE American suspended trading in the Parent's common stock and notified the Parent of its intent to file an application with the SEC to delist the Parent's common stock from the NYSE American. Such application on Form 25 was filed on June 10, 2020 and the delisting officially became effective on June 22, 2020. Since June 2, 2020, the Parent's common stock has been quoted on the OTC Pink marketplace maintained by the OTC Markets Group, Inc. under the symbol "LBYYQ."

The following is a chart illustrating the Company's organizational structure as of the Petition Date.



1.   Owns factories in Ohio and Louisiana and distribution center in Texas.
2.   Owns factory in Mexico.  Mexican subsidiaries owned by a combination of Netherlands subsidiaries.
3.   Owns factory in Netherlands.
4.   Owns factory in Portugal.

US-DOCS\115812051.19

**B.** **OVERVIEW OF THE DEBTORS' BUSINESSES**

The Company is a global leader in the design, production and sale of tableware and other products. Headquartered in Toledo, Ohio, the Company produces glass tableware in five countries and sells to customers in over 100 countries. Under their Libbey®, Libbey Signature®, Master's Reserve®, Crisa®, Royal Leerdam®, World Tableware®, Syracuse China® and Crisal Glass® brand names (among others), the Company designs and markets an extensive line of high-quality glass tableware, ceramic dinnerware and metal flatware for sale primarily in the foodservice, retail and business-to-business channels of distribution.

The Company owns and manufactures glass tableware and other products at two manufacturing plants in the United States as well as at plants in Mexico, the Netherlands, Portugal and China. In addition, the Company sources glass tableware, ceramic dinnerware, metal flatware, buffetware and other products globally in order to complement its line of manufactured items. The combination of manufacturing and procurement allows the Company to compete in the global tabletop market by offering an extensive product line at competitive prices. The Company believes its glass tableware manufacturing, distribution and service network is the largest in the Western Hemisphere and is among the largest in the world.

1.      Manufacturing and Sourcing

As of the Petition Date, the Company owns and operates three glass manufacturing plants in North America, two of which are located in the United States (one in Toledo, Ohio, and one in Shreveport, Louisiana) and one of which is located in Monterrey, Mexico. In Europe, the Company owns and operates two glass tableware manufacturing plants, one in Leerdam, the Netherlands, and the other in Marinha Grande, Portugal. In Asia, the Company owns and operates a glass tableware production facility in Langfang, China.

The manufacturing of the Company's tableware products involves the use of automated processes and technologies, as well as manual production. The Company designs much of its glass tableware production machinery, and continuously refines such machinery to incorporate technological advances. The Company believes that its production machinery and equipment will be adequate for its needs for the foreseeable future, but continues to invest to further improve its products, gain production efficiencies and reduce its cost profile.

The Company's glass tableware products are generally produced using one of two manufacturing methods, commonly referred to as "blown" or "pressed." In the case of certain stemware, the Company may use a combination of these methods. Most of the Company's tumblers, stemware and other glass tableware products are "blown," meaning that they are produced by forming molten glass in molds with the use of compressed air. The Company's other glass tableware products and the stems of certain stemware are "pressed," meaning that they are produced by pressing molten glass into the desired product shape.

To assist in the manufacturing process, the Company employs a team of engineers whose responsibilities include efforts to improve and upgrade the Company's manufacturing facilities, equipment and processes. In addition, this team provides engineering required to manufacture

US-DOCS\115812051.19

new products and implement the large number of innovative changes continuously being made to the Company's product designs, sizes and shapes

2.    Products

The Company's tabletop product portfolio consists of an extensive line of high quality, machine-made glass tableware, including casual glass beverageware, in addition to ceramic dinnerware and metal flatware.  In addition to glassware products that the Company produces at its six manufacturing facilities, the Company's products include glass tableware, ceramicware, metalware, handmade glass tableware and other tabletop products that the Company sources globally, primarily from the Asia-Pacific region.

The Company's glass tableware include products such as tumblers, stemware, mugs, bowls, shot glasses, canisters, candleholders and other items.  Other glass products include candle jars, vases, storageware, serveware, bakeware and components such as blender jars and mixing bowls sold to original equipment manufacturers (OEMs).

The Company also offers a wide range of ceramic dinnerware products, including plates, bowls, platters, cups, saucers and other tabletop accessories, as well as an extensive selection of metal flatware, including knives, forks, spoons and serving utensils.

With the exception of certain products sold at the Company's two factory outlet stores and certain decorated products governed by the Company's Consent Judgment (as defined below), the Company does not sell any products containing lead.  Silica dioxide (in the form of sand) is one of the primary raw materials of the Company's glass composition.  The silica dioxide and other raw materials are combined, melted, formed and cooled in the glassware production process. The resulting glass is non-crystalline and non-respirable. Glass is classified by the FDA as a GRAS ("**Generally Recognized as Safe**") Substance.

Certain products manufactured and/or sold by the Company bear a California proposition 65 warning.  In addition, Libbey Glass Inc. is party to a consent judgment in *Leeman v. Arc Intn'l North Am. Inc.* et al., San Francisco Superior Court Consolidated Case No. CGC-03-418025 (the "**Consent Judgment**").   Under the Consent Judgment, externally decorated glass tableware products that the Company sells must meet certain standards related to lead and cadmium in order to comply with the requirements of Proposition 65.  For products covered by the Consent Judgment, the Company can no longer comply with Proposition 65 by warning.  The Company is not party to any lead- or silica-based litigation.

The Debtors maintain general and products liability insurance with coverage limits of $10,000,000 in the aggregate and $1,000,000 per occurrence, subject to a self-insured retention of $200,000 per occurrence. In addition, the Debtors maintain umbrella liability insurance with coverage limits of $100,000,000 per occurrence and in the aggregate.

3.    Sales, Marketing and Distribution

The Company sells its products in over 100 countries around the world.   In 2019, approximately 78 percent of the Company's sales were to customers located in North America (U.S., Canada and Mexico), and approximately 22 percent of the Company's sales were to

23

customers in other countries.  The Company employs its own sales force to market to customers and distributors.  In addition, the Company occasionally retains the services of manufacturers' representative organizations to assist in selling its products.  The Company has marketing staff located at its corporate headquarters in Toledo, Ohio, and in its Columbus, Ohio office, as well as in Mexico, Portugal, the Netherlands and China.

The Company operates distribution centers at or near each of its manufacturing facilities.  In addition, the Company operates distribution centers in Laredo, Texas and West Chicago, Illinois, and the Company has contracts with third-party logistics providers to service a portion of the Company's direct-to-consumer e-commerce business.  The Company's warehouse and distribution centers are strategically located to enable its to supply significant quantities of its products to customers on a timely and cost-effective basis.

The Company's sales, cash flow and operating income tend to be stronger in the last three quarters of each year and weaker in the first quarter of each year, primarily due to the impact of consumer buying patterns and production activity.  The Company typically builds inventory during the first half of the year to allow for optimal customer service and timely delivery in the second half of the year, a higher demand period when orders may exceed short-term production capabilities.  The Company also builds inventory to service customers during periods of planned downtime for furnace rebuilds or maintenance, as well as to maintain an appropriate level of safety stock of items that the Company sources primarily from the Asia Pacific region and that, as a result, require longer lead times.

The majority of the Company's sales and revenue in the United States and Canada are in the foodservice, retail and business-to-business channels.  Each channel has a different marketing strategy, customer base and product composition.  In Latin America and in Europe, the Middle East and Africa (EMEA), the majority of the Company's revenue is derived from the retail and business-to-business channels.

        (a)     <u>Foodservice</u>

The Company believes it maintains a leading market share in glass tableware sales in the U.S. and Canadian foodservice channel, placing the Company among the leading glass tableware foodservice suppliers around the globe.  The majority of the Company's tabletop products sold in the foodservice channel are sold through a network of foodservice distributors.  The Company's strong foodservice distributor network and in-house sales force provide broad coverage to a wide variety of foodservice establishments, including restaurants, bars, hotels, other travel and tourism venues, and healthcare facilities.  A high percentage of foodservice sales are replacements, historically driving a relatively predictable revenue stream.

Over the past few years, the Company has seen more customers in the U.S. and Canada turning to web-based distribution, particularly when ordering replacement products after the original installation.  The Company is leveraging its digital and e-commerce experience and capabilities developed in the retail channel to help its foodservice distribution customers adapt to this changing environment and meet this demand.  In 2019, the Company developed a new foodservice website to provide end users and distributors quicker visibility into the Company's product offerings.  In addition, the Company reconfigured its sales force in 2018 and 2019 to

24

increase focus on the healthcare industry (with a particular focus on the senior living segment of that industry) and hospitality.

(b)     <u>Retail</u>

The Company's primary customers in the retail channel include mass merchants, department stores, national retail chains, pure play e-commerce retailers or marketers, retail and wholesale distributors, value-oriented retailers, grocers and specialty housewares stores in the U.S. and around the globe. The Company believes it maintains a leading share of the U.S. retail market for glass beverageware. The Company's relationships with major retailers, particularly in the U.S. & Canada, Latin America and EMEA regions, position the Company to successfully introduce differentiated new retail products to pursue increased market share and profitability. The Company also operates outlet stores in the U.S., Mexico and Portugal and makes sales via internet retailers.

(c)     <u>Business-to-Business</u>

The Company supplies glass tableware to the business-to-business channel of distribution. The Company's customers for products sold in the business-to-business channel in the U.S. & Canada and Latin America include drink companies and custom decorators of glassware for promotional purposes and resale, as well as producers of products for candle and floral applications. In addition, the Latin America segment sells blender jars and various OEM products in this channel. The craft industries and gourmet food-packing companies are also among the Company's business-to-business glassware customers. In Europe, the Company's customers in the business-to-business channel include marketers who decorate the Company's glassware with company logos and resell these products to large breweries and distilleries, which redistribute the glassware for promotional purposes and resale.

4.     **Patents, Trademarks and Licenses**

Based upon market research and surveys, the Company believes that its trade names and trademarks, as well as its product shapes and styles, enjoy a high degree of consumer recognition. The Company believes that the Libbey®, Libbey Signature®, Master's Reserve®, Master's Gauge®, Syracuse China®, World Tableware®, Crisa®, Royal Leerdam® and Crisal Glass® trade names and trademarks are material to their business.

5.     **Employees**

The Debtors and Non-Debtors collectively employed 5,543 persons as of the Petition Date. Approximately 70 percent of the Company's employees are employed outside the United States.

The unprecedented COVID-19 pandemic (defined and described in more detail below) has had a significant impact on the Debtors' workforce and resulted in the temporary furlough or lay-off of certain employees in the United States, the temporary reduction of employee salaries in the United States by between 10% and 25% depending on salary and position, and the suspension of the Debtors' salaried 401(k) matching program. A limited number of furloughed employees have begun to return to the plants and retail stores as restrictions are beginning to be lifted.

As of the Petition Date, inclusive of the furloughed employees and laid-off employees, the Debtors' workforce consists of approximately 1,752 employees worldwide (excluding non-employee directors), of whom approximately 1,743 are located in the United States, and approximately six are located in Canada and one each in Singapore, Australia, and China.

The majority of the Debtors' U.S. employees are paid hourly and covered by four local collective bargaining agreements in Toledo, Ohio and one in Shreveport, Louisiana (described further below).  In addition, some of the Debtors' employees have the benefit of certain defined benefit pension plans and retiree medical and life insurance programs, described in further detail below.

 (a) Collective Bargaining Agreements

The following chart sets forth the Debtors' Collective Bargaining Agreements (the "**CBAs**") and their respective expiration dates:

| Union | Affiliation | Libbey Entity | Term |
|---|---|---|---|
| *Toledo, Ohio* | | | |
| **Local 700T** | United Steelworkers AFL-CIO-CLC | Libbey Glass Inc. | Oct. 2019 -Sept. 2022 |
| **Local 65T** | United Steelworkers AFL-CIO-CLC | Libbey Glass Inc. | Oct. 2019 -Sept. 2022 |
| **Lodge 105** | International Association of Machinists and Aerospace Workers | Libbey Glass Inc. | Oct. 2019 -Sept. 2022 |
| **Local 59M** | United Steel, Paper, Forestry, Rubber and Manufacturing International | Libbey Glass Inc. | Oct. 2019 -Sept. 2022 |
| *Shreveport, Louisiana* | | | |
| **Local 711T** | United Steelworkers AFL-CIO | Libbey Glass Inc. | Dec. 2017-Dec. 2020 |

 (b) Defined Benefit Pension Obligations

Certain of the U.S. employees are eligible to participate in either a Salaried Employee pension plan (the "**US Salaried Pension Plan**") or an Hourly Employee pension plan (the "**US Hourly Pension Plan**", and together, the "**US Pension Plans**").  However, the US Pension Plans were closed to new participants for: (i) US Salaried Employees hired on or after January 1, 2006; (ii) Union US Hourly Employees at the Shreveport Plant hired on or after December 16, 2008; and (iii) Union US Hourly Employees at the Toledo Plant hired on or after October 1, 2010.  Future benefit accruals under the US Salaried Pension Plan were frozen effective January 1, 2013.  The US Hourly Pension Plan was approximately 97% funded for the 2019 plan year and does not have payments due until 2025 and the US Salaried Pension Plan was fully funded.

 (c) Other Retiree Obligations

The Debtors have historically provided certain eligible employees with medical benefits and life insurance after retirement.  The retiree benefit program has approximately 3,100 union and salaried participants in aggregate, of which 2,100 are in payment status (*i.e.*, retired) and approximately 1,000 are in active status (*i.e.*, currently employed).  Of that population, there are approximately 2,200 hourly participants, including 700 in active status.  Retirees under the age of 65 pay a monthly premium towards the cost of coverage under a PPO Plan, the amount of which

is dependent in part on the amount of coverage elected (single, single +one, family) and whether certain annual average costs per participant exceed set cost sharing thresholds.  For hourly retirees, the premium and cost sharing thresholds are set under the applicable CBAs.  For salaried retirees, the premiums and cost sharing thresholds depend on retirement date and years of service.  Hourly retirees above the age of 65 receive an annual stipend of $600 per covered person.  Salaried retirees above the age of 65 are eligible to enroll in a supplemental retiree health reimbursement account through the Company providing $300 per covered person annually.  The retiree benefit plans have been closed to new participants for more than ten years.  As of December 31, 2019, the Debtors' liability under the retiree benefit programs for both salaried and hourly employees is approximately $48 million and the liability is unfunded.  The Debtors incurred a cash cost of $4.4 million in 2019 with approximately $4.2 million attributable to hourly workers.  The approximate cash cost for 2020 for the Debtors is expected to be $3.8 million with $3.2 million attributable to hourly workers.[8]

### 6.    **Properties**

As of the Petition Date, the Company's global manufacturing, warehousing and distribution facilities have an aggregate floor space of 7.1 million square feet.  As of the Petition Date, the Company owns approximately 65 percent and leases approximately 35 percent of this floor space.  In addition, the Company's headquarters in Toledo, Ohio, office space for members of the marketing, digital and e-commerce team in Columbus, Ohio, some warehouses in various locations, sales offices in various locations, showrooms in Chicago, Illinois, New York, New York and Toledo, Ohio and various outlet stores are located in leased space.  The Company also uses various warehouses as needed on a month-to-month basis.

## C.    **PREPETITION INDEBTEDNESS**

### 1.    **Prepetition ABL Facility**

Libbey Glass and Libbey Europe B.V. ("**Libbey Europe**") are borrowers under the Prepetition ABL Agreement, with JPMorgan Chase Bank, N.A. as administrative agent with respect to the US Loans (as defined in the Prepetition ABL Agreement), and J.P. Morgan Europe Limited as administrative agent with respect to the Netherlands Loans (as defined in the Prepetition ABL Agreement), and the lenders party thereto from time to time (the "**Prepetition ABL Facility**").  Each of the Debtors is a guarantor of Libbey Glass's and Libbey Europe's borrowings while certain Dutch Non-Debtor entities are guarantors of Libbey Europe's borrowings under the Prepetition ABL Agreement.

The Prepetition ABL Facility provides for borrowings of up to $100.0 million, subject to certain borrowing base limitations, reserves and outstanding letters of credit.  The borrowing base under the Prepetition ABL Facility is determined by a monthly analysis of the eligible accounts receivable and inventory.  As of the Petition Date, the Debtors had $66.9 million of outstanding borrowings under the Prepetition ABL Facility and $9.4 million in letters of credit and $5.6 million of other reserves, and a borrowing base of $83.1 million, resulting in $1.4 million of unused

---

[8]    The Company has additional retiree obligations associated with its Canadian workforce that are paid by the U.S. Debtors and reconciled with an intercompany charge to the Canadian entities.

US-DOCS\115812051.19

availability. The interest rate on the Prepetition ABL Facility borrowings was the Eurocurrency (as defined in the Prepetition ABL Facility) rate plus 1.50 percent as of the Petition Date. In addition, the Prepetition ABL Facility Obligations include approximately $22 million under the JP Morgan Swap (defined below) and the Fifth Third Swap (defined below) as well as other commodity hedging obligations described further below.

All borrowings under the Prepetition ABL Facility are secured by:

- a first-priority security interest in:

  - substantially all of the existing and future current assets (including, without limitation, inventory and A/R) and proceeds thereof of Libbey Glass and its domestic subsidiaries;

  - 100% of the stock of Libbey Glass and 100% of the stock of substantially all of Libbey Glass's present and future direct and indirect domestic subsidiaries;

  - 100% of the non-voting stock of substantially all of Libbey Glass's first-tier present and future foreign subsidiaries;

  - 100% of the voting stock of substantially all of Libbey Glass's first-tier present and future foreign subsidiaries; and

  - substantially all proceeds and products of the property and assets described above (collectively, the "**Prepetition ABL Priority Collateral**");

- a second-priority security interest in substantially all of the owned real property, equipment and fixtures in the United States of Libbey Glass and its domestic subsidiaries, subject to certain exceptions and permitted liens ("**Prepetition Term Loan Priority Collateral**").

Additionally, borrowings by Libbey Europe under the Prepetition ABL Facility are secured by a first-priority security interest in:

- substantially all of the existing and future real and personal property of Libbey Europe and its Dutch subsidiaries;

- 100% of the stock of Libbey Europe and 100% of the stock of substantially all of the Dutch Non-Debtor entity subsidiaries; and

- 100% (or a lesser percentage in certain circumstances) of the outstanding stock issued by the first-tier foreign subsidiaries of Libbey Europe and its Dutch Non-Debtor subsidiaries.

The Prepetition ABL Facility matures on December 7, 2022. However, in the event that the Prepetition Term Loans (as defined below) are not refinanced by January 9, 2021, the Prepetition ABL Facility's springing maturity date becomes effective and the Prepetition ABL Facility matures on such date.

US-DOCS\115812051.19

(a)     The Swaps

Libbey Glass was party to two interest rate swap transactions, one opposite JPMorgan Chase Bank, N.A. (the "**JP Morgan Swap**") and one opposite Fifth Third Bank (the "**Fifth Third Swap**"), each with a trade date of September 24, 2018.  Under each interest rate swap transaction, Libbey Glass made fixed rate payments to the applicable counterparty and received floating LIBOR payments from the applicable counterparty on the 9th day of each month.  The effective date of each interest rate swap transaction was January 9, 2020 and the termination date was January 9, 2025.  Each swap was governed by an ISDA Master Agreement that references the Prepetition ABL Facility, and each ISDA Master Agreement provides that the obligations under the ISDA Master Agreements, including, as applicable, the JP Morgan Swap and the Fifth Third Swap, are secured obligations under the Prepetition ABL Facility in the aggregate amount of approximately $22 million, as noted above.  Libbey Glass Inc. was also party to a series of commodity hedge transactions with three secured parties under the Prepetition ABL Agreement (JPM, Fifth Third Bank and Citibank, N.A.).  Similar to the swaps described above, these commodity hedge agreements are governed by ISDA Master Agreements that reference the Prepetition ABL Facility, and each ISDA Master Agreement provides that the obligations under the ISDA Master Agreements, including, as applicable, the commodity hedge transactions, are secured obligations under the Prepetition ABL Facility.

(b)     The Forbearance Agreement

Contemporaneous with the filing of these Chapter 11 Cases, the Prepetition ABL Lenders and, among others, Libbey Europe and other Non-Debtor foreign Dutch affiliates entered into a forbearance agreement whereby the Prepetition ABL Lenders agreed to forbear from exercising their rights and remedies against such entities under the Prepetition ABL Agreement against the Non-Debtors as the result of the Debtors' commencement of these Chapter 11 Cases.

2.     **Prepetition Term Loan**

Libbey Glass is the borrower under the Prepetition Term Loan Credit Agreement, with Cortland Capital Market Services LLC, as administrative agent and collateral agent, (as successor agent to Citibank, N.A.), and the lenders party thereto from time to time.  Each of the other Debtors is a guarantor of the loans under the Prepetition Term Loan Credit Agreement (the "**Prepetition Term Loans**").  The Prepetition Term Loans mature on April 9, 2021.  Neither Libbey Europe nor any of the other foreign Non-Debtor Affiliates are an obligor or guarantor under the Prepetition Term Loan Credit Agreement.  The Prepetition Term Loans and the related guarantees under the Prepetition Term Loan Credit Agreement are secured by (i) first priority liens on the Prepetition Term Loan Priority Collateral and (ii) second priority liens on the Prepetition ABL Priority Collateral as set forth in that certain Intercreditor Agreement, dated April 9, 2014, as amended on April 30, 2020.

As of the Petition Date, the principal amount of Prepetition Term Loans outstanding was approximately $377.9 million.  The Prepetition Term Loans bear interest at the rate of LIBOR plus 3.0 percent, subject to a LIBOR floor of 0.75 percent.

29

3.     **Other Unsecured Debt/Trade Debt**

In the ordinary course, the Debtors incur trade debt with certain vendors and suppliers in connection with the operation of their business.  In addition, the Debtors have other potential and contingent liabilities related to litigation, pension, employee obligations, and real estate, certain of which are described herein.  The Debtors believed that, as of the Petition Date, their obligations related to unsecured trade debt are in excess of $35 million.

**D.     EVENTS LEADING TO THE CHAPTER 11 FILING**

1.     **Challenges Facing the Debtors' Business and Impact on Debtors.**

(a)     General Background

In early 2019, the Debtors' board of directors and management team began evaluating their capital structure due to the scheduled maturity of the Prepetition Term Loans in April 2021 and the springing maturity of the Prepetition ABL Facility in January 2021 if the Prepetition Term Loans were not previously refinanced.  On February 18, 2019, the Parent's board of directors (the "**Board of Directors**") also approved a plan to pursue strategic alternatives with respect to the Company's business in China, including the potential sale or closure of the Company's manufacturing and distribution facility located in Langfang, China within 12 to 18 months, in order to better focus on the Company's core markets.

As a result of a significant reduction to the trading price of the Company's common stock, the Company determined that a triggering event had occurred requiring it to perform interim impairment tests of goodwill and other intangible assets as of June 30, 2019.  During the second quarter of 2019, the Company updated its long-range plan which indicated lower sales and profitability within the Mexico reporting unit as compared to the projections used in prior goodwill impairment testing, and as a result the Company recorded a non-cash impairment charge of $46.0 million during the second quarter of 2019.

Additionally, throughout 2019 management worked to reduce costs and improve cash flows to help offset some of these issues.  Specifically as announced in August 2019, the Company executed on an organizational realignment plan that focused on transformational actions and structural changes to create a simplified organization structure to reduce costs.

In the fall of 2019, the Company engaged an investment bank to lead an effort to refinance the Prepetition Term Loans with high-yield notes first and thereafter with preferred equity in order to address the upcoming maturities.  These efforts were unsuccessful and abandoned in the first quarter of 2020.

During 2019 and continuing into the first quarter of 2020, the Company also explored other strategic transactions involving the Company's EMEA operations, as well as the Company as a whole, however such strategic transactions did not advance.

30

With no deleveraging transaction materializing, the Company began working with Latham & Watkins LLP ("**Latham**"), its corporate counsel, in late 2019 and retained Lazard & Frères, & Co. LLC ("**Lazard**"), its investment banker advisor, in January 2020 to evaluate all restructuring options.

For the year ended December 31, 2019, the Company incurred a net loss of $69.0 million, compared to a net loss of $8.0 million in the prior year, of which $65.2 million was attributed to non-cash impairment charges in the Company's Latin America and EMEA segments, while total revenues were down just $16.0 million over the same period.

Throughout 2019 and the start of 2020, the Debtors' business was impacted by global competition in all of the Debtors' distribution channels, fluctuating business and consumer confidence in the United States and Europe as a result of increased economic and political uncertainty from various factors including ongoing trade tensions between the United States and China and the potential for a Brexit no-deal in Europe, as well as slowing economies in Europe, China and parts of Latin America. Other factors impacting the Debtors' business during 2019 and the start of 2020 were continued declines in United States and Canada foodservice traffic with take-out and delivery increasing in popularity relative to in-restaurant dining; continued migration of consumer purchasing from brick-and-mortar stores to online commerce, particularly in the United States, Canada and Europe; shifting consumer preferences in Europe from mid-tier retailers (where sales of the Company's Royal Leerdam® products have been concentrated) to discounters; and increased competitive pressures in Latin America, as Chinese manufacturers divert sales of their products from the U.S. market to Latin America in order to avoid the increased tariffs imposed by the United States on Chinese imports.

The competitive pressures in China and Mexico in 2019 persisted into the beginning of 2020. With these challenges in mind, the Company published guidance for the 2020 fiscal year, excluding any impact from the pandemic of coronavirus disease 2019 ("**COVID-19**"), which at the time was highly uncertain, expecting net sales to be flat or to increase in the low-single digits as compared to the 2019 fiscal year. The Company's performance in January and February of 2020 outpaced management's 2020 operating plan.

Nevertheless, as part of the Debtors' on-going assessment of its goodwill at March 31, 2020, the Debtors determined that a triggering event occurred due to a significant reduction in demand during the quarter and the high level of macroeconomic uncertainty in the near-term. Additionally, the Debtors' low share price and lower trading value of certain debt underlying the Prepetition Term Loan Credit Agreement caused valuation limitations. Thus, an interim impairment test was performed as of March 31, 2020. As the impairment testing indicated that the carrying value of the U.S. and Canada reporting unit exceeded its fair value, the Debtors recorded a non-cash impairment charge of $38.4 million during the first quarter of 2020. After recording the impairment charge, there was no longer any goodwill on the balance sheet.

As a result of the volatile conditions the Debtors experienced in the first quarter of 2020, the Debtors' net sales were $150.5 million, 14.0 percent lower than the prior-year quarter, or 13.2 percent lower on a constant currency basis. The reduction in net sales was driven by lower volume, and unfavorable impacts from channel mix and currency, partially offset by favorable price and mix of product sold. The Debtors recorded a net loss of $78.7 million for the three months ended

31

March 31, 2020, compared to a net loss of $4.5 million in the prior-year quarter. The $74.2 million increase in net loss for the current quarter was primarily driven by a $38.4 million non-cash goodwill impairment charge in the Debtors' U.S. and Canada segment, an additional $21.7 million of income tax expense primarily due to recording valuation allowances against net deferred tax assets in all jurisdictions, and $12.9 million of loss on derivatives de-designated as hedging instruments. In addition, the Debtors experienced reduced profitability throughout the Company as a result of COVID-19 related closures of manufacturing and distribution operations and demand reductions; the negative impacts on the Debtors' sales margins and manufacturing activity were partially offset by lower selling, general and administrative spend as a result of controlled spending.

The above information regarding the Debtors' goodwill impairment charges was announced in the Debtors' Quarterly Report on Form 10-Q, filed with the SEC on June 19, 2020.

2.    **Impact of COVID-19 Pandemic**

As COVID-19 swept from China to Europe and eventually the United States, the Company saw an abrupt and sharp decline in revenue in mid-March. In advance of this decline, on March 3, 2020, Moody's Investors Service ("**Moody's**") downgraded Libbey Glass Inc.'s corporate family rating from B3 to Caa2, downgraded the Company's Prepetition Term Loans from B3 to Caa2, and changed the Company's outlook from stable to negative. Moody's stated the downgrades and negative outlook reflected the increasing risk of constrained liquidity as the Prepetition Term Loans become current in April 2020 and heightened risk of a debt restructuring. Similar actions were also taken by Standard & Poors Financial Services LLC ("**S&P**").

Due to the intensifying impact of COVID-19, the Company withdrew its previously announced 2020 guidance on March 19, 2020 citing the rapidly changing economic environment and impact on demand caused by the virus as discussed further below. On that date, the Company announced that the Company's facilities in both Toledo and Louisiana had halted production, and the Company had closed its two U.S. retail outlet stores in response to the outbreak. The Company largely shut-down their production facilities in Toledo and Shreveport in mid-March in response to stay at home orders. Operations at the Company's distribution centers in the U.S. were also temporarily halted and operations were limited at the Company's Mexican production facility during April 2020. Throughout this time, operations at the Company's Leerdam, Netherlands and Marinha Grande, Portugal facilities were reduced as was the case at the Company's Langfang, China facility earlier in the first quarter.

Due to the decreased demand and to preserve liquidity, the Debtors implemented a lay-off of virtually all of their U.S. hourly workforce in March and furloughed approximately 280 salaried employees in two waves in April and May. In addition, the Debtors implemented temporary tiered salary reductions in mid-April and suspended the salaried 401(k) matching program. The Company also reduced salaries for certain of their Mexico employees. The Company also reduced all non-essential spending, slashed capital expenditures, and has taken advantage of various government relief programs, primarily in Europe. These efforts are expected to provide substantial cost savings over the second and third quarters of 2020.

US-DOCS\115812051.19

Despite these efforts, the Debtors have been unable to offset the steep decline in sales and have had to borrow heavily on their Prepetition ABL Facility and use their cash reserves.

    3.        **The Debtors' Prepetition Restructuring Efforts.**

While the efforts to restructure the balance sheet began in earnest at the start of 2020, the COVID-19 pandemic has exacerbated demand and revenue decline and in turn has had an acute impact on the Debtors' liquidity. The Ad Hoc Term Loan Lender Group formed in late 2019 and retained legal and financial advisors to evaluate restructuring alternatives. The Company engaged in discussions with the Ad Hoc Term Lender Group around an amend-and-extend transaction. However, the Ad Hoc Term Lender Group's concern over the impact COVID-19 would have on the Company's business ultimately prevented those discussions from resulting in a transaction. The Company also informed the Ad Hoc Term Lender Group of certain inbound merger and acquisition proposals from strategic buyers. These proposals were not pursued because, among other reasons, they were insufficient to pay the Company's Prepetition Term Loans in full, thus requiring lender consent, and the Ad Hoc Term Lender Group did not believe it was in the Company's best interest to pursue such a transaction.

The accelerating COVID-19 pandemic led the Company to evaluate its liquidity needs and like many other peers and comparably sized companies, the Debtors requested a draw of $40 million on their Prepetition ABL Facility on March 19, 2020 to boost liquidity with the support of the Prepetition ABL Lenders. The Company also retained Alvarez & Marsal North America, LLC ("**A&M**") as its financial advisor on March 24, 2020, to help address liquidity issues and potential restructuring alternatives.

On April 9, 2020, the Company entered into an amendment of the Prepetition Term Loans to extend the due date (the "**ECF Payment Date**") for an excess cash flow payment (the "**ECF Payment**") of approximately $12 million until April 30, 2020, in order to preserve liquidity and avoid cross-defaults. Subsequent amendments further extended the payment date to May 7, May 17, May 25, and May 31, 2020, respectively, subject to certain additional conditions, including the Debtors' provision of certain financial information and the maintenance by the Debtors of a minimum level of liquidity.

In addition, to fulfill a condition to obtain a further extension of the ECF Payment Date, the Board of Directors voted to increase membership from eight members to ten members on May 12, 2020 to allow for the appointment of two independent directors (Mr. Patrick Bartels, Jr. and Mr. Timothy Pohl) acceptable to the Ad Hoc Term Lender Group. The Board of Directors currently consists of eight independent directors, the current Chief Executive Officer (Mr. Michael Bauer) and one former employee.

During the period covered by the extension of the ECF Payment Date, the Debtors and their advisors engaged in extensive negotiations with the Ad Hoc Term Lender Group and the Prepetition ABL Lenders in order to obtain the necessary financing to achieve a successful chapter 11 reorganization.

The Board of Directors (including the newly-appointed additional independent directors) evaluated all options for the Company, including reviewing liquidity, the COVID-19 pandemic's

33

impact on operations and the industry, cost cutting measures and overall restructuring strategies. The extensions of the ECF Payment Date provided the Company with the runway to negotiate constructively with the Ad Hoc Term Lender Group and the Prepetition ABL Lenders, resulting in the entry into two debtor-in-possession financing facilities.

4.    **The Debtor-In-Possession Financing Marketing Process and Agreements**

Although the Debtors instituted measures to preserve capital, including reducing operations at the Debtors' manufacturing plants and reducing employment-related expenses through temporary furloughs and salary reductions, it became increasingly clear that such measures alone would be insufficient to satisfy financial obligations under the Debtors' Prepetition Debt Documents.  Ultimately, the unprecedented global shutdowns and distress in the financial markets led the Debtors to determine, in the exercise of the business judgment of their Board of Directors and management, to pursue an in-court restructuring and acceptable debtor-in-possession ("**DIP**") financing.

The Debtors began negotiating postpetition DIP financing in or around March 2020.  The extensions of the ECF Payment provided the Debtors with the necessary runway to negotiate constructively with the Ad Hoc Term Lender Group and the Prepetition ABL Lenders regarding a potential DIP financing.  In the months leading up to the Petition Date, the Company, with the assistance of their advisors, ran a marketing process for postpetition DIP financing to achieve the best terms available.  The Company's financial advisors canvassed the market to assess whether any third parties were willing to provide DIP financing.  Lazard, drawing on its experience in debt financing transactions, identified targets that in their professional judgment had the ability to complete diligence quickly, had experience or interest in providing postpetition financing, and ability to commit to financing on an expedited basis.  Specifically, Lazard identified potential financial institutions, including large commercial banks, credit funds and alternative investment managers, who in its professional judgement could seriously pursue third-party postpetition financing to the Company.

Lazard initially solicited proposals for DIP financing from ten (10) potential third-party lenders and asked if they would be willing to provide DIP financing proposals on a priming or non-priming basis or to extend financing to replace the current Prepetition ABL Agreement.  Of the ten (10) potential lenders that were contacted, only three (3) requested a non-disclosure agreement, and only two (2) of those parties executed a non-disclosure agreement and were offered access to a data room and performed diligence regarding potential postpetition financing, including calls with management and the Debtors' advisors.  Ultimately, none of the third-party institutions from whom Lazard solicited proposals were willing to provide postpetition financing on any terms.

The Company did not receive any actionable proposals from third parties.  Specifically, many of the parties contacted by the Company's advisors reported that they were unwilling to extend financing due to a number of factors, including the Company's financial position and highly leveraged capital structure, as well as the lack of significant unencumbered collateral to secure postpetition financing on a non-priming basis, the challenges, uncertainty and legal expenses inherent in a priming fight with the Prepetition Term Loan Lenders and Prepetition ABL Lenders, and the volatile state of the global economy due to the COVID-19 crisis.  The Debtors concluded, in consultation with Lazard and their other advisors, that engaging with the Prepetition Term Loan

Lenders and Prepetition ABL Lenders represented the best path towards successfully obtaining DIP financing.

Accordingly, simultaneously with the outreach to the third party lenders, the Company and its advisors commenced hard fought, arm's-length negotiations with the Ad Hoc Term Lender Group and Prepetition ABL Lenders with respect to a potential DIP financing. Beginning in late April through May 2020, the Debtors, the Ad Hoc Term Lender Group, and the Prepetition ABL Lenders began exchanging term sheets around a potential DIP financing. The negotiations spanned several weeks and lasted until shortly before the Petition Date. Throughout this process, the Company and its advisors pushed back on material terms—including the amount of financing available, economics, covenants, and roll-up terms—of the DIP financing. As a result of those negotiations, the parties agreed upon the DIP Facilities (as defined below), which collectively provide for, among other things, $160 million in total senior secured postpetition DIP financing, exclusive of certain rolled-up loans.

The structure of the DIP Facilities mirrors the prepetition debt financing with a similar intercreditor agreement. The Debtors' DIP Facilities consist of:

- _DIP ABL Facility._ A $100 million senior secured superpriority DIP revolving, asset-based facility with the Prepetition ABL Lenders, which includes refinancing of a portion of the Prepetition ABL Claims with a "creeping roll-up" during the interim period and a complete "roll-up" of the borrowings of Libbey Glass Inc. pursuant to the final order;[9] and

- _DIP Term Loan Facility._ A new money $60 million senior secured superpriority DIP term loan facility with the Ad Hoc Term Lender Group, with a dollar-for-dollar "roll-up" of such amounts due under the Prepetition Term Loan Credit Agreement for such lenders.

(collectively, the "**DIP Facilities**").

The Debtors received interim approval from the Bankruptcy Court to make an initial draw of $30 million under the DIP Term Loan Agreement and received final approval to draw the remaining $30 million upon entry of the Final Order. [Docket Nos. 72 and 234]. The Company and its advisors determined that the DIP Facilities represented the best DIP financing alternative available. The DIP Facilities provide the Company and its creditor constituencies with market-tested DIP financing on the best available terms. The DIP Facilities were the product of extensive arm's-length, good-faith negotiations. Alternative sources of DIP financing were not readily available to the Company (whether unsecured or secured) on terms better than or comparable to the DIP Facilities. The DIP Facilities provide the Company with immediate and critical access to liquidity that is necessary to ensure that the Company's businesses are stabilized, that chapter 11 administrative costs are paid in full, and that value is preserved during the course of the Company's reorganization.

---

9    The borrowings of Libbey Europe under the Prepetition ABL Facility will remain outstanding and will reduce the availability under the DIP ABL Credit Agreement.

US-DOCS\115812051.19

5.        **Prepetition Retention Payments**

The Debtors' management team's immediate goal prior to filing the Chapter 11 Cases was to maintain stability with their workforce, vendors, customers and distributors.  On May 19, 2020, the compensation committee of the Debtors' Board of Directors (the "**Compensation Committee**"), following extensive consultation with their compensation and legal advisors, approved cash retention bonuses (each, a "**Retention Bonus**") and a form of Retention Bonus Agreement (the "**Retention Bonus Agreement**") for the Company's executive officers and other key employees (each, a "**Participant**").  This prepetition retention bonus plan was implemented to demonstrate the Company's support for its employees, including certain members of the management team.  The Retention Bonuses enabled the Debtors to retain and motivate the Participants through the volatile and uncertain environment affecting the foodservice, hospitality and retail industries, as well as the previously disclosed disruptions to the Debtors' business related to the COVID-19 pandemic. Pursuant to the Retention Bonus Agreements, Participants were paid the Retention Bonuses on or before May 22, 2020.  The aggregate amount of Retention Bonuses paid was approximately $3.1 million, with approximately $2.35 million in the aggregate paid to the Chief Executive Officer, the Chief Operating Officer, the Chief Financial Officer, the Chief Human Resources Officer, and the General Counsel, with the balance of approximately $750,000 paid to 16 non-insiders.  The Retention Bonuses received by the Debtors' executive officers are set forth in the table below.

| Name | Title | Retention Bonus |
|---|---|---|
| Michael P. Bauer | Chief Executive Officer | $900,000 |
| James C. Burmeister | Senior Vice President, Chief Operating Officer | $400,000 |
| Sarah J. Zibbel | Senior Vice President, Chief Human Resources Officer | $325,000 |
| Juan Amezquita | Senior Vice President, Chief Financial Officer and Treasurer | $400,000 |
| Jennifer M. Jaffee | Senior Vice President, General Counsel and Secretary | $325,000 |

The Retention Bonuses were announced in the Debtors' Current Report on Form 8-K, filed with the SEC on May 26, 2020.

Relatedly, on May 31, 2020, the compensation committee of the Debtors' Board of Directors (the "**Compensation Committee**") approved an amendment and restatement of Mr. Bauer's Retention Bonus Agreement (the "**Amended Agreement**") to update the clawback provisions applicable to Mr. Bauer's Retention Bonus.  Specifically, pursuant to the Amended Agreement, Mr. Bauer will be required to repay all or a portion of the Retention Bonus to the Company as follows:

- In the event that the Company terminated Mr. Bauer's employment for "Cause" or Mr. Bauer voluntarily resigned without "Good Reason" (each as defined in the Amended Agreement) on or before July 3, 2020, Mr. Bauer would have to repay the full Retention Bonus;

- If Mr. Bauer voluntarily resigns without Good Reason or is terminated for Cause after July 3, 2020 but before October 2, 2020, or, if earlier, the effective date of the Company's plan of reorganization, then he will repay half the Retention Bonus; and

36

- If the Company does not achieve certain cash-flow milestones, tested twice, once as of July 3, 2020 and the second time as of the earlier of October 2, 2020 or the effective date of the Company's plan of reorganization, then Mr. Bauer will repay half the Retention Bonus for each cash flow metric not met.[10]

The above Amended Agreement was announced in the Debtors' Current Report on Form 8-K, filed with the SEC on June 1, 2020.

The Debtors do not believe any of the foregoing transactions constitute a fraudulent conveyance, preference, or would otherwise be subject to avoidance under the Bankruptcy Code. The Committee and the U.S. Trustee dispute whether the Retention Bonuses should be included in the Release and Third-Party Release under Article X of the Plan. The Debtors disagree with that position and maintain that the Retention Bonuses should be included in the Release and Third-Party Release under Article X of the Plan.

6.    **Case Timeline and DIP Financing Milestones**

The key to successfully effectuating this restructuring is speed and cooperation. Access to new capital is not endless. As such, the Company's DIP Facilities are highly conditioned on moving quickly through these Chapter 11 Cases with support from all major stakeholders. The DIP Financing Documents provide the Debtors with the below milestones for these Chapter 11 Cases ("**DIP Milestones**").

- Entry of the Interim Order (as defined in the DIP Financing Documents) by no later than 5 days following the Petition Date;

- Plan and Disclosure Statement filed by no later than 15 days following the Petition Date;

- Motion to approve this Disclosure Statement and the related solicitation materials filed by no later than 15 days following the Petition Date;

- Entry of the DIP Final Order approving the DIP Term Loan Agreement on a final basis by no later than 35 days following the Petition Date;

- Entry of an order approving the solicitation of the Plan by no later than 55 days following the Petition Date;

- Commencement of solicitation of the Plan by no later than 57 days following the Petition Date;

- Entry of Confirmation Order by no later than 100 days following the Petition Date; and

- Consummation of Plan by no later than 105 days following the Petition Date.

---

10    The Company achieved its first cash-flow milestone tested as of July 3, 2020.

37

These DIP Milestones have since been amended and there may be further amendments to the DIP Milestones during the Chapter 11 Cases.[11]  Specifically, on July 6, 2020, the Debtors entered into amendments to their DIP Term Loan Agreement and their DIP ABL Credit Agreement to extend the dates by which certain DIP Milestones are required to be satisfied under the DIP Financing Documents.  The amendments to the DIP Milestones are as follows:

- The date by which the Bankruptcy Court shall enter an order approving the solicitation of the Plan is extended to August 12, 2020;

- The date by which the Debtors shall commence solicitation of the Plan is extended to August 14, 2020;

- The date by which the Bankruptcy Court shall enter an order confirming the Plan is extended to September 25, 2020; and

- The date by which the Plan must be consummated is extended to October 2, 2020; and

- The DIP Milestones may continue to be amended during the Chapter 11 Cases.

The above DIP Milestones have since been amended again and there may be further amendments to the DIP Milestones during the Chapter 11 Cases.[12]  Specifically, on August 6, 2020, the Debtors entered into amendments to their DIP Term Loan Agreement and their DIP ABL Credit Agreement to extend the dates by which certain DIP Milestones are required to be satisfied under the DIP Financing Documents.  The amendments to the DIP Milestones are as follows:

- The date by which the Bankruptcy Court shall enter an order approving the solicitation of the Plan is extended to August 24, 2020;

- The date by which the Debtors shall commence solicitation of the Plan is extended to August 26, 2020;

- The date by which the Bankruptcy Court shall enter an order confirming the Plan is extended to Oct 1, 2020; and

- The date by which the Plan must be consummated is extended to October 5, 2020.  The DIP Milestones may continue to be amended during the Chapter 11 Cases.

---

[11]   The Debtors' announced amendments to their DIP Milestones in the Company's Current Report on Form 8-K, filed with the SEC on July 10, 2020.

[12]   The Debtors' announced amendments to their DIP Milestones in the Company's Quarterly Report on Form 10-Q filed with the SEC on August 10, 2020.

US-DOCS\115812051.19

## III.
## EVENTS DURING THE CHAPTER 11 CASE

### A.    FIRST DAY MOTIONS AND CERTAIN RELATED RELIEF

Immediately following the Petition Date, the Debtors devoted substantial efforts to stabilizing their operations and preserving and restoring their relationships with, among others, vendors, customers, employees and utility providers that the Debtors believed could be impacted by the commencement of the Chapter 11 Cases.  As a result of these initial efforts, the Debtors were able to minimize, as much as practicable, the negative impacts of the commencement of the Chapter 11 Cases.

On June 1, 2020, the Debtors filed a number of motions (collectively referred to herein as "**First Day Motions**") with the Bankruptcy Court.  At a hearing conducted on June 2, 2020, the Bankruptcy Court entered several orders in connection with the First Day Motions to, among other things: (i) prevent interruptions to the Debtors' businesses; (ii) ease the strain on the Debtors' relationships with certain essential constituents, including employees, vendors, customers and utility providers; (iii) provide access to critical financing and capital; and (iv) allow the Debtors to retain certain advisors to assist with the administration of the Chapter 11 Cases (each, a "**First Day Order**").

#### 1.    Procedural Motions

To facilitate a smooth and efficient administration of the Chapter 11 Cases, the Bankruptcy Court also entered certain "procedural" First Day Orders, by which the Bankruptcy Court (a) approved the joint administration of the Debtors' twelve Chapter 11 Cases and (b) authorized the retention and appointment of Prime Clerk LLC ("**Prime Clerk**") as Voting and Claims Agent. [Docket Nos. 58, 61].

#### 2.    Stabilizing Operations

Recognizing that any interruption of the Debtors' businesses, even for a brief period of time, would negatively impact their operations, relationships with the vendors, revenue and profits, the Debtors filed a number of First Day Motions to help facilitate the stabilization of its operations and effectuate, as much as possible, a smooth transition into operations as debtors in possession. Specifically, the Debtors sought and obtained First Day Orders granting the Debtors interim authority (certain of which were later approved on a final basis at a hearing held on July 2, 2020 (the "**Second Day Hearing**")) to, *inter alia*:

- pay prepetition wages, salaries and other compensation, reimbursable employee expenses and employee medical and similar benefits;

- determine adequate assurance for future utility service and establish procedures for utility providers to object to such assurance;

- continue insurance coverage and a bonding program, and enter into new insurance policies and purchase new surety bonds, if necessary;

39

US-DOCS\115812051.19

- maintain the existing cash management system;

- continue, implement new and/or terminate customer programs and any other customer practices as they deem appropriate;

- remit and pay certain taxes and fees; and

- establish certain notice and hearing procedures for the transfer of, or worthlessness deductions with respect to, certain equity interests.

In addition to the foregoing relief, to prevent the imposition of the automatic stay from disrupting their businesses and to ensure continued deliveries and services on favorable credit terms, the Debtors sought and obtained Bankruptcy Court approval to pay a limited amount of prepetition claims of certain vendors, third-party service providers, and shippers/warehousemen who the Debtors believe are essential to the ongoing operation of their businesses. The Debtors' ability to pay the claims of these vendors and service providers was and remains critical to maintaining ongoing business operations due to the Debtors' inability to acquire essential replacement goods and services of the same quality, reliability, cost or availability from other sources. The Debtors' ability to pay the claims of these vendors and service providers was, and is, critical to the success of the Debtors' Chapter 11 Cases.

The relief sought by the Debtors pursuant to the First Day Motions is described in further detail below:

    (a)    <u>Debtor in Possession Financing.</u>

In order to obtain funding for operations and for the expenses of these Chapter 11 Cases, the Debtors sought and obtained interim and final authority to enter into and perform under the DIP Facilities. [Docket Nos. 72 and 234]. Specifically, the Debtors received interim and final authority to borrow under the DIP ABL Credit Agreement and DIP Term Loan Agreement. The Debtors received, among other things, interim approval from the Bankruptcy Court to make an initial draw of $30 million under the DIP Term Loan Agreement and final approval from the Bankruptcy Court to draw the remaining $30 million under the DIP Term Loan Agreement.[13]

    (b)    <u>Cash Management System</u>

The Debtors maintain a cash management system that manages the Debtors' cash inflows and outflows through a number of bank accounts. The system is designed to (i) monitor and control all of the Debtors' cash receipts and disbursements, (ii) identify the cash requirements of the Debtors and the Non-Debtor Affiliates, (iii) transfer cash as needed to respond to the cash requirements of the Debtors and the Non-Debtor Affiliates, and (iv) track all intercompany transfers. On the Petition Date, the Debtors received authority from the Bankruptcy Court to continue using their existing cash management system, bank accounts, and related business forms,

---

[13]  On June 25, 2020, the Debtors filed a *Notice of First Amendment to Senior Secured Superpriority Postpetition Financing Arrangements* setting forth certain non-material amendments to the DIP ABL Credit Agreement concerning the Debtors' Portuguese agent and Portugal collateral. [Docket No. 146].

as well as to continue their intercompany arrangements to avoid disruption in the Debtors' operations and facilitate the efficient administration of the Chapter 11 Cases. [Docket No. 70].

(c)      Trade Creditors and Shippers/Warehouseman

In the ordinary course of business, the Debtors rely upon a variety of vendors, both foreign and domestic, service providers, and shippers/warehousemen. Certain vendors or service providers may seek to terminate or alter the terms of their agreements with the Debtors if the Debtors fail to honor their obligations as they become due. Also, the Debtors' shippers and warehousemen may attempt to withhold goods in their possession and exert a possessory lien over those goods if the Debtors fail to honor their obligations as they become due. Additionally, many of the Debtors' foreign vendors may not be (or may assert that they are not) subject to the jurisdiction of the Bankruptcy Court, may disregard the automatic stay provisions of the Bankruptcy Code, and may engage in conduct that would disrupt the Debtors' operations. To avoid the detrimental effects of potential actions taken by the Debtors' vendors, including their foreign vendors, service providers, and shippers/warehouseman, and to minimize any disruption to the Debtors' operations, the Debtors obtained authority from the Bankruptcy Court to satisfy certain obligations to these vendors, service providers, and shippers/warehousemen in the ordinary course and only up to a capped amount. [Docket Nos. 67-69].

(d)      Taxes

Pursuant to the Plan, the Debtors intend to pay all taxes and fees in full. To minimize any disruption to the Debtors' operations and ensure the efficient administration of the Chapter 11 Cases, the Debtors obtained authority from the Bankruptcy Court to pay all taxes, fees, and similar charges and assessments, whether arising pre- or postpetition, to the appropriate taxing, regulatory, or other governmental authority in the ordinary course of the Debtors' businesses. [Docket No. 63].

(e)      Utilities

In the ordinary course of business, the Debtors incur certain expenses related to the essential utility services such as electricity, gas, water, and telecommunications. The Debtors obtained approval from the Bankruptcy Court of procedures to provide such utility providers with adequate assurance that the Debtors will continue to honor their obligations in the ordinary course. [Docket No. 93].

(f)      Insurance and Surety

In connection with the operation of the Debtors' businesses, the Debtors maintain various insurance policies and surety bond obligations designed to protect their property, assets, key personnel, and business operations. The types of insurance policies maintained by the Debtors include general liability, excess liability, directors' and officers' liability, fiduciary liability, workers' compensation, and property, crime, automobile, pollution, and cyber liability coverage. Similarly, in the ordinary course of business, the Debtors are required to provide surety bonds to certain third parties to secure the Debtors' payment, or the enforcement, of certain obligations to governmental units or contract counterparties, in each case related to the release of goods and services, importer or broker fees, and merchandise.

41

The maintenance of certain insurance coverage and surety bonds is essential to the Debtors' operations and is required by laws, various regulations, financing agreements and contracts. The Debtors believe that the satisfaction of their insurance and surety obligations, whether arising pre- or postpetition, is necessary to maintain the Debtors' relationships with third parties and the uninterrupted operation of the Debtors' business. Accordingly, the Debtors obtained authority from the Bankruptcy Court to continue to honor their insurance and surety bond obligations in the ordinary course. [Docket No. 65].

(g)     Customer Programs

The Debtors have historically provided certain incentives, coupons, discounts, and accommodations to their customers to attract and maintain positive customer relationships. In addition, the Debtors issue credits, adjustments, discounts, or other similar obligations to their customers from time to time, the vast majority of which do not entail the expenditure of cash. Each of these programs is designed to target a different sales channel to ensure maximization of the Debtors' customer base. These programs promote customer loyalty and goodwill to the Debtors' business and the value of their brand. Maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in these Chapter 11 Cases and is necessary to maximize value for the benefit of all of the Debtors' stakeholders. Accordingly, the Debtors obtained authorization from the Bankruptcy Court to continue their customer programs in a manner consistent with their past practices. [Docket No. 64].

(h)     Employee Wage and Benefits

The Debtors' businesses are labor intensive and rely upon various employees in various jurisdictions. Generally, members of the Debtors' workforce rely upon their compensation to meet their daily living expenses. To minimize the uncertainty and potential distractions associated with the Chapter 11 Cases and the potential disruption of the Debtors' operations resulting therefrom, the Debtors obtained authority from the Bankruptcy Court to continue to honor their obligations to their workforce in the ordinary course of business, including (a) the payment of pre- and postpetition wages, salaries, and reimbursable employee expenses, (b) the payment of pre- and postpetition wages of their supplemental workforce, including temporary workers, (c) the payment of pre- and postpetition accrued and unpaid employee benefits, and (d) the continuation of certain of the Debtors' benefit and incentive programs and policies and other workforce programs. [Docket No. 66].[14]

(i)     Transfer of, or Worthlessness Deductions with Respect to, Certain Equity Interests

If Libbey Inc. experiences an "ownership change" (as defined in the Internal Revenue Code) prior to the Debtors' emergence from the Chapter 11 Cases, the Debtors' ability to use their tax attributes may be substantially limited, which would cap the Debtors' or the Reorganized

---

[14]   On July 19, 2020, the Debtors filed a supplemental motion to their first day wages motion seeking authorization for the Debtors to continue administering the US Non-Executive Severance Plan (as defined in the wages motion at Docket No. 10) in the ordinary course and to continue to pay and honor all obligations associated therewith, which was approved and entered by the Bankruptcy Court on July 20, 2020. [*See* Docket Nos. 287, 292].

US-DOCS\115812051.19

Debtors' ability to offset taxable income arising upon emergence from the Chapter 11 Cases or in future tax years. As a result, the Debtors established procedures designed to reduce the possibility of a pre-emergence ownership change and preserve their ability to rely on certain favorable tax rules. In particular, certain trading and worthless stock deductions with respect to Libbey Inc.'s common stock are currently subject to procedures requiring (among other things) prior notification and advance approval from Debtors. [Docket No. 91].

**B.    Second Day Motions and Related Relief**

In addition to the final relief in respect of the interim orders summarized above [*see* Docket Nos. 220-21, 223-26, 229-31, 234, and 257] the Debtors filed motions seeking additional relief at the Second Day Hearing or thereafter, including the following.

### 1.    Professional Retentions

To assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases, the Bankruptcy Court authorized the Debtors to retain and employ the following advisors: (a) Latham & Watkins LLP and Richards, Layton & Finger, P.A., as restructuring co-counsel [Docket Nos. 203 and 207]; (b) Lazard & Frères, & Co. LLC, as investment banker [Docket No. 205]; (c) Alvarez & Marsal North America, LLC, as financial advisor [Docket No. 256]; (d) Prime Clerk LLC, as Administrative Advisor [Docket No. 206]; (e) Deloitte & Touche LLP, as independent auditors [Docket No. 328]; and (f) Deloitte Tax LLP, as tax services provider [Docket No. 329].

### 2.    Other Procedural Second Day Motions

On June 18, 2020, the Debtors filed the *Motion of Debtors' for Entry of an Order Under 11 U.S.C. §§ 105(a) and 331, Fed. R. Bankr. P. 2016(a) and Del. Bankr. L.R. 2016-2 Establishing Procedures for Interim Compensation and Reimbursement of Professionals* [Docket No. 126] (the "**Interim Compensation Motion**"). On July 1, 2020, the Bankruptcy Court entered an order granting the Interim Compensation Motion that established procedures with respect to interim compensation of the Debtors' bankruptcy-related advisors [Docket No. 204].

Additionally, on June 18, 2020, the Debtors filed the *Motion of Debtors' for Entry of an Order Authorizing the Employment and Payment of Professionals Utilized in Ordinary Course of Business* [Docket No. 127] (the "**OCP Motion**"). On July 1, 2020, the Bankruptcy Court entered an order granting the OCP Motion that approved and established procedures for the retention of professionals utilized in the ordinary course of the Debtors' businesses [Docket No. 222].

**C.    APPOINTMENT OF THE OFFICIAL COMMITTEE**

On June 11, 2020, the U.S. Trustee filed the Notice of Appointment of Committee of Unsecured Creditors [Docket No. 104] notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors in the Chapter 11 Cases. The Committee is currently composed of the following members: (a) The Pension Benefit Guaranty Corp. ("**PBGC**"); (b) United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union; and (c) Packaging Corp. of America. [Docket No. 320]. Former Committee members, Pratt Corrugated Holdings, Inc. and A.A. Boos & Sons, Inc.,

43

US-DOCS\115812051.19

resigned from the Committee effective June 19, 2020 and July 23, 2020, respectively.  On August 3, 2020, the Bankruptcy Court approved the Committee's retention of Brown Rudnick LLP and Bayard, P.A. as its legal counsel.  [Docket Nos. 330-31].

The Committee's application for authority to retain and employ Greenhill & Co., Inc., as financial advisor and investment banker, *see* Docket No. 269, is still pending before the Bankruptcy Court.

### D.    REORGANIZATION STRATEGY

1.    **Negotiations with Creditors.**

With the assistance of their legal and financial advisors, the Debtors have continued their prepetition efforts to develop a reorganization strategy to (a) maximize the value of their Estates, (b) address the factors that led to the bankruptcy filing, and (c) enable the Debtors to emerge from chapter 11 as stronger, more viable companies.  At the business level, this reorganization strategy has primarily, though not exclusively, focused on:

- restructuring the Debtors' balance sheet and emerging from chapter 11 with a long-term capital structure conducive to future profitability;

- negotiating with the Debtors' Unions (as defined below) to achieve consensual modifications to the Debtors' collective bargaining agreements and union retiree benefits in accordance with the Debtors' DIP Term Loan Agreement, which is described in more detail below;

- managing the Debtors' businesses to enhance their financial and operating performance, including utilizing the unique competitive advantage and opportunities afforded to chapter 11 debtors in possession; and

- reviewing the Debtors' Executory Contracts and Unexpired Leases to determine whether there are benefits to the Debtors in assuming or rejecting any Executory Contracts or Unexpired Leases.

2.    **Labor Negotiations**

The reduction of the Debtors' labor liabilities continues to be a crucial and necessary step towards their successful emergence from Chapter 11.  The Debtors are evaluating their obligations to their employees who are represented by unions and their retirees to reduce overall expenditures.  The Debtors' goal is to negotiate consensual changes to their collective bargaining agreements (the "**CBAs**") and other retiree related programs.  The Debtors, their advisors and DIP Lenders concluded that they would need to either modify or reject provisions of the Debtors' CBAs in order to ensure the Debtors successfully emerge from bankruptcy.

Pursuant to the terms of the DIP Term Loan Agreement, the Debtors began negotiations with the unions representing their employees (collectively, the "**Unions**") immediately after the Petition Date.  The DIP Term Loan Agreement obligates the Debtors to obtain approval of consensual modifications to the CBAs that are acceptable to the DIP Required Lenders (as defined

44

in the DIP Term Loan Agreement).  If lender-approved modifications to the CBAs are not reached, then, pursuant to the terms of the DIP Term Loan Agreement, the Debtors will be forced to seek relief under sections 1113 and/or 1114 of the Bankruptcy Code to achieve the necessary modifications to the CBAs and/or its retiree benefit obligations within the DIP Milestones set forth in the DIP Term Loan Agreement.  Specifically, the DIP Term Loan Agreement contemplates the obtaining of an order of the Bankruptcy Court authorizing the Debtors to reject provisions of the Debtors' CBAs and/or modify the retiree benefits pursuant to sections 1113 and 1114 of the Bankruptcy Code, respectively, if the Debtors and the Unions fail to come to a consensual resolution on modifications to the CBAs.

The DIP Term Loan Agreement, which is incorporated into the Interim Order (as defined in the DIP Financing Documents), provides:

- Within ten (10) days of the Petition Date, the Debtors shall contact each applicable union (United Steelworkers Locals 711T (Shreveport), and/or Locals 65T, 700, and 59M (Toledo) and International Association of Machinists Lodge 105 (Toledo)) to commence good-faith negotiations with such unions regarding any required modifications to the terms of the CBAs between Debtors and such union, as determined and approved by the Required Lenders (the "**Selected CBAs**"); and

- within ninety (90) days of the Petition Date (or such longer period of time as the Required DIP Lender Group may agree in their sole discretion), the Debtors shall have either:

  - (x) executed definitive documents with each Union modifying the respective Selected CBA on terms acceptable to the Required DIP Lender Group (as defined in the DIP Term Loan Agreement) (the "**Modified CBAs**"), if necessary, or

  - (y) if determined necessary by the Required DIP Lender Group in their sole discretion, (I) submitted their application to the Bankruptcy Court to reject any Selected CBAs which are not Modified CBAs in a manner acceptable to the Required DIP Lender Group in their sole discretion pursuant to Section 1113 of the Bankruptcy Code, and/or to modify retiree benefits under the CBAs (and outside of the CBAs) in a manner acceptable to the Required DIP Lender Group in their sole discretion pursuant to section 1114 of the Bankruptcy Code and (II) the Bankruptcy Court shall have entered a final order regarding the requested modifications to (1) the Selected CBAs pursuant to Section 1113 of the Bankruptcy Code, and/or (2) retiree benefits under the CBAs (or outside of the CBAs); provided that, in the case of this subclause (y), in the event that the Bankruptcy Court has not issued a ruling within its mandated time period to do so pursuant to the Bankruptcy Code, the Debtors shall modify or terminate the CBAs on the terms set forth in such Modified CBAs and modify or terminate the retiree benefits consistent with the application to the Bankruptcy Court.

On June 2, 2020, the Debtors initiated negotiations with the Unions by presenting them with proposals for modifications to the CBAs and other materials demonstrating that these modifications are necessary for the Debtors' reorganization.  The proposed modifications to the

45

CBAs reflected actions to both (i) drive near-term cash savings to allow the Debtors to emerge from Chapter 11, service their post-emergence debt, and operate their business and (ii) achieve long-term stability to successfully compete in the marketplace and be an investable business.

Prior to and following the June 2 Meeting, the Debtors received certain requests for information or documents from the Unions in connection with the Chapter 11 Cases and/or the Debtors' initial proposals for concessions under the CBAs. The Debtors responded to all such requests and provided the requested information. Thereafter, the Debtors and the Unions continued to trade proposals and negotiate.

Specifically, during July and August, the Debtors and the Unions exchanged proposals around consensual modifications to the CBAs and conducted numerous negotiating sessions. However, the parties were unable to reach an agreement. On or around August 10, 2020, the Unions formally rejected the Debtors' fourth proposals regarding the modification of the CBAs.

The Debtors engaged in honest, good-faith efforts to obtain only the necessary consensual modifications to the CBAs that would allow the Debtors to successfully reorganize and continue as a going concern. Notwithstanding the Debtors' willingness to bargain with the Unions to achieve mutually satisfactory modifications to the CBAs, the Unions have rejected each of the Debtors' proposals and made untenable counterproposals, leaving the Debtors with no choice but to file the 1113/1114 Motion.

Please refer to the Debtors' 1113/1114 Motion (as defined below) and accompanying declarations and exhibits for a more detailed and comprehensive discussion relating to the Debtors' and their Unions' labor negotiations.

3.     **Section 1113 and 1114 Process**

The Debtors remain open to continuing good-faith negotiations with their Unions. Although the Debtors and the Unions have been unable to reach a consensual resolution on the modification of the CBAs, the Debtors remain willing to continue to engage in negotiations with the Unions in the hopes of coming to a consensual arrangement that would reduce the financial burden of the Debtors' CBAs on the Debtors' future business prospects.

In light of the foregoing, on August 17, 2020, the Debtors filed the *Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 1113 And 1114 (I) Authorizing The Debtors To (A) Reject Certain Collective Bargaining Agreements, (B) Modify Certain Retiree Benefits, And (C) Implement The Terms Of The Debtors' Fourth Proposals Under Sections 1113 And 1114, And (II) Granting Related Relief* (the "**1113/1114 Motion**"). [Docket No. 353]. The Debtors also filed multiple declarations in support of the 1113/1114 Motion setting forth in more detail the nature and specifics of the Debtors' and Unions' negotiations in connection with the CBAs. [Docket Nos. 354, 356, 358-59]. The 1113/1114 Motion is currently set for a hearing that will begin on [August [ ● ]], 2020 (the "**1113/1114 Hearing**"). [Docket Nos. [ ● ]].

Please refer to the Debtors' 1113/1114 Motion for a more detailed and comprehensive discussion relating to the Debtors' and their Unions' labor negotiations, including discussions regarding the Debtors' prepetition and postpetition cost-saving measures, the Debtors' numerous proposals made to the Unions, and a timeline of the negotiations with the Unions.

US-DOCS\115812051.19

The Debtors reserve all rights to dispute or correct any claims set forth herein in connection with the labor negotiations, proposals, and the CBAs, and plans to do so at the 1113/1114 Hearing.

On August 14, 2020, one of the Debtors' Unions, The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, filed an objection to this Disclosure Statement (the "**Union DS Objection**").  [*See* Docket No. 352]. The Union DS Objection requested that the Debtors insert:

"The Union has informed the Debtors that, in the absence of a consensual agreement, there is a substantial risk that the Union will strike as a consequence of any imposition of terms and conditions of employment pursuant to Sections 1113 and 1114; the length and impact of such strike is uncertain; any such strike may have a material impact on the financial condition and results of operations of the Debtors by limiting production, sales, and profitability; such work stoppages could have a material impact on any projections and valuations included in the Disclosure Statement, financing, and the ability of the Debtors to confirm or consummate the Plan.

The Union has also informed the Debtors that the imposition of its current proposal would most probably lead to the departure of skilled employees."

The Debtors deny that the Unions ever informed the Debtors during the parties' negotiations that the Unions will strike as a consequence of the Section 1113/1114 Motion.  It is the Debtors' intention to avoid any strike as a consequence of any imposition of terms and conditions of employment pursuant to the 1113/1114 Order, which the Debtors believe would be value-destructive, and to continue to engage the Unions in good-faith during the 1113/1114 process in the hopes of achieving Acceptable CBA Modifications that would reduce the financial burden of the Debtors' CBAs on the Debtors' future business prospects and preserve jobs for approximately 1,200 individuals and strengthen the defined benefit pension plans for the Debtors' retirees.  The Debtors otherwise disagree with all of the claims and assertions made in the Union DS Objection and reserve all rights to respond accordingly.

4.    **Shreveport Facility Closure**

On July 8, 2020, the Debtors announced a tentative plan to close their manufacturing facility in Shreveport, Louisiana.[15]  Thereafter, the Debtors continued to consider and take actions to reduce costs and align manufacturing capacity with the lower levels of projected demand.  As a result, the Debtors shifted from their tentative plan and instead, on August 17, 2020, reaffirmed their intent to close their manufacturing facility in Shreveport, Louisiana.  The Debtors intend to cease production at the Shreveport manufacturing facility by the end of 2020, with full closure to be completed by the second half of 2022.  The Debtors continue to bargain with their Unions regarding the effects of the facility closure.

---

[15]   The Debtors' tentative plan to close their manufacturing facility in Shreveport, Louisiana was disclosed in a press release and in the Company's Current Report on Form 8-K, filed with the SEC on July 8, 2020.

47

When the closure occurs, the Debtors will leverage their existing U.S. and international manufacturing footprint, along with their best-in-class sourcing capabilities, to continue to provide industry-leading service to their customers and end users.  The Debtors' distribution center in Greenwood, Louisiana, is not impacted by this decision and will remain open.

> 5.     **Debtors' Current Manufacturing Status**

Since largely shuttering their production facilities in Toledo and Shreveport in mid-March in response to stay at home orders from the COVID-19 pandemic, most of the furnaces at both plants remained warm and production has gradually resumed from late May when the Debtors restarted two production lines in Toledo.  In Toledo, the Debtors are currently operating eight out of ten production lines and a ninth line is in process of restarting.  The Debtors are operating five out of seven principal production lines in Shreveport despite having announced preliminary plans to close such plant later in 2020 as part of a move to reduce capacity.  The Debtors' non-debtor subsidiary in Mexico, which supplies the U.S. market, is also close to full operation.

For the full year, the Debtors expect its U.S. plants to be approximately 51% utilized and to rise to approximately 88% in 2021 after the closure of the Shreveport facility.  The expectation for the Debtors' go-forward operations (other than Shreveport) is to operate the production plant in Toledo as well as the plants of non-debtor subsidiaries in Mexico, the Netherlands, and Portugal indefinitely.  Absent significant improvement to the Company's commercial business in China, the Company's China operations are likely to be wound down in the future.

> E.     **FILING OF THE SCHEDULES AND ESTABLISHMENT OF THE CLAIMS BAR DATE**

> 1.     **Filing of the Schedules**

The Debtors filed their schedules of assets and liabilities, schedules of executory contracts, and statements of financial affairs (collectively, the "**Schedules**") with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code on June 29 and 30, 2020. [Docket Nos. 162-64, 166-71, 174-88, 193-99].

> 2.     **Establishment of the Claims Bar Date**

On June 18, 2020, the Debtors filed the *Motion of Debtors for Entry of an Order Pursuant to Bankruptcy Rule 3003(C)(3) and Local Rule 2002-1(E)  Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Administrative Expense Claims Arising Under Section 503(B)(9) of the Bankruptcy Code) and Approving the Form and Manner of Notice Thereof*  [Docket No. 128] (the "**Bar Date Motion**").  On July 2, 2020, the Bankruptcy Court entered an order granting the Bar Date Motion and establishing 5:00 p.m. (Eastern Time) on August 10, 2020 as the General Bar Date (as defined under the Bar Date Motion) for creditors (as defined in section 101(10) of the Bankruptcy Code) to file Proofs of Claim in the Debtors' Chapter 11 Cases and establishing November 30, 2020 at 5 p.m. (Eastern Time) as the Governmental Bar Date (as defined under the Bar Date Motion)  (the "**Bar Date Order**").  [Docket No. 232].

Following the entry of the Bar Date Order, counsel for the Unions entered into discussions with counsel for the Debtors and Committee to amend the Bar Date Order to exempt (a) labor

48

organizations representing the Debtors' employees, and (b) employees and former employees represented by a Union (and, with respect to the benefit claims, spouses and beneficiaries of such employees or former employees), from the requirement to file proofs of claims pursuant to the Bar Date Order for claims under a CBA covered by the Debtors' first-day wages motion.

As a result of those discussions, the Debtors, the Unions, and the Committee entered into a stipulation providing, among other things, that present or former employees of the Debtors whose employment is or was, as applicable, subject to the terms of a CBA (and, with respect to the benefit claims, spouses and beneficiaries of such employees) or any labor organization representing such employees or former employees, do not need to file proofs of claim at this time for amounts covered by the Debtors' first day wages motion. Notwithstanding the foregoing: (a) employees (present or former) or the relevant labor organization must submit claims relating to grievances prior to the General Bar Date (as defined under the Bar Date Motion) to the extent the grounds for such grievances arose on or before the Petition Date, provided that a labor organization may submit a claim itemizing such grievances on behalf of its respective members, and (b) employees (present or former) must submit claims that are not covered by a CBA pursuant to the Bar Date Order (the "**Unions Claims Stipulation**").

On July 23, 2020, the Bankruptcy Court approved the Union Claims Stipulation and entered the *Order Regarding Stipulation And Agreement By And Among The Debtors, The United Steel, Paper And Forestry, Rubber, Manufacturing, Energy, Allied Industrial And Service Workers International Union, The International Association Of Machinists And Aerospace Workers, Local 105 And The Official Committee Of Unsecured Creditors* [Docket No. 303].

## F.    EXCLUSIVE PERIOD FOR FILING A PLAN AND SOLICITING VOTES

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief. If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the petition date to solicit acceptances to the plan. During these exclusive periods, no other party in interest may file a competing plan of reorganization; however, a court may extend these periods upon request of a party in interest and "for cause." The Debtors intend to seek additional extensions of the exclusive periods to file a plan and solicit acceptances of a plan as necessary.

US-DOCS\115812051.19

G.       **ANTICIPATED POST-EMERGENCE CAPITAL STRUCTURE & OPERATIONS**

During the course of these Chapter 11 Cases, the Debtors, in consultation with their advisors and key stakeholders developed the following anticipated capital structure of the Reorganized Debtors.  The instruments and amounts set forth in the table below are subject to change prior to the Effective Date.

| Instrument | Amount | Description |
|---|---|---|
| Exit ABL Facility | Approximately $[100] million, that bears interest at a rate of approximately LIBOR + 3.50%, with a letter of credit sub-facility.  The Exit ABL Facility is expected to be drawn to approximately $19.9 million of Exit ABL Facility Loans as at the Effective Date. | It is contemplated that amounts outstanding under the Prepetition ABL Loan Documents and the DIP ABL Facility Claims will be rolled into a single asset-based revolving credit facility as of the Effective Date in an amount to be agreed. The Exit ABL Facility is to be provided by the DIP ABL Lenders or such other financial institutions or legal entities as are acceptable to the Backstop Parties. |
| Exit Term Loan Facility | Approximately $[150] million, which includes up to approximately $[60] million of the New Money DIP Loans (as defined in the DIP Term Loan Agreement) that will be automatically converted into Exit Term Loan Facility Loans on a dollar-for-dollar basis, and approximately $[75] million that will consist of new money term loans, and approximately $[15] constituting OID. | The Exit Term Loan Facility will be a senior secured term loan facility in an aggregate principal amount equal to approximately $[150] million.  The Backstop Parties entered into a backstop agreement whereby certain members of the Ad Hoc Term Lender Group agreed to backstop the Exit Term Loan Facility Loans, consistent with the terms of the Exit Term Loan Facility Term Sheet and the Exit Term Loan Facility Credit Agreement.  Each Backstop Party, severally and not jointly, agreed to backstop the Exit Term Loan Facility Loans in an amount equal to such Backstop Party's percentage of the Exit Term Loan Facility Loans.   The Backstop Parties agreed to backstop their commitments either through funding Exit Term Loan Facility Loans and/or converting their respective New Money DIP Loans (as defined in the DIP Term Loan Agreement) into Exit Term Loan Facility Loans.  A term sheet describing the terms of the Exit Term Loan Facility is attached as Exhibit F to this Disclosure Statement. The Debtors and the Backstop Parties are continuing to negotiate the terms of the Exit Term Loan Facility. |

US-DOCS\115812051.19

| New Preferred Equity Interests | N/A | Convertible preferred stock issued by Reorganized Parent to certain holders of DIP Term Loan Facility Claims.  This new preferred stock shall rank senior to, and have a preference as to payment of dividends and distributions and rights upon liquidation and otherwise over, any other class of capital stock issued by Reorganized Parent, including Interests in the New Equity Interests Pool.  A term sheet describing the terms of the New Preferred Equity Interests is attached as <u>Exhibit G</u> to this Disclosure Statement.  The Debtors and the Backstop Parties are continuing to negotiate the terms of the New Preferred Equity Interests. |

US-DOCS\115812051.19

## IV.
## SUMMARY OF THE PLAN

> **THIS SECTION IV IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE MATERIAL TERMS OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS SECTION IV AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL CONTROL AND GOVERN.**

### A.    ADMINISTRATIVE AND PRIORITY TAX CLAIMS

#### 1.    Administrative Claims

Subject to sub-paragraph (a) below, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim (other than an Allowed Professional Fee Claim) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) Cash equal to the amount of such Allowed Administrative Claim; or (ii) such other less favorable treatment as to which the Debtors (with the consent of the Super-Majority Term Loan Lenders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Administrative Claim will have agreed upon in writing; provided, however, that Administrative Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

##### (a)    Bar Date for Administrative Claims

Except as otherwise provided in the Plan, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the Debtors or Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order or the occurrence of the Effective Date (as applicable) no later than the Administrative Claims Bar Date; provided that the foregoing will not apply to the Holders of Claims arising under section 503(b)(1)(D) of the Bankruptcy Code or the United States Trustee as the Holder of Administrative Claims.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date will be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors and their respective Estates and property and such Administrative Claims will be deemed discharged as of the Effective Date.  All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G of the Plan.  Nothing in Article II.A of the Plan will limit, alter, or impair the terms and conditions of the Claims Bar Date Order with respect to the Claims Bar

52

Date for filing administrative expense claims arising under section 503(b)(9) of the Bankruptcy Code.

Objections to such requests for payment must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 120 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by Final Order of the Bankruptcy Court.

(b)   Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated in the Confirmation Order an application for final allowance of such Professional Fee Claim no later than the Professional Fees Bar Date; provided that the Reorganized Debtors will pay the reasonable fees, costs, and out-of-pocket expenses of the Debtors' Professionals in the ordinary course of business for any work performed after the Effective Date, including those reasonable and documented fees, costs, and expenses incurred by such Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any Debtor Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses from the Debtors and Reorganized Debtors for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order, in each case without further application or notice to or order of the Bankruptcy Court. Upon the Effective Date and subject to the funding of the Professional Fee Reserve as set forth in the Plan, the DIP ABL Agent, DIP ABL Lenders, DIP Term Loan Agent and DIP Term Loan Lenders will have no further obligations with respect to the Carve Out under and as defined in the DIP Orders. If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any Professionals' post-Effective Date fees, costs, or expenses, the Debtors or Reorganized Debtors, as applicable, or the affected Professional, may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice will not be paid until the dispute is resolved.

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by no later than thirty (30) days after the Filing of the applicable final request for payment of the Professional Fee Claim. Each Holder of an Allowed Professional Fee Claim will be paid in full in Cash by the Reorganized Debtors, including from the Professional Fee Reserve, within five (5) Business Days after entry of the order approving such Allowed Professional Fee Claim. The Reorganized Debtors will use such funds to pay only the Professional Fee Claims, as and when allowed by order of the Bankruptcy Court (except that the Unused Professional Fee Reserve Amount may be distributed from the Professional Fee Reserve as and when provided in the Plan). Notwithstanding anything to the contrary contained herein or in the Plan, the failure of the Professional Fee Reserve to satisfy in full the Professional Fee Claims will not, in any way, operate or be construed as a cap or limitation on the amount of Professional Fee Claims due and payable by the Reorganized Debtors.

US-DOCS\115812051.19

2. **DIP Facility Claims**

On the Effective Date, in full satisfaction, settlement, discharge and release of, and in exchange for the DIP ABL Facility Claims, such DIP ABL Facility Claims shall be indefeasibly Paid in Full in Cash from the proceeds of the Exit Facilities, any unused commitments under the DIP Financing Documents shall be deemed terminated, and the DIP ABL Facility Liens will be deemed discharged, released, and terminated for all purposes without further action of or by any Person or Entity.

On the Effective Date, in full satisfaction, settlement, discharge and release of, and in exchange for the DIP Term Loan Facility Claims, such DIP Term Loan Facility Claims shall be paid in part in Cash or, in the case of a DIP Term Loan Lender that will be an Exit Facility Lender under the Exit Term Loan Facility Credit Agreement, if elected by such DIP Term Loan Lender, rolled into Exit Term Loan Facility Loans as part of a cashless roll of DIP Term Loan Facility Claims from the Exit Term Loan Facility Loans and paid in part by the issuance of New Preferred Equity Interests on the terms set forth in the Exit Term Loan Facility Term Sheet which, when consummated, shall result in the indefeasible Payment in Full of the DIP Term Loan Facility Claims.

3. **Priority Tax Claims**

Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors, as applicable:  (A) Cash equal to the amount of such Allowed Priority Tax Claim; (B) such other less favorable treatment as to which the Debtors (with the consent of the Super-Majority Term Loan Lenders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Priority Tax Claim will have agreed upon in writing; (C) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code or (D) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that Priority Tax Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. Any installment payments to be made under clause (C) or (D) above will be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.

US-DOCS\115812051.19

B.   **CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS**

1.   **Summary**

The Plan constitutes a separate plan of reorganization for each Debtor.  All Claims and Equity Interests, except Administrative Claims, DIP Facility Claims, and Priority Tax Claims, are placed in the Classes set forth below. For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors (*i.e.*, there will be nine Classes for each Debtor); provided, that any Class that is vacant as to a particular Debtor will be treated in accordance with Article III.D of the Plan.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, for voting, confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remaining portion of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released, Disallowed or otherwise settled prior to the Effective Date.

2.   **Classification and Treatment of Claims and Equity Interests**

(a)   Class 1 – Other Priority Claims

o   *Classification*: Class 1 consists of the Other Priority Claims.

o   *Treatment*: Subject to Article VIII Gof the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim as of the Effective Date or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtors or Reorganized Debtors, as applicable (with the consent of the Super-Majority Term Loan Lenders): (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that Class 1 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court.

US-DOCS\115812051.19

     o   *Voting*: Class 1 is an Unimpaired Class, and the Holders of Claims in Class 1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.

(b)    Class 2 – Other Secured Claims

     o   *Classification*: Class 2 consists of the Other Secured Claims.  Class 2 consists of separate subclasses for each Other Secured Claim.

     o   *Treatment*: Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim as of the Effective Date or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors or Reorganized Debtors, as applicable (with the consent of the Super-Majority Term Loan Lenders): (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 2 Claim will have agreed upon in writing; (C) the Collateral securing such Allowed Class 2 Claim; or (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; provided, *however*, that Class 2 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court.

     o   *Voting*: Class 2 is an Unimpaired Class, and the Holders of Claims in Class 2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

(c)    Class 3 – Secured Tax Claims

     o   *Classification*: Class 3 consists of Secured Tax Claims.

     o   *Treatment*: Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 3 Claim is an Allowed Class 3 Claim as of the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim, at the election of the Debtors or

56

US-DOCS\115812051.19

Reorganized Debtors, as applicable (with the consent of the Super-Majority Term Loan Lenders):  (A) Cash equal to the amount of such Allowed Class 3 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 3 Claim will have agreed upon in writing; (C) the Collateral securing such Allowed Class 3 Claim; (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code or (E) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Class 3 Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that Class 3 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  Any installment payments to be made under clause (D) or (E) above will be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Class 3 Claim.

o   *Voting*: Class 3 is an Unimpaired Class, and the Holders of Claims in Class 3 will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 3 are not entitled to vote to accept or reject the Plan.

(d)   Class 4 – Prepetition ABL Claims

o   *Classification*: Class 4 consists of the Prepetition ABL Claims.

o   *Allowance*:  The Prepetition ABL Claims are deemed Allowed Claims and, as of the Petition Date, such Prepetition ABL Claims included Allowed Claims in respect of (i) loans in the aggregate principal amount of not less than $66,954,400 and letters of credit issued under the Prepetition ABL Loan Documents with a face amount of $9,419,321.29, (ii) Swap Obligations (as defined in Prepetition ABL Agreement) in an aggregate amount not less than $22,404,935,[16] (iii) reimbursement obligations under Section 9.03 of the Prepetition ABL Agreement for

---

[16]   The amount of approximately $66.9 million is inclusive of guarantee obligations related to the "Netherlands Obligations" (as defined in the Prepetition ABL Agreement).

57

out-of-pocket expenses, and (iv) any accrued and unpaid interest and fees, amounts owing and liabilities on account of Banking Services Obligations (as such term is defined in the Prepetition ABL Agreement), expenses, charges, indemnities and other obligations incurred in connection therewith through the Effective Date.

o   *Treatment*:   On or prior to the Effective Date, to the extent such Prepetition ABL Claims have not been "rolled up" or otherwise refinanced pursuant to the terms of the DIP ABL Loan Documents and DIP Orders, and in addition to the reimbursement described in Article V.R of the Plan, subject to the Payoff Letter, each Holder of Prepetition ABL Claims shall receive (i) Payment in Full, in cash, of its Prepetition ABL Claims, or (ii) such other less favorable treatment as may otherwise be agreed to by such Holder and the Debtors (with the consent of the Super-Majority Term Loan Lenders).

o   *Voting*: Class 4 is an Unimpaired Class, and the Holders of Claims in Class 4 shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Therefore, Holders of Claims in Class 4 are not entitled to vote to accept or reject the Plan.

(e)   Class 5 – Prepetition Term Loan Claims (Secured Portion)

o   *Classification*: Class 5 consists of the Prepetition Term Loan Claims (Secured Portion).

o   *Allowance*: The Prepetition Term Loan Claims (Secured Portion) are deemed Allowed Secured Claims in the aggregate principal amount of $162.9 million, plus any accrued and unpaid interest payable on such amounts through the Effective Date.

o   *Treatment*: On the Effective Date and in addition to the reimbursement described in Article V.R of the Plan, each holder of an Allowed Prepetition Term Loan Claim (Secured Portion) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 5 Claim its Pro Rata share of 100% of the New Equity Interests Pool (subject to dilution by the New Management Incentive Plan Equity).

o   *Voting*: Class 5 is Impaired, and Holders of Claims in Class 5 are entitled to vote to accept or reject the Plan.

(f)   Class 6 – General Unsecured Claims

o   *Classification*: Class 6 consists of the General Unsecured Claims.

58

US-DOCS\115812051.19

o *Allowance*: The Prepetition Term Loan Claims (Unsecured Deficiency Portion) are deemed Allowed Claims in the aggregate principal amount of $155.8 million.

o *Treatment*: Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 6 Claim is an Allowed Class 6 Claim as of the Effective Date or (ii) the next Subsequent Distribution Date after the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed General Unsecured Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim, its Pro Rata share of the General Unsecured Recovery Cash Pool (which equals $100,000 in the aggregate); provided that the Holders of the Prepetition Term Loan Claims (Unsecured Deficiency Portion) shall not share in the General Unsecured Recovery Cash Pool which is equal to $100,000 (with a full reservation of rights to their Pro Rata share of the General Unsecured Recovery Cash Pool in excess of $100,000, if any).

o *Voting*: Class 6 is an Impaired Class, and the Holders of Claims in Class 6 are entitled to vote to accept or reject the Plan.

(g) Class 7 – Intercompany Claims

o *Classification*: Class 7 consists of the Intercompany Claims.

o *Treatment*: Subject to the Restructuring Transactions, the Intercompany Claims will be reinstated, compromised, or cancelled, at the option of the relevant Holder of such Intercompany Claims with the consent of the Super-Majority Term Loan Lenders.

o *Voting*: Class 7 is an Impaired Class.  However, because the Holders of such Claims are Affiliates of the Debtors, the Holders of Claims in Class 7 will be conclusively deemed to have accepted the Plan.  Therefore, Holders of Claims in Class 7 are not entitled to vote to accept or reject the Plan.

(h) Class 8 – Old Parent Interests

o *Classification*: Class 8 consists of the Old Parent Interests.

o *Treatment*: On the Effective Date, the Old Parent Interests will be cancelled without further notice to, approval of or action by any Person or Entity, and each Holder of an Old Parent Interest will not receive any distribution or retain any property on account of such Old Parent Interest.

59

    o  *Voting*: Class 8 is an Impaired Class, and the Holders of Old Parent Interests in Class 8 will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Old Parent Interests in Class 8 will not be entitled to vote to accept or reject the Plan.

(i)      <u>Class 9 – Old Affiliate Interests</u>

    o  *Classification*: Class 9 consists of the Old Affiliate Interests.

    o  *Treatment*: Subject to the Restructuring Transactions, the Old Affiliate Interests shall remain effective and outstanding on the Effective Date and shall be owned and held by the same applicable Person(s) or Entities, as reorganized, that held and/or owned such Old Affiliate Interests immediately prior to the Effective Date.

    o  *Voting*: Class 9 is an Unimpaired Class, and the Holders of the Old Affiliate Interests in Class 9 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of the Old Affiliate Interests in Class 9 are not entitled to vote to accept or reject the Plan.

3.    **Special Provision Governing Unimpaired Claims**

Except as otherwise provided herein, nothing under the Plan will affect or limit the Debtors' or the Reorganized Debtors' rights and defenses (whether legal or equitable) in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

4.    **Elimination of Vacant Classes**

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a claim temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, will be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## C.    ACCEPTANCE OR REJECTION OF THE PLAN

1.    **Presumed Acceptance of Plan**

Classes 1, 2, 3, 4, and 9 are Unimpaired under the Plan.  Therefore, the Holders of Claims or Equity Interests in such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.  Class 7 is Impaired under the Plan.  However, because the Holders of such Claims are Affiliates of the Debtors, the Holders of Claims in Class 7 are conclusively deemed to have accepted the Plan.

US-DOCS\115812051.19

2. **Presumed Rejection of Plan**

Class 8 is Impaired, and the Holders of Equity Interests in such Class will receive no distribution under the Plan on account of such Equity Interests.  Therefore, such Holders are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

3. **Voting Classes**

Classes 5 and 6 are Impaired under the Plan.  The Holders of Claims in such Classes as of the Voting Record Date are entitled to vote to accept or reject the Plan.

4. **Acceptance by Impaired Classes of Claims**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

5. **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code will be satisfied for purposes of Confirmation by acceptance of the Plan by Class 5 or Class 6.  The Debtors request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors reserve the right to modify the Plan or any Exhibit or Plan Schedule in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

6. **Votes Solicited in Good Faith**

The Debtors have, and upon the Confirmation Date will be deemed to have, solicited votes on the Plan from the Voting Classes in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the solicitation.  Accordingly, the Debtors, the Reorganized Debtors, and each of their respective Related Persons will be entitled to, and upon the Confirmation Date are hereby granted, the protections of section 1125(e) of the Bankruptcy Code.

D. **MEANS FOR IMPLEMENTATION OF THE PLAN**

1. **Restructuring Transactions**

Without limiting any rights and remedies of the Debtors or Reorganized Debtors under the Plan or applicable law, but in all cases subject to the terms and conditions of the Restructuring Documents and any consents or approvals required thereunder, the entry of the Confirmation Order shall constitute authorization for the Reorganized Debtors to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of the Plan prior to,

61

on and after the Effective Date, including such actions as may be necessary or appropriate to effectuate a corporate restructuring of their respective businesses, to otherwise simplify the overall corporate structure of the Reorganized Debtors, or to reincorporate or reorganize certain of the Affiliate Debtors under the laws of jurisdictions other than the laws of which the applicable Affiliate Debtors are presently incorporated. Such restructuring may include one or more mergers, consolidations, restructures, dispositions, liquidations, dissolutions or the Taxable Sale Transaction, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate, but in all cases subject to the terms and conditions of the Plan and the Restructuring Documents and any consents or approvals required thereunder (collectively, the "**Restructuring Transactions**"). The Restructuring Transactions will either be implemented as a recapitalization intended to be non-taxable to the Debtors for U.S. federal income tax purposes or as the Taxable Sale Transaction. The Restructuring Transactions Steps will describe the manner in which the Restructuring Transactions will be implemented.

All such Restructuring Transactions taken, or caused to be taken, will be deemed to have been authorized and approved by the Bankruptcy Court. The actions to effectuate the Restructuring Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions, but in all cases subject to the terms and conditions of the Plan and the Restructuring Documents and any consents or approvals required thereunder.

2.    **Continued Corporate Existence**

Subject to the Restructuring Transactions permitted by Article V.A of the Plan, after the Effective Date, the Reorganized Debtors will continue to exist as separate legal entities in accordance with the applicable law in the respective jurisdiction in which they are incorporated or formed and pursuant to their respective certificates or articles of incorporation and by-laws, or other applicable organizational documents, in effect immediately prior to the Effective Date, except to the extent such certificates or articles of incorporation and by-laws, or other applicable organizational documents, are amended, restated or otherwise modified under the Plan. Notwithstanding anything to the contrary in the Plan, the Claims against a particular Debtor or Reorganized Debtor will remain the obligations solely of such Debtor or Reorganized Debtor and will not become obligations of any other Debtor or Reorganized Debtor solely by virtue of the Plan or the Chapter 11 Cases.

US-DOCS\115812051.19

3. **Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims**

Except as otherwise expressly provided in the Plan, the Confirmation Order, or any Restructuring Document, pursuant to sections 1123(a)(5), 1123(b)(3), 1141(b) and (c) and other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property and assets of the Estates of the Debtors, including all claims and rights of the Debtors, and any other assets or property acquired by the Debtors or the Reorganized Debtors during the Chapter 11 Cases or under or in connection with the Plan (other than any rejected Executory Contracts and/or Unexpired Leases and the Professional Fee Reserve, but including the Unused Professional Fee Reserve Amount), will vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, and other encumbrances, subject to the Restructuring Transactions and Liens which survive the occurrence of the Effective Date as described in Article III of the Plan (including, without limitation, each of Prepetition Debt Liens and other Liens that may secure the Exit Facility Loans, obligations under the indemnifications in the Payoff Letter, and all other obligations of the Reorganized Debtors under the Exit Facility Loan Documents). On and after the Effective Date, the Reorganized Debtors may (i) operate their respective businesses, (ii) use, acquire, and dispose of their respective property and (iii) compromise or settle any Claims, in each case without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.

4. **Exit Facility Loan Documents**

(a) *Exit Term Loan Facility*

On the Effective Date, the Debtors and the Reorganized Debtors, as applicable, will be authorized to execute and deliver, and to consummate the transactions contemplated by, the Exit Term Loan Facility Loan Documents, in each case in form and substance acceptable to the Backstop Parties and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the Exit Term Loan Facility Loan Documents). On the Effective Date, the Exit Term Loan Facility Documents will constitute legal, valid, binding and authorized indebtedness and obligations of the Reorganized Debtors, enforceable in accordance with their respective terms and such indebtedness and obligations will not be, and will not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance under the Plan, the Confirmation Order or on account of the Confirmation or Consummation of the Plan.

On and as of the Effective Date, all Persons or Entities entitled to Plan consideration in the form of Exit Term Loan Facility Loans in accordance with the Plan will be deemed to be parties to, and bound by, the Exit Term Loan Facility Credit Agreement, without the need for execution thereof by any such Person or Entity.

US-DOCS\115812051.19

(b)  *Exit ABL Facility*

On the Effective Date, the Debtors and the Reorganized Debtors, as applicable, will be authorized to execute and deliver, and to consummate the transactions contemplated by, the Exit ABL Facility Loan Documents, in each case in form and substance acceptable to the DIP ABL Agent and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the Exit ABL Facility Loan Documents).  On the Effective Date, the Exit ABL Facility Loan Documents will constitute legal, valid, binding and authorized indebtedness and obligations of the Reorganized Debtors, enforceable in accordance with their respective terms and such indebtedness and obligations will not be, and will not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance under the Plan, the Confirmation Order or on account of the Confirmation or Consummation of the Plan.  For the avoidance of doubt, any letter of credit issued and outstanding under the DIP ABL Loan Documents on the Effective Date will be treated in a manner sufficient to cause the Payment in Full of the DIP ABL Facility Claims.

On and as of the Effective Date, all Persons or Entities entitled to Plan consideration in the form of Exit ABL Facility Loans in accordance with the Plan will be deemed to be parties to, and bound by, the Exit ABL Facility Credit Agreement, without the need for execution thereof by any such Person or Entity.

(c)  *Instruction and Direction to Agents*

By voting to accept the Plan, each such vote to accept the Plan will, for all purposes, constitute an instruction from such Prepetition ABL Lenders and Prepetition Term Loan Lenders directing the Prepetition ABL Agreement Agent, the Prepetition Term Loan Agent, and the Exit Facility Agents (as applicable), to (i) act as Distribution Agent to the extent required by the Plan, (ii) execute and deliver the Exit Facility Loan Documents (each to the extent it is a party thereto), as well as to execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, to which the Exit Facility Agents are a party and to promptly consummate the transactions contemplated thereby, and (iii) take any other actions required or contemplated to be taken by the Exit Facility Agents and/or the Prepetition ABL Agreement Agent and the Prepetition Term Loan Agent (as applicable) under the Plan or any of the Restructuring Documents to which it is a party.

5.  **New Equity Interests**

On the Effective Date, subject to the terms and conditions of the Restructuring Transactions, Reorganized Parent will issue the New Equity Interests pursuant to the Plan and the Amended/New Organizational Documents.  Except as otherwise expressly provided in the Restructuring Documents, the Reorganized Parent will not be obligated to register the New Equity Interests under the Securities Act or to list the New Equity Interests for public trading on any securities exchange.

Distributions of the New Equity Interests may be made by delivery of physical certificates or book-entry transfer thereof by the applicable Distribution Agent in accordance with the Plan

64

and the Amended/New Organizational Documents.  Upon the Effective Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of Reorganized Parent will be that number of shares of New Equity Interests as may be designated in the Amended/New Organizational Documents.

6.     **New Stockholders Agreement**

Subject to the Restructuring Transactions permitted by Article V.A of the Plan, on the Effective Date, Reorganized Parent will enter into the New Stockholders Agreement, which will become effective and binding in accordance with its terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the New Stockholders Agreement).

On and as of the Effective Date, all of the Holders of New Equity Interests will be deemed to be parties to the New Stockholders Agreement, without the need for execution by such Holder. The New Stockholders Agreement will be binding on all Persons or Entities receiving, and all Holders of, the New Equity Interests (and their respective successors and assigns), whether such New Equity Interest is received or to be received on or after the Effective Date and regardless of whether such Person or Entity executes or delivers a signature page to the New Stockholders Agreement.

7.     **New Management Incentive Plan**

As soon as reasonably practicable after the Effective Date, Reorganized Parent will institute the New Management Incentive Plan, enact and enter into related policies and agreements, and distribute New Management Incentive Plan Equity to plan participants based on the terms and conditions determined by the Reorganized Parent; provided, however that the New Management Incentive Plan is not subject to Bankruptcy Court approval.  The New Management Incentive Plan Equity will dilute all of the common stock included within the New Equity Interests equally, including the common stock issued upon conversion of the New Preferred Equity Interests.

8.     **Plan Securities and Related Documentation; Exemption from Securities Laws**

On and after the Effective Date, the Debtors and the Reorganized Debtors, as applicable, are authorized to and will provide or issue, as applicable, the New Equity Interests and any and all other securities to be distributed or issued under the Plan (collectively, the "**Plan Securities**") and any and all other notes, instruments, certificates, and other documents or agreements required to be distributed, issued, executed or delivered pursuant to or in connection with the Plan (collectively, the "**Plan Securities and Documents**"), in each case in form and substance acceptable to the Super-Majority Term Loan Lenders, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.

The offer, distribution, and issuance, as applicable, of the Plan Securities and Documents under the Plan will be exempt from registration and prospectus delivery requirements under

65

applicable securities laws (including Section 5 of the Securities Act or any similar state or local law requiring the registration and/or delivery of a prospectus for offer or sale of a security or registration or licensing of an issuer of a security) pursuant to section 1145(a) of the Bankruptcy Code, section 4(a)(2) of the Securities Act and/or other applicable exemptions.  An offering of Plan Securities provided in reliance on the exemption from registration under the Securities Act pursuant to section 1145(a) of the Bankruptcy Code may be sold without registration to the extent permitted under section 1145 of the Bankruptcy Code and is deemed to be a public offering in accordance with section 1145(c) of the Bankruptcy Code, and such Plan Securities may be resold without registration to the extent permitted under section 1145 of the Bankruptcy Code.  Any Plan Securities and Documents provided in reliance on the exemption from registration under the Securities Act provided by section 4(a)(2) of such act will be provided in a private placement.

Persons who purchase securities pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will hold "restricted securities." Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Holders of restricted securities would, however, be permitted to resell Plan Securities without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A or any other applicable registration exemption under the Securities Act, or if such securities are registered with the Commission.

9.      **Release of Liens and Claims**

To the fullest extent provided under section 1141(c) and other applicable provisions of the Bankruptcy Code, except as otherwise provided in the Plan (including, without limitation, Articles V.D, V.E, and V.F of the Plan) or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan (including the Payoff Letter), on the Effective Date and concurrently with the applicable distributions made pursuant to Article VII of the Plan, all Liens, Claims, mortgages, deeds of trust, or other security interests against the assets or property of the Debtors or the Estates will be fully released, canceled, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.  The filing of the Confirmation Order with any federal, state, or local agency or department will constitute good and sufficient evidence of, but will not be required to effect, the termination of such Liens, Claims and other interests to the extent provided in the immediately preceding sentence.  Any Person or Entity holding such Liens, Claims or interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

10.      **Organizational Documents of the Reorganized Debtors**

The respective organizational documents of each of the Debtors will be amended and restated or replaced (as applicable) in form and substance satisfactory to the Debtors and the Super-Majority Term Loan Lenders and as necessary to satisfy the provisions of the Plan and the Bankruptcy Code.  Such organizational documents will: (i) to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting

equity securities; (ii) authorize the issuance of New Equity Interests in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan; (iii) to the extent necessary or appropriate, include restrictions on the transfer of New Equity Interests; and (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated in the Plan.  After the Effective Date, the Reorganized Debtors may, subject to the terms and conditions of the Restructuring Documents, amend and restate their respective organizational documents as permitted by applicable law.

11.     **Directors and Officers of the Reorganized Debtors**

The New Board will be identified in the Plan Supplement.  The initial new board of directors or other governing body of each Parent Subsidiary will consist of one or more of the directors or officers of Reorganized Parent.  Any directors elected pursuant to this section will be subject to approval of the Bankruptcy Court pursuant to section 1129(a)(5) of the Bankruptcy Code.

Pursuant to and to the extent required by section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, at or prior to the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the initial board of directors or be an officer of each of the Reorganized Debtors, and, to the extent such Person is an insider other than by virtue of being a director or an officer, the nature of any compensation for such Person.  Each such director and officer will serve from and after the Effective Date pursuant to applicable law and the terms of the Amended/New Organizational Documents and the other constituent and organizational documents of the applicable Reorganized Debtors.  The existing boards of directors and other governing bodies of the Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.

12.     **Corporate Action**

Each of the Debtors and the Reorganized Debtors may take any and all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the issuance and the distribution of the securities to be issued pursuant hereto, in each case in form and substance acceptable to the Super-Majority Term Loan Lenders, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors or by any other Person (except for those expressly required pursuant hereto or by the Restructuring Documents).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, directors, officers, managers, members or partners of the Debtors (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors,

67

officers, managers, members or partners of the Debtors or the Reorganized Debtors, or the need for any approvals, authorizations, actions or consents of any Person.

As of the Effective Date, all matters provided for in the Plan involving the legal or corporate structure of the Debtors or the Reorganized Debtors (including, without limitation, the adoption of the Amended/New Organization Documents and similar constituent and organizational documents, and the selection of directors and officers for, each of the Reorganized Debtors), and any legal or corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the stockholders, directors, officers, managers, members or partners of the Debtors or the Reorganized Debtors or by any other Person.

On and after the Effective Date, the appropriate officers of the Debtors and the Reorganized Debtors are authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtors and the Reorganized Debtors, in each case in form and substance acceptable to the Super-Majority Term Loan Lenders, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person or Entity.  Any officer of the Debtors or the Reorganized Debtors will be authorized to certify or attest to any of the foregoing actions.

13. **Cancellation of Certificates and Instruments**

On the Effective Date, except to the extent otherwise provided herein (including, without limitation, Article V.E of the Plan) all stock, indentures, instruments, certificates, agreements and other documents evidencing or relating to Claims or Equity Interests (other than Old Affiliate Interests) will be canceled, and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person or Entity; provided, that, any credit document or loan agreement that governs the rights of the Holder of a Claim will continue in effect for the limited purposes of (1) allowing Holders of Claims to receive  distributions under the Plan, (2) allowing and preserving the rights of the Prepetition Agents and the DIP Agents to make distributions pursuant to the Plan, (3) preserving each of the Prepetition Agents' and DIP Agents' rights to compensation and indemnification as against any money or property distributed by such Entities pursuant to the Plan, (4) preserving all rights, including rights of enforcement, of each of the Prepetition Agents and DIP Agents, against any Person or Entity other than a Released Party, including with respect to contractual indemnification or contribution claims, (5) permitting each of the Prepetition Agents and DIP Agents to enforce any obligation (if any) owed to such respective Person or Entity under the Plan, (6) permitting each of the Prepetition Agents and DIP Agents to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, (7) preserving all rights of the Prepetition ABL Secured Parties and DIP ABL Secured Parties under the Payoff Letter, and (8) permitting

68

each of the Prepetition Agents and each of the DIP Agents to perform any functions that are necessary to effectuate the foregoing; provided, further, however, that (a) the preceding proviso will not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan, and (b) except as otherwise provided in the Plan, the terms and provisions of the Plan will not modify any existing credit document or loan agreement that would in any way be inconsistent with distributions under the Plan.  Except to the extent otherwise provided herein (including, without limitation, Article V.E of the Plan) and the Restructuring Documents, upon completion of all such distributions in accordance with the Plan, the loan agreements, credit documents, indentures, instruments, certificates, agreements and other documents evidencing or relating to Claims or Equity Interests (other than Old Affiliate Interests) against the Debtors will terminate completely without further notice or action and be deemed surrendered.  For the avoidance of doubt, nothing in this paragraph will apply to or affect or impair the Exit Facility Loan Documents, which will remain in full force and effect as of and after the Effective Date.

14.     **Old Affiliate Interests**

On the Effective Date, the Old Affiliate Interests will remain effective and outstanding, and will be owned and held by the same applicable Person(s) that held and/or owned such Old Affiliate Interests immediately prior to the Effective Date.  Each Parent Subsidiary will continue to be governed by the terms and conditions of its applicable organizational documents as in effect immediately prior to the Effective Date, except as amended or modified by the Plan.

15.     **Sources of Cash for Plan Distributions**

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Debtors or the Reorganized Debtors, as applicable, to make payments required pursuant to the Plan will be obtained from their respective Cash balances, including Cash from operations and the Exit Loan Facility.  The Debtors and the Reorganized Debtors, as applicable, may also make such payments using Cash received from their subsidiaries through their respective consolidated cash management systems and the incurrence of intercompany transactions, but in all cases subject to the terms and conditions of the Restructuring Documents.

16.     **Continuing Effectiveness of Final Orders**

Payment authorization granted to the Debtors under any prior Final Order entered by the Bankruptcy Court will continue in effect after the Effective Date.  Accordingly, the Debtors or the Reorganized Debtors may pay or otherwise satisfy any Claim to the extent permitted by, and subject to, the applicable Final Order without regard to the treatment that would otherwise be applicable to such Claim under the Plan.

17.     **Funding and Use of the Professional Fee Reserve**

Each Professional will provide the Debtors with a reasonable and good-faith estimate of its fees, costs, and expenses expected to be incurred between the Confirmation Date and the Effective Date, and will deliver such estimate to the Debtors no later than five (5) days before the anticipated Effective Date; provided that such estimate will not limit the amount of Allowed Professional Fee

US-DOCS\115812051.19

Claims payable or to be paid by the Debtors or the Reorganized Debtors. As soon as reasonably practicable prior to the Effective Date, and no later than the Effective Date, the Debtors will fund the Professional Fee Reserve with Cash in the aggregate amount of (i) the aggregate unpaid Professional Fee Claims incurred prior to and as of the Confirmation Date, plus (ii) the Professionals' good-faith estimate of their fees, costs, and expenses expected to be incurred between the Confirmation Date and the Effective Date, or such greater amount that may be agreed between the Debtors and the Super-Majority Term Loan Lenders; provided that the foregoing will not limit the amount of Allowed Professional Fee Claims payable or to be paid by the Debtors or the Reorganized Debtors.

The Cash contained in the Professional Fee Reserve will be used solely to pay the Allowed Professional Fee Claims, with the Unused Professional Fee Reserve Amount (if any) being returned to the Reorganized Debtors. The Debtors and the Reorganized Debtors, as applicable, will maintain detailed records of all payments made from the Professional Fee Reserve, such that all payments and transactions will be adequately and promptly documented in, and readily ascertainable from, their respective books and records. After the Effective Date, neither the Debtors nor the Reorganized Debtors will include any other funds or property within the Professional Fee Reserve without further order of the Bankruptcy Court. To the extent the Professional Fee Reserve is insufficient to pay in full in Cash the obligations and liabilities for which such reserve was established, then the Reorganized Debtors will, within five (5) Business Days, pay such obligations and liabilities from either Cash on hand or by drawing under the Exit Facility Credit Agreements to the extent of any availability thereunder.

The Professional Fee Reserve will be maintained in trust for the Professionals and will not be considered property of the Debtors' Estates; provided that the Reorganized Debtors will have a reversionary interest in the Unused Professional Fee Reserve Amount. To the extent that funds held in the Professional Fee Reserve do not or are unable to satisfy the full amount of the Allowed Professional Fee Claims, such Professionals will have an Allowed Administrative Claim for any such deficiency, which will be satisfied in full in Cash in accordance with Article II.A of the Plan.

18.     **Payment of Fees and Expenses of Certain Creditors**

The Debtors will, on and after the Effective Date and to the extent invoiced, pay the Prepetition Term Loan Agent & Lenders Fees and Expenses including, for the avoidance of doubt, the Ad Hoc Term Lender Group Fees and Expenses) (in each case whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases), without application by any such parties to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise; provided, however, if the Debtors or Reorganized Debtors and any such Person or Entity cannot agree with respect to the reasonableness of the fees and expenses (incurred prior to the Effective Date) to be paid to such parties, the reasonableness of any such fees and expenses will be determined by the Bankruptcy Court (with any undisputed amounts to be paid by the Debtors on or after the Effective Date (as applicable) and any disputed amounts to be escrowed by the Reorganized Debtors). Notwithstanding anything to the contrary in the Plan, the fees and expenses described in this paragraph will not be subject to the Administrative Claims Bar Date.

70

**E.      TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

1.      **Assumption of Executory Contracts and Unexpired Leases**

On the Effective Date, the Reorganized Debtors will assume all Executory Contracts and Unexpired Leases of the Debtors in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that:

i.      have been assumed or rejected by the Debtors by prior order of the Bankruptcy Court;

ii.     are the subject of a motion to reject filed by the Debtors that is pending on the Effective Date;

iii.    are identified in the Plan Supplement, which Plan Supplement may be amended by the Debtors to add or remove Executory Contracts and Unexpired Leases by filing with the Bankruptcy Court an amended Plan Schedule and serving it on the affected non-Debtor contract parties at least seven (7) days prior to the Plan Objection Deadline; or

iv.     are rejected by the Debtors or terminated pursuant to the terms of the Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

To the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to the Plan or any prior order of the Bankruptcy Court (including, without limitation, any "change of control" provision) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (i) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (ii) any Debtor's or any Reorganized Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease or (iii) the Confirmation or Consummation of the Plan, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease will be deemed satisfied by the Confirmation of the Plan.

Each Executory Contract and Unexpired Lease assumed and/or assigned pursuant to the Plan will revest in and be fully enforceable by the applicable Reorganized Debtor or the applicable assignee in accordance with its terms and conditions, except as modified by the provisions of the Plan, any order of the Bankruptcy Court approving its assumption and/or assignment, or applicable law.

71

The inclusion or exclusion of a contract or lease on any schedule or exhibit will not constitute an admission by any Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

For the avoidance of doubt, the Debtors reserve all rights to seek relief with respect to their CBAs pursuant to sections 1113 and 1114 of the Bankruptcy Code.

2.       **Cure of Defaults; Assignment of Executory Contracts and Unexpired Leases**

Any defaults under each Executory Contract and Unexpired Lease to be assumed, or assumed and assigned, pursuant to the Plan will be satisfied, pursuant to and to the extent required by section 365(b)(1) of the Bankruptcy Code, by payment of the applicable default amount in Cash on or in connection with the Effective Date or on such other terms as the Bankruptcy Court may order or the parties to such Executory Contracts or Unexpired Leases may otherwise agree in writing (the "**Cure Claim Amount**").

In the event of an assumption, or an assumption and assignment, of an Executory Contract or Unexpired Lease under the Plan, at least fourteen (14) days prior to the Plan Objection Deadline, the Debtors will File and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, or proposed assumption and assignment, which will: (a) list the applicable Cure Claim Amount, if any; (b) if applicable, identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption, or proposed assumption and assignment under the Plan, or any related cure amount, must be Filed, served and actually received by the Debtors prior to the Plan Objection Deadline (notwithstanding anything in the Schedules or a Proof of Claim to the contrary). Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, or proposed assumption and assignment, or cure amount will be deemed to have consented to such matters and will be deemed to have forever released and waived any objection to such proposed assumption, proposed assumption and assignment, and cure amount. The Confirmation Order will constitute an order of the Bankruptcy Court approving each proposed assumption, or proposed assumption and assignment, of Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any Debtor or assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned or (c) any other matter pertaining to assumption or assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving such assumption, or assumption and assignment. If such objection is sustained by Final Order of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming or assigning it. The Debtors or the Reorganized Debtors, as applicable, will be authorized to effect such rejection by filing a written notice of rejection with

72

the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

Subject to any cure claims Filed with respect thereto, assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan will result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment, in each case as provided in section 365 of the Bankruptcy Code. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned by Final Order will be deemed disallowed and expunged (subject to any cure claims Filed with respect thereto), without further notice to or action, order, or approval of the Bankruptcy Court.

With respect to any Executory Contract or Unexpired Lease assumed and assigned pursuant to the Plan, upon and as of the Effective Date, the applicable assignee will be deemed to be substituted as a party thereto for the applicable Debtor party to such assigned Executory Contract or Unexpired Lease and, accordingly, the Debtors and the Reorganized Debtors will be relieved, pursuant to and to the extent set forth in section 365(k) of the Bankruptcy Code, from any further liability under such assigned Executory Contract or Unexpired Lease.

3.   **Rejection of Executory Contracts and Unexpired Leases**

The Debtors reserve the right, at any time prior to the Effective Date, except as otherwise specifically provided in the Plan, to seek to reject any Executory Contract or Unexpired Lease and to file a motion requesting authorization for the rejection of any such contract or lease. All Executory Contracts and Unexpired Leases listed on the Plan Supplement will be deemed rejected as of the Effective Date. The Confirmation Order will constitute an order of the Bankruptcy Court approving the rejections described in this Article VI pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise will not constitute a termination of any preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

4.   **Claims on Account of the Rejection of Executory Contracts or Unexpired Leases**

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after service of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

Any Person or Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so will be forever barred, estopped and enjoined from asserting such Claim, and such Claim will not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and their respective assets and property will be forever discharged from any and

73

all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan.  All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G of the Plan.

5.      **D&O Liability Insurance Policies**

On the Effective Date, each D&O Liability Insurance Policy will be deemed and treated as an Executory Contract that is and will be assumed by the Debtors (and assigned to the applicable Reorganized Debtors, if necessary) pursuant to section 365(a) and section 1123 of the Bankruptcy Code as to which no Proof of Claim, request for administrative expense, or cure claim need be Filed, and all Claims arising from the D&O Liability Insurance Policies will survive the Effective Date and be Unimpaired. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the D&O Liability Insurance Policies. Confirmation and Consummation of the Plan will not impair or otherwise modify any available defenses of the Reorganized Debtors under the D&O Liability Insurance Policies.  For the avoidance of doubt, the D&O Liability Insurance Policies will continue to apply with respect to actions, or failures to act, that occurred on or prior to the Effective Date, subject to the terms and conditions of the D&O Liability Insurance Policies.  The Debtors are further authorized to take such actions, and to execute and deliver such documents, as may be reasonably necessary or appropriate to implement, maintain, cause the binding of, satisfy any terms or conditions of, or otherwise secure for the insureds the benefits of the D&O Tail Policy, without further notice to or order of the Bankruptcy Court or approval or consent of any Person or Entity.

6.      **Indemnification Provisions**

On the Effective Date, all Indemnification Provisions will be deemed and treated as Executory Contracts that are and will be assumed by the Debtors (and assigned to the applicable Reorganized Debtors, if necessary) pursuant to section 365(a) and section 1123 of the Bankruptcy Code as to which no Proof of Claim, request for administrative expense, or cure claim need be Filed, and all Claims arising from the Indemnification Provisions will survive the Effective Date and be Unimpaired.  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of such Indemnification Provisions. Confirmation and Consummation of the Plan will not impair or otherwise modify any available defenses of the Reorganized Debtors or other applicable parties under the Indemnification Provisions.  For the avoidance of doubt, the Indemnification Provisions will continue to apply with respect to actions, or failures to act, that occurred on or prior to the Effective Date, subject to the terms and conditions of the Indemnification Provisions.

7.      **Insurance Contracts**

On the Effective Date, and without limiting the terms or provisions of Paragraph E of Article VI of the Plan, each Insurance Contract will be deemed and treated as an Executory Contract that is and will be assumed by the Debtors pursuant to section 365(a) and section 1123 of the Bankruptcy Code as to which no Proof of Claim, request for administrative expense, or cure claim need be Filed.  Unless previously effectuated by separate order entered by the Bankruptcy

US-DOCS\115812051.19

Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the Insurance Contracts. Confirmation and Consummation of the Plan will not impair or otherwise modify any available defenses of the Reorganized Debtors or any Insurer under the Insurance Contracts.

8.     **The Pension Plans**

The Debtors sponsor two defined benefit pension plans covered by ERISA. On the Effective Date, the Reorganized Debtors will assume and continue to maintain the US Salaried Pension Plan and the US Hourly Pension Plan in accordance with their respective terms (as such terms may be amended from time to time including pursuant to the 1113/1114 Order) and applicable non-bankruptcy law.

After the Effective Date, the Reorganized Debtors (to the extent they are controlled group members of the US Pension Plans' sponsor under ERISA) will be responsible for (i) satisfying the minimum funding requirements under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083 for the US Pension Plans and (ii) paying all required PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307 for the US Pension Plans. After the Effective Date, the sponsors of the US Pension Plans will be responsible for administering the US Pension Plans in accordance with the applicable provisions of ERISA and the Internal Revenue Code.

With respect to the US Pension Plans, no provision of the Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code will be construed to discharge, release, or relieve the Reorganized Debtors, or their successors, from liabilities or requirements imposed under any law or regulatory provision arising after the Effective Date with respect to the US Pension Plans or PBGC. PBGC and the US Pension Plans will not be enjoined or precluded from enforcing such liability with respect to the US Pension Plans as a result of any provision of the Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code. PBGC and the Reorganized Debtors agree that all proofs of claim filed by PBGC will be deemed withdrawn as of the Effective Date.

9.     **Employee Compensation and Benefit Programs**

Other than those programs and policies to be rejected as set forth in the Plan Supplement and as set forth in the 1113/1114 Order, all employment agreements and severance policies, and all employment, compensation and benefit plans, policies, and programs of the Debtors applicable to any of their respective officers, employees or retirees, and any of the officers, employees or retirees of their respective subsidiaries, including, without limitation, all workers' compensation programs, savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, retention plans, life, and accidental death and dismemberment insurance plans, health and welfare plans, 401(k) plans, and pension plans (collectively, the "**Employee Compensation and Benefit Programs**"), shall be deemed and treated as Executory Contracts that are and shall be assumed by the Debtors (and assigned to the applicable Reorganized Debtors, if necessary) pursuant to section 365(a) and section 1123 of the Bankruptcy Code as to which no Proof of Claim, request for administrative expense, or cure claim need be Filed; provided, however, that any incentive or bonus program of the Debtors shall be deemed rejected unless otherwise listed as assumed pursuant to the Plan Supplement. All Claims arising from the Employee Compensation and Benefit Programs that are not identified in the Plan Supplement to be rejected shall survive

75

the Effective Date and be Unimpaired.  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' assumption of such Employee Compensation and Benefit Programs. Confirmation and Consummation of the Plan shall not impair or otherwise modify any available defenses of the Reorganized Debtors under the Employee Compensation and Benefit Programs.

10.     **Extension of Time to Assume or Reject**

Notwithstanding anything to the contrary set forth in Article VI of the Plan, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the right of the Reorganized Debtors to move to assume or reject such contract or lease will be extended until the date that is ten (10) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired.  The deemed assumption provided for in Article VI.A of the Plan will not apply to any such contract or lease, and any such contract or lease will be assumed or rejected only upon motion of the Reorganized Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

11.     **Modifications, Amendments, Supplements, Restatements, or Other Agreements**

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed by the Debtors or the Reorganized Debtors will include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing has been previously rejected or repudiated or is rejected or repudiated hereunder. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases will not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.     **PROVISIONS GOVERNING DISTRIBUTIONS**

1.     **Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in the "Treatment" sections in Article III of the Plan or as ordered by the Bankruptcy Court, initial distributions to be made on account of Claims that are Allowed Claims as of the Effective Date will be made on the Initial Distribution Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under the Plan on a day other than a Business Day will be made on the next succeeding Business Day.  Distributions on account of Disputed Claims that first become Allowed Claims after the Effective Date will be made pursuant to Article VIII of the Plan.

2.     **No Postpetition Interest on Claims**

Unless otherwise specifically provided for in the Plan, the Confirmation Order, the DIP Orders, or Final Order of the Bankruptcy Court, or required by applicable bankruptcy law (including, without limitation, as required pursuant to section 506(b) or section 511 of the

76

Bankruptcy Code), postpetition interest will not accrue or be paid on any Claims and no Holder of a Claim will be entitled to interest accruing on or after the Petition Date on any Claim.

3. **Distributions by Reorganized Debtors or Other Applicable Distribution Agent**

Other than as specifically set forth below or in the Plan, the Reorganized Debtors or other applicable Distribution Agent will make all distributions required to be distributed under the Plan. Distributions on account of the Allowed Prepetition ABL Claims, Allowed Prepetition Term Loan Claims and DIP Claims will be made to the Prepetition ABL Agreement Agent, the Prepetition Term Loan Agent, and the applicable DIP Agent, respectively, and such agent will be, and will act as, the Distribution Agent with respect to its respective Class of Claims in accordance with the terms and conditions of the Plan and the applicable credit documents. All distributions to Holders of Allowed Prepetition ABL Claims, Allowed Prepetition Term Loan Claims, and DIP Claims will be deemed completed when made by the Reorganized Debtors to the Prepetition ABL Agreement Agent, the Prepetition Term Loan Agent, or the applicable DIP Agent, respectively. The Reorganized Debtors may employ or contract with other entities to assist in or make the distributions required by the Plan and may pay the reasonable fees and expenses of such entities and the Distribution Agents in the ordinary course of business. No Distribution Agent will be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

4. **Delivery and Distributions; Undeliverable or Unclaimed Distributions**

(a) Record Date for Distributions

On the Distribution Record Date, the Claims Register will be closed. Accordingly, the Debtors, the Reorganized Debtors or other applicable Distribution Agent will have no obligation to recognize the assignment, transfer or other disposition of, or the sale of any participation in, any Allowed Claim (other than Prepetition Debt Claims) that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes in the Plan to recognize and distribute securities, property, notices and other documents only to those Holders of Allowed Claims (other than Prepetition Debt Claims) who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. The Reorganized Debtors or other applicable Distribution Agent will be entitled to recognize and transact with, for all purposes under the Plan, only those record holders stated on the Claims Register, or their books and records, as of the close of business on the Distribution Record Date; provided, however, that the Distribution Record Date will not apply to the Prepetition Debt Claims and DIP Facility Claims.

(b) Delivery of Distributions in General

Except as otherwise provided the Plan, the Debtors, the Reorganized Debtors or other applicable Distribution Agent, as applicable, will make distributions to Holders of Allowed Claims, or in care of their authorized agents, as appropriate, at the address for each such Holder or agent as indicated on the Debtors' or other applicable Distribution Agent's books and records as of the date of any such distribution; provided, however, that the manner of such distributions will be determined in the discretion of the applicable Distribution Agent (subject to the terms and

77

conditions of the relevant Prepetition Debt Documents, if applicable); provided further, that the address for each Holder of an Allowed Claim will be deemed to be the address set forth in the latest Proof of Claim Filed by such Holder pursuant to Bankruptcy Rule 3001 as of the Distribution Record Date.

        (c)        <u>Minimum Distributions</u>

Notwithstanding anything to the contrary in the Plan, no Distribution Agent will be required to make distributions or payments of less than $100.00 (whether in Cash or otherwise) or to make partial distributions or payments of fractions of dollars or New Equity Interests, in each case with respect to Impaired Claims. With respect to Impaired Claims, whenever any payment or distribution of a fraction of a dollar or share of New Equity Interest under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar or share of New Equity Interest (up or down), with half dollars and half shares of New Equity Interest or more being rounded up to the next higher whole number and with less than half dollars and half shares of New Equity Interest being rounded down to the next lower whole number (and no Cash will be distributed in lieu of such fractional New Equity Interest).

No Distribution Agent will have any obligation to make a distribution on account of an Allowed Claim that is Impaired under the Plan if: (a) the aggregate amount of all distributions authorized to be made on the Subsequent Distribution Date in question is or has an economic value less than $25,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Subsequent Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $100.00, which will be treated as an undeliverable distribution under <u>Article VII.D.4</u> of the Plan.

        (d)        <u>Undeliverable Distributions</u>

        (i)        <u>Holding of Certain Undeliverable Distributions</u>

If the distribution to any Holder of an Allowed Claim is returned to the Distribution Agent as undeliverable or is otherwise unclaimed, no further distributions will be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then current address, at which time all currently due but missed distributions will be made to such Holder on the next Subsequent Distribution Date (or such earlier date as determined by the applicable Distribution Agent). Undeliverable distributions will remain in the possession of the Reorganized Debtors or in the applicable reserve, subject to <u>Article VII.D.4.(b)</u> of the Plan, until such time as any such distributions become deliverable. Undeliverable distributions will not be entitled to any additional interest, dividends or other accruals of any kind on account of their distribution being undeliverable.

        (ii)        <u>Failure to Claim Undeliverable Distributions</u>

Any Holder of an Allowed Claim (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such Holder) that does not assert a right pursuant to the Plan for an undeliverable or unclaimed distribution within one (1) year after the later of the Effective Date or the date such distribution is due will be deemed to have forfeited its rights for such undeliverable or unclaimed distribution and will be forever barred and enjoined from asserting any

78

such rights for an undeliverable or unclaimed distribution against the Debtors or their Estates, the Reorganized Debtors or their respective assets or property, or any Distribution Agent.  In such case, (i) for Claims other than in Classes 4 and 5, any Cash, Plan Securities, or other property reserved for distribution on account of such Claim will become the property of the Estates free and clear of any Claims of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary, and (ii) for Claims in Class 4, Class 5, or Class 6 any Cash, Plan Securities and Documents, and/or other property, as applicable, held for distribution on account of such Claim will be allocated Pro Rata by the applicable Distribution Agent for distribution among the other Holders of Claims in such Class.  Nothing contained in the Plan will require the Debtors, the Reorganized Debtors, or any Distribution Agent to attempt to locate any Holder of an Allowed Claim.

(e)     Failure to Present Checks

Checks issued by the Distribution Agent on account of Allowed Claims will be null and void if not negotiated within 180 days after the issuance of such check.  In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, no later than 90 days after the issuance of such checks, the Reorganized Debtors will file with the Bankruptcy Court a list of the Holders of any un-negotiated checks.  This list will be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open.  Requests for reissuance of any check will be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.  Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 90 days after the date of mailing or other delivery of such check will have its Claim for such un-negotiated check discharged and be forever barred, estopped and enjoined from asserting any such Claim against the Debtors or their Estates, the Reorganized Debtors or their respective assets or property.  In such case, any Cash held for payment on account of such Claims will be distributed to the applicable Distribution Agent for distribution or allocation in accordance with the Plan, free and clear of any Claims of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary.

5.     **Compliance with Tax Requirements**

In connection with the Plan and all distributions hereunder, the Reorganized Debtors or other applicable Distribution Agent will comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder will be subject to any such withholding and reporting requirements.  The Reorganized Debtors or other applicable Distribution Agent will be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  All Persons holding Claims will be required to provide any information necessary to effect information reporting and the withholding of taxes.

6.     **Allocation of Plan Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution will, to the extent permitted by applicable law, be allocated for income tax purposes to the principal amount of the

79

Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

### 7.     **Means of Cash Payment**

Payments of Cash made pursuant to the Plan will be in U.S. dollars and will be made, at the option of the Debtors or the Reorganized Debtors (as applicable), by checks drawn on, or wire transfer from, a domestic bank selected by the Debtors or the Reorganized Debtors.  Cash payments to foreign creditors may be made, at the option of the Debtors or the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### 8.     **Timing and Calculation of Amounts to Be Distributed**

Except as otherwise provided in the "Treatment" sections in Article III of the Plan or as ordered by the Bankruptcy Court, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on the Subsequent Distribution Date occurring after such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim will receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims will be made pursuant to the provisions set forth in the applicable class treatment or in Article VIII of the Plan.  Except as otherwise provided in the Plan, Holders of Claims will not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### 9.     **Setoffs**

Without altering or limiting any of the rights and remedies of the Debtors and the Reorganized Debtors under section 502(d) of the Bankruptcy Code, all of which rights and remedies are hereby reserved, the Debtors and the Reorganized Debtors may, but will not be required to, withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any claims, Causes of Action and Litigation Claims of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim; provided that, at least ten (10) days prior to effectuating such withholding, the Debtors or the Reorganized Debtors, as applicable, will provide written notice thereof to the applicable Holder of such Claim, and all objections and defenses of such Holder to such withholding are preserved.  In the event that any such claims, Causes of Action or Litigation Claims are adjudicated by Final Order or otherwise resolved against the applicable Holder, the Debtors and the Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of such adjudicated or resolved claims, Causes of Action or Litigation Claims.  Neither the failure to effect such a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, Causes of Action or Litigation Claims, all of which are reserved unless expressly released or compromised pursuant to the Plan or the Confirmation Order.

80

## G.  PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

### 1.  Resolution of Disputed Claims

#### (a)  Allowance of Claims

After the Effective Date, and except as otherwise provided in the Plan, the Reorganized Debtors will have and will retain any and all available rights and defenses that the Debtors had with respect to any Claim, including, without limitation, the right to assert any objection to Claims based on the limitations imposed by section 502 of the Bankruptcy Code.  The Debtors and the Reorganized Debtors may contest the amount and validity of any Disputed Claim or contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

#### (b)  Prosecution of Objections to Claims

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors will have the authority to File objections to Claims (other than Claims that are Allowed under the Plan) and settle, compromise, withdraw or litigate to judgment objections to any and all such Claims, regardless of whether such Claims are in an Unimpaired Class or otherwise; provided, however, this provision will not apply to Professional Fee Claims, which may be objected to by any party-in-interest in these Chapter 11 Cases.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court.  The Reorganized Debtors will have the sole authority to administer and adjust the Claims Register and their respective books and records to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

#### (c)  Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim or contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, whether for allowance or to determine the maximum amount of such Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, will be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that

81

estimated amount will constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

(d)     Deadline to File Objections to Claims

Any objections to Claims will be Filed by no later than the Claims Objection Deadline; provided that nothing contained in the Plan will limit the Reorganized Debtors' right to object to Claims, if any, Filed or amended after the Claims Objection Deadline. Moreover, notwithstanding the expiration of the Claims Objection Deadline, the Debtors or the Reorganized Debtors will continue to have the right to amend any claims objections and to file and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is Allowed. Moreover, notwithstanding the expiration of the Claims Objection Deadline, the Reorganized Debtors will continue to have the right to amend any claims or other objections and to File and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is or becomes Allowed by Final Order of the Bankruptcy Court.

2.     **No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan to the contrary, no payments or distributions of any kind or nature will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim has become an Allowed Claim pursuant to a Final Order. Notwithstanding the foregoing, to the extent that a Disputed Claim is only disputed in part, a distribution will be timely made on the undisputed portion of the Claim.

3.     **Distributions on Account of Disputed Claims Once They Are Allowed and Additional Distributions on Account of Previously Allowed Claims**

On each Subsequent Distribution Date (or such earlier date as determined by the Reorganized Debtors in their sole discretion), the Reorganized Debtors or other applicable Distribution Agent will make distributions (a) on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter, and (b) on account of previously Allowed Claims of property that would have been distributed to the Holders of such Claims on the dates distributions previously were made to Holders of Allowed Claims in such Class had the Disputed Claims that have become Allowed Claims or Disallowed Claims by Final Order of the Bankruptcy Court been Allowed or disallowed, as applicable, on such dates. Such distributions will be made pursuant to the applicable provisions of Article VII of the Plan. For the avoidance of doubt, but without limiting the terms or conditions of Article VII.B or the Plan or Paragraph B of Article VIII of the Plan, any dividends or other distributions arising from property distributed to holders of Allowed Claims in a Class and paid to such Holders under the Plan will also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to holders of Allowed Claims in such Class.

82

4.     **Reserve for Disputed Claims**

The Debtors, the Reorganized Debtors, and the Distribution Agent may, in their respective sole discretion, establish such appropriate reserves for Disputed Claims in the applicable Class(es) as it determines necessary and appropriate, in each case with the consent of the Super-Majority Term Loan Lenders or as approved by order of the Bankruptcy Court.  Without limiting the foregoing, reserves (if any) for Disputed Claims will equal, as applicable, an amount of Cash equal to 100% of distributions to which Holders of Disputed Claims in each applicable Class would otherwise be entitled under the Plan as of such date if such Disputed Claims were Allowed Claims in their respective Face Amount (or based on the Debtors' books and records if the applicable Holder has not yet Filed a Proof of Claim and the Claims Bar Date has not yet expired); provided, however, that the Debtors and the Reorganized Debtors, as applicable, will have the right to file a motion seeking to estimate any Disputed Claims.

**H.     CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

1.     **Conditions Precedent to Confirmation**

It will be a condition to Confirmation of the Plan that the following conditions will have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

- The Plan and the Restructuring Documents will be in form and substance acceptable to the Debtors, the DIP ABL Agent, and the Super-Majority Term Loan Lenders; and

- The Confirmation Order will have been entered by the Bankruptcy Court.

2.     **Conditions Precedent to Consummation**

It will be a condition to Consummation of the Plan that the following conditions will have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan.

- The Confirmation Order, which shall be in form and substance acceptable to the Debtors and the Super-Majority Term Loan Lenders, will have become a Final Order and such order will not have been amended, modified, vacated, stayed, or reversed;

- The Confirmation Date will have occurred;

- The Bankruptcy Court will have entered one or more Final Orders (which may include the Confirmation Order), in form and substance acceptable to the Debtors and the Super-Majority Term Loan Lenders, authorizing the assumption, assumption and assignment and rejection of the Executory Contracts and Unexpired Leases by the Debtors as contemplated in the Plan and the Plan Supplement;

- The Plan and the Restructuring Documents will not have been amended or modified other than in a manner in form and substance acceptable to the Debtors, DIP ABL Agent, and the Super-Majority Term Loan Lenders;

US-DOCS\115812051.19

- The Restructuring Documents will have been filed, tendered for delivery, and been effectuated or executed by all Entities party thereto (as appropriate), and in each case in full force and effect. All conditions precedent to the effectiveness of such Restructuring Documents, including, without limitation, the Exit Facility Credit Agreements, will have been satisfied or waived pursuant to the terms of such applicable Restructuring Documents (or will be satisfied concurrently with the occurrence of the Effective Date);

- All consents, actions, documents, certificates and agreements necessary to implement the Plan and the transactions contemplated by the Plan will have been, as applicable, obtained and not otherwise subject to unfulfilled conditions, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws, and in each case in full force and effect;

- All governmental approvals and consents, including Bankruptcy Court approval, that are applicable and legally required for the consummation of the Plan will have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, will have expired;

- The New Board will have been selected;

- The conditions to the effectiveness of the Exit Facility Credit Agreements will have been satisfied or waived and the Exit Facility Credit Agreements will have closed or will close simultaneously with the effectiveness of the Plan;

- The Professional Fee Reserve will have been funded in full in Cash by the Debtors in accordance with the terms and conditions of the Plan;

- The earlier to occur of (i) the Acceptable CBA Modifications and (ii) entry of the 1113/1114 Order; and

- As and to the extent invoiced, all Ad Hoc Term Lender Group Fees and Expenses and Prepetition Term Loan Agent & Lenders Fees and Expenses will have been paid in full in Cash or reserved in a manner acceptable to the applicable Super-Majority Term Loan Lenders (or approved by order of the Bankruptcy Court) to the extent of any disputes related thereto.

3. **Waiver of Conditions**

Subject to section 1127 of the Bankruptcy Code, the conditions to Confirmation and Consummation of the Plan set forth in Article IX of the Plan may be waived by the Debtors, with the consent of the Super-Majority Term Loan Lenders, the DIP Term Loan Agent (at the direction of the Required DIP Lender Group) and the DIP ABL Agent, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan. The failure of the Debtors or Reorganized Debtors to exercise any of the foregoing rights will not

84

be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

4.    **Effect of Non-Occurrence of Conditions to Confirmation or Consummation**

If the Confirmation or the Consummation of the Plan does not occur with respect to one or more of the Debtors, then the Plan will, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in the Plan or this Disclosure Statement will: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Person or Entity; (3) constitute an Allowance of any Claim or Equity Interest; or (4) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Person or Entity in any respect.

I.    **RELEASE, DISCHARGE, INJUNCTION AND RELATED PROVISIONS**

1.    **General**

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions (if any) and treatments hereunder, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise. As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions (if any) and treatments hereunder, are settled, compromised, terminated and released pursuant hereto; provided, however, that nothing contained in the Plan will preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan.

2.    **Release of Claims and Causes of Action**

(a)    Release by the Debtors and their Estates

**Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, and on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "Debtor Releasing Parties") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released will be deemed forever released, waived and discharged by the Debtor Releasing Parties)**

85

and their respective assets and properties (the "**Debtor Release**") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Documents, the Prepetition Debt Documents, the DIP Financing Documents, or the Restructuring Transactions (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the DIP Financing Documents, the Prepetition Debt Documents or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on the Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person or Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release will not operate to waive or release the rights of such Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan (including, without limitation, the Exit Facility Loan Documents) or assumed pursuant to the Plan or assumed pursuant to Final Order of the Bankruptcy Court.  The foregoing release will be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release.  Notwithstanding the foregoing, nothing in this **Article X.B.** will or will be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in the Plan.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the

US-DOCS\115812051.19

**Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.**

(b)      <u>Release by Third Parties</u>

**Except as otherwise expressly provided in the Plan, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "<u>Releasing Parties</u>") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released will be deemed forever released, waived and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "<u>Third Party Release</u>") from any and all Claims, Causes of Action, Litigation Claims (as applicable) and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Documents, the Prepetition Debt Documents, the DIP Financing Documents, or the Restructuring Transactions (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the DIP Financing Documents, the Prepetition Debt Documents or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on the Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; _provided_, _however_, that the foregoing provisions of this Third Party Release will not operate to waive or release (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction and/or (ii) the rights of such Non-Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan (including, without limitation, the Exit Facility Loan Documents and the Payoff Letter) or assumed pursuant to the Plan or assumed pursuant to Final Order of the Bankruptcy Court.  The foregoing release will be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent,**

87

**authorization or approval of any Person or Entity and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.**

**Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Third Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that the Third Party Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Third Party Release; (iii) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.**

3. **Waiver of Statutory Limitations on Releases**

Each of the Releasing Parties in each of the releases contained above expressly acknowledges that although ordinarily a general release may not extend to Claims which the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims.  Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release, which if known by it may have materially affected its settlement with the released party.  Except as otherwise provided in the Plan and subject to the terms of the Payoff Letter, the releases contained in the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

4. **Discharge of Claims and Equity Interests**

**To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan (including, without limitation, Articles V.D, V.E, V.F, and V.G of the Plan) or the Confirmation Order, effective as of the Effective Date, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims, Equity Interests and Causes of Action of any kind or nature whatsoever against the Debtors or any of their respective assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims, Equity Interests or Causes of Action.**

US-DOCS\115812051.19

Except as otherwise expressly provided by the Plan (including, without limitation, **Articles V.D, V.E, V.F**, and V.G of the Plan) or the Confirmation Order, upon the Effective Date, the Debtors and their Estates will be deemed discharged and released under and to the fullest extent provided under sections 524 and 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code. Such discharge will void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.

Except as otherwise expressly provided by the Plan (including, without limitation, **Articles V.D, V.E, V.F**, and V.G of the Plan) the Confirmation Order or the Payoff Letter, upon the Effective Date: (i) the rights afforded in the Plan and the treatment of all Claims and Equity Interests will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their respective assets, property, or Estates; (ii) all Claims and Equity Interests will be satisfied, discharged, and released in full, and each of the Debtor's liability with respect thereto will be extinguished completely without further notice or action; and (iii) all Entities will be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, each of their respective successors and assigns, and each of their respective assets and properties, any such Claims or Equity Interests, whether based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date or otherwise.

5.      **Exculpation**

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties will neither have nor incur any liability to any Person or Entity for any claims or Causes of Action for any act taken or omitted to be taken on or after the Petition Date and on or before the Effective Date in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of the Plan, the Disclosure Statement, the Restructuring Documents, the DIP Financing Documents, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of the Plan; *provided*, *however*, that the foregoing provisions of this exculpation will not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan or assumed pursuant to the Plan or Final Order of the Bankruptcy Court; **provided**, **further**, that each Exculpated Party will be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in

89

**connection with, the above referenced documents, actions or inactions. The foregoing exculpation will be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity. Notwithstanding the foregoing, nothing in this Article X.E will or will be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in the Plan.**

6. **Preservation of Causes of Action**

(a) <u>Maintenance of Causes of Action</u>

Except as otherwise provided in Article X of the Plan (including, without limitation, and for the avoidance of doubt, the Releases contained in Article X.B and Exculpation contained in Article X.E of the Plan) or elsewhere in the Plan or the Confirmation Order, after the Effective Date, the Reorganized Debtors will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Litigation Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Cases. The Reorganized Debtors, as the successors-in-interest to the Debtors and the Estates, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of such Litigation Claims without notice to or approval from the Bankruptcy Court.

(b) <u>Preservation of All Causes of Action Not Expressly Settled or Released</u>

The Debtors expressly reserve all Causes of Action and Litigation Claims for later adjudication by the Debtors or the Reorganized Debtors (including, without limitation, Causes of Action and Litigation Claims not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action or Litigation Claims upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except in each case where such Causes of Action or Litigation Claims have been expressly waived, relinquished, released, compromised or settled in the Plan (including, without limitation, and for the avoidance of doubt, the Releases contained in Article X.B and Exculpation contained in Article X.E of the Plan) or any other Final Order (including, without limitation, the Confirmation Order). In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant or an interested party, against any Person or Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

7. **Injunction**

US-DOCS\115812051.19

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND,  IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED).  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, WILL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.**

**J.      BINDING NATURE OF THE PLAN**

**ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, THE DEBTORS, THE REORGANIZED DEBTORS, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THE PLAN, EACH PERSON AND ENTITY ACQUIRING PROPERTY UNDER THE PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH THE DEBTORS AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON OR ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN, AFFIRMATIVELY VOTED TO REJECT THE PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THE PLAN.**

US-DOCS\115812051.19

K.    **PROTECTION AGAINST DISCRIMINATORY TREATMENT**

To the extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Persons and Entities, including Governmental Units, will not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant, against the Reorganized Debtors, or another Person or Entity with whom the Reorganized Debtors have been associated, solely because any Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

L.    **INTEGRAL PART OF PLAN**

Each of the provisions set forth in the Plan with respect to the settlement, release, discharge, exculpation, injunction, indemnification and insurance of, for or with respect to Claims and/or Causes of Action are an integral part of the Plan and essential to its implementation.  Accordingly, each Person or Entity that is a beneficiary of such provision will have the right to independently seek to enforce such provision and such provision may not be amended, modified, or waived after the Effective Date without the prior written consent of such beneficiary.

US-DOCS\115812051.19

# V.
# CONFIRMATION AND CONSUMMATION PROCEDURES

### A.      SOLICITATION OF VOTES

The process by which the Debtors will solicit votes to accept or reject the Plan is summarized in Section I herein titled, "Executive Summary" and set forth in detail in the Disclosure Statement Order, which is attached as Exhibit B to this Disclosure Statement.

**PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT VOTES ARE PROPERLY AND TIMELY SUBMITTED SUCH THAT THEY ARE COUNTED AS VOTES TO ACCEPT OR REJECT THE PLAN.**

### B.      CONFIRMATION PROCEDURES

#### 1.      **Confirmation Hearing**

The Confirmation Hearing will commence on October [1], 2020 before the Honorable Laurie Selber Silverstein, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 6th Floor, Courtroom 2, Wilmington, Delaware 19801-3024, and such hearing will be conducted either by teleconference or videoconference via CourtCall and/or Zoom.  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

#### 2.      **Filing Objections to the Plan**

The Plan Objection Deadline is September [21], 2020.

Any objection to confirmation of the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim or Equity Interest held by such Entity; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Plan Objection Deadline by the Notice Parties, as defined in Section I.F herein.

CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

93

US-DOCS\115812051.19

## C.   STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtors complied with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the cases, has been or will be disclosed to the Bankruptcy Court, and any such payment: (a) made before the confirmation of the Plan is reasonable; or (b) if it is to be fixed after confirmation of the Plan, is subject to the approval of the Bankruptcy Court for the determination of reasonableness;

- The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan.  The appointment to, or continuance in, such office by such individual, will be consistent with the interests of creditors and equity security holders and with public policy and the Debtors will have disclosed the identity of any insider that the Reorganized Debtors will employ or retain, and the nature of any compensation for such insider;

- Either each Holder of an Impaired Claim will have accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code;

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan will either have accepted the Plan or will not be Impaired under the Plan, or the Plan can be confirmed without the approval of such Voting Class pursuant to section 1129(b) of the Bankruptcy Code;

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Other Priority Claims will be paid in full in Cash on the Effective Date, or as soon thereafter as is

94

reasonably practicable, and that Priority Tax Claims will be paid in accordance with section 1129(a)(9)(C) of the Bankruptcy Code;

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class;

- Confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor thereto under the Plan; and

- All outstanding fees payable pursuant to section 1930 of title 28 of the United States Code will be paid when due.

1.      **Best Interests of Creditors Test/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provide, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor or debtors are liquidated under chapter 7 of the Bankruptcy Code.  To make these findings, the Bankruptcy Court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the Chapter 11 Cases were converted to a chapter 7 case and the assets of the particular debtors' estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the chapter 11 plan that such holder would receive if the chapter 11 plan were confirmed.

In chapter 7 cases, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid in full: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

Accordingly, the cash amount that would be available for satisfaction of claims (other than secured claims) would consist of the proceeds resulting from the disposition of the unencumbered assets of the debtors, augmented by the unencumbered cash held by the debtors at the time of the commencement of the liquidation.  Such cash would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from termination of the debtor's business and the use of chapter 7 for purposes of a liquidation.

As described in more detail in the liquidation analysis attached hereto as Exhibit D (the "**Liquidation Analysis**"), the Debtors believe that confirmation of the Plan will provide each Holder of an Allowed Claim or Allowed Equity Interest in each Class with a recovery greater than

95

or equal to the value of any distributions if the Chapter 11 Cases were converted to a case under chapter 7 of the Bankruptcy Code because, among other reasons, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale of the Debtors' assets and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution.  In addition, distributions in a chapter 7 case may not occur for a longer period of time than distributions under the Plan, thereby reducing the present value of such distributions.  In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a significant period while the chapter 7 trustee and its advisors become knowledgeable about, among other things, the Chapter 11 Cases and the Claims against the Debtors.  As set forth in the Liquidation Analysis, Holders of Claims in Class 5 – Prepetition Term Loan Claims (Secured Portion) would receive a recovery of between 0.0% to 6.3% of the amount of their Allowed Claims under a chapter 7 liquidation.  Further, Holders of Claims in Class 6 – General Unsecured Claims would receive no recovery under a chapter 7 liquidation.  Those foregoing recoveries are substantially less than the projected 51% recovery for Class 5 Claims pursuant to the Plan and less than the projected recovery for Class 6 Claims under the Plan, so the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code with respect to such Classes.

    2.    **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation of the reorganized debtors or the need for further financial reorganization, unless the plan contemplates such liquidation.  For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed the ability of the Reorganized Debtors to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.  Financial projections of the Reorganized Debtors for fiscal years 2020 to 2024 (the "**Financial Projections**") are attached hereto as Exhibit C.  Additionally, the Debtors' consolidated historical financial statements are available from the SEC at https://www.sec.gov/edgar.shtml or upon request and at the Debtors' expense by (a) calling the Voting and Claims Agent at 877-429-7404 (US/Canada); 646-214-8836 (International); and/or (b) writing to (i) Libbey Inc., c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165 or (ii) libbeyinfo@primeclerk.com.

In general, as illustrated by the Financial Projections, the Debtors believe that as a result of the transactions contemplated by the Plan, including the Exit Facilities, the Reorganized Debtors should have sufficient cash flow and availability to make all payments required pursuant to the Plan while conducting ongoing business operations.  The Debtors believe that confirmation and consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.  Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

96

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.

THE FINANCIAL PROJECTIONS HAVE NOT BEEN EXAMINED OR COMPILED BY INDEPENDENT ACCOUNTANTS. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THEIR ABILITY TO ACHIEVE THE PROJECTED RESULTS. MANY OF THE ASSUMPTIONS ON WHICH THE PROJECTIONS ARE BASED ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES WHICH ARE BEYOND THE CONTROL OF THE DEBTORS. INEVITABLY, SOME ASSUMPTIONS WILL NOT MATERIALIZE AND UNANTICIPATED EVENTS AND CIRCUMSTANCES MAY AFFECT THE ACTUAL FINANCIAL RESULTS. THEREFORE, THE ACTUAL RESULTS ACHIEVED THROUGHOUT THE PERIOD OF THE FINANCIAL PROJECTIONS MAY VARY FROM THE PROJECTED RESULTS AND THE VARIATIONS MAY BE MATERIAL.  ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO EXAMINE CAREFULLY ALL OF THE ASSUMPTIONS ON WHICH THE FINANCIAL PROJECTIONS ARE BASED IN CONNECTION WITH THEIR EVALUATION OF THE PLAN.

BASED ON THE FINANCIAL PROJECTIONS SET FORTH IN EXHIBIT C HERETO, THE DEBTORS BELIEVE THAT THEY WILL BE ABLE TO MAKE ALL DISTRIBUTIONS AND PAYMENTS UNDER THE PLAN AND THAT CONFIRMATION OF THE PLAN IS NOT LIKELY TO BE FOLLOWED BY LIQUIDATION OF THE REORGANIZED DEBTORS OR THE NEED FOR FURTHER FINANCIAL REORGANIZATION OF THE REORGANIZED DEBTORS.

3.    **Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

97

US-DOCS\115812051.19

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their Ballots/Opt-Out Forms in favor of acceptance.

Claims and Equity Interests, as applicable, in Classes 1, 2, 3, 4, and 9 are not Impaired under the Plan, and, as a result, the Holders of such Claims or Equity Interests are deemed to have accepted the Plan.  Claims in Class 7 are Impaired, but are deemed to have accepted the Plan because such Holders are Affiliates of the Debtors.  Accordingly, the Debtors are not required to solicit their vote.

Claims in Classes 5 and 6 are Impaired under the Plan, and as a result, the Holders of Claims in Classes 5 and 6 are entitled to vote on the Plan.  Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to Classes 5 and 6 and without considering whether the Plan "discriminates unfairly" with respect to Classes 5 and 6, as both standards are described herein.  As explained above, each of Classes 5 and 6 will have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in amount and a majority in number of the Claims of each of Classes 5 and 6, as applicable (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

Equity Interests in Class 8 are Impaired and deemed to have rejected the Plan.  The Debtors, therefore, will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code as more fully described below.

4.      **Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if less than all impaired classes entitled to vote on the plan have accepted it, provided that the plan has been accepted by at least one impaired class of claims.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired Class's rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Debtors' request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

5.      **No Unfair Discrimination**

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

US-DOCS\115812051.19

6.    **Fair and Equitable Test**

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

- Secured Claims.  The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

- Unsecured Claims.  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

- Equity Interests.  The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:

  o    the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or

  o    if the class does not receive the amount required in the paragraph directly above, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

**As noted above, the Debtors will seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by Class 8.** To the extent that any of the Voting Classes votes to reject the Plan, the Debtors reserve the right to seek (a) confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XII.D of the Plan.

The votes of Holders of Equity Interests in Class 8 are not being solicited because, under Articles III and VII of the Plan, there will be no distribution to such Holders and, therefore, such Holders are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the

Bankruptcy Code.  All Class 8 Equity Interests will be deemed cancelled and will be of no further force and effect, whether surrendered for cancellation or otherwise.

Notwithstanding the deemed rejection by Class 8, the Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for non-consensual confirmation of the Plan.

**D.      CONSUMMATION OF THE PLAN**

The Plan will be consummated on the Effective Date.  For a more detailed discussion of the conditions precedent to the consummation of the Plan and the impact of failure to meet such conditions, see Article IX of the Plan.

US-DOCS\115812051.19

# VI.
# PLAN-RELATED RISK FACTORS[17]

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES, THE PLAN OR THE IMPLEMENTATION OF THE PLAN. THE RISK FACTORS SET FORTH HEREIN SHOULD BE READ TOGETHER WITH THE ADDITIONAL RISK FACTORS PROVIDED IN THE COMPANY'S ANNUAL REPORT ON FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2019 AND QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED MARCH 31, 2020, FILED WITH THE SEC ON FEBRUARY 27, 2020 AND JUNE 19, 2020, RESPECTIVELY.

## A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

### 1.    General

Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, the Chapter 11 Cases could have a material adverse effect on the Debtors' business, financial condition, results of operations and liquidity.  So long as the Chapter 11 Cases continue, the Debtors' management may be required to spend a significant amount of time and effort managing the bankruptcy process instead of focusing exclusively on the Debtors' business operations.  Bankruptcy protection and operating as debtors-in-possession also may make it more difficult to retain management and the key personnel necessary to the success and growth of the Debtors' business.  In addition, during the pendency of the Chapter 11 Cases, the Debtors' customers and suppliers might lose confidence in the Debtors' ability to reorganize their business successfully and may seek to establish alternative commercial relationships, which may cause, among other things, their suppliers, vendors, counterparties and service providers to renegotiate the terms of their agreements, attempt to terminate their relationship with the Debtors or require financial assurances from the Debtors.  Although the Debtors remain committed to providing safe, reliable operations, and the Debtors believe that they have sufficient resources to do so, customers may lose confidence in the Debtors' ability to provide them the level of service they expect, resulting in a significant decline in the Debtors' revenues, profitability and cash flow.

---

[17]  Additional risk factors are provided in the Company's Annual Report on Form 10-K for the year ended December 31, 2019 and Quarterly Report on Form 10-Q for the quarter ended March 31, 2020, filed with the SEC on February 27, 2020 and June 19, 2020, respectively.

US-DOCS\115812051.19

2.    **The Debtors Will Be Subject to the Risks and Uncertainties Associated with Chapter 11 Proceedings.**

As a consequence of the Debtors' filing for relief under chapter 11 of the Bankruptcy Code, the Debtors' operations and their ability to develop and execute their business plan, and their continuation as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:

- the Debtors' ability to continue as a going concern;

- the Debtors' ability to develop, confirm and consummate the Plan;

- the Debtors' ability to obtain court approval with respect to motions filed in the Chapter 11 Cases from time to time;

- the Debtors' ability to maintain relationships with their suppliers, service providers, customers, employees and other third parties;

- the Debtors' ability to maintain contracts that are critical to their operations;

- the Debtors' ability to develop and execute their business plan;

- the Debtors' ability to attract, motivate and retain key employees;

- the Debtors' ability to operate within the restrictions and the liquidity limitations of the DIP Financing Documents and any related orders entered by the Bankruptcy Court in connection with the Chapter 11 Cases;

- the Debtors' ability to maintain strategic control as debtors-in-possession during the pendency of the Chapter 11 Cases;

- the cancellation of the Debtors' existing equity, including the outstanding shares of common stock, in the Chapter 11 Cases;

- the ability of third parties to seek and obtain court approval to terminate contracts and other agreements with the Debtors;

- the ability of third parties to seek and obtain the Bankruptcy Court's approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm the Plan, to appoint a Chapter 11 trustee, or to convert the Chapter 11 Cases to proceedings under Chapter 7 of the Bankruptcy Code; and

- the actions and decisions of the Debtors' creditors and other third parties who have interests in the Debtors' Chapter 11 Cases that may be inconsistent with the Debtors' plans.

US-DOCS\115812051.19

Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that will occur during the Chapter 11 Cases.

3.    **The Parent's common stock was delisted from the NYSE American. Trading in the Parent's securities during the pendency of the Chapter 11 Cases is highly speculative and poses substantial risks. The Parent expects that the existing common stock of the Parent will be extinguished and existing equity holders will not receive consideration in respect of their equity interests.**

As a consequence of the Chapter 11 Cases, on June 1, 2020, the NYSE American suspended trading in the Parent's common stock and notified the Parent of their intent to file an application with the SEC to delist the Parent's common stock from the NYSE American. Such application on Form 25 was filed on June 10, 2020, and the delisting officially became effective on June 22, 2020. Since June 2, 2020, the Parent's common stock has been quoted on the OTC Pink marketplace maintained by the OTC Markets Group, Inc. under the symbol "LBYYQ." The Debtors can provide no assurance that the Parent's common stock will continue to trade on this market, whether broker-dealers will continue to provide public quotes of the Parent's common stock on this market, whether the trading volume of the Parent's common stock will be sufficient to provide for an efficient trading market or whether quotes for the Parent's common stock will continue on this market in the future. The Debtors expect that the existing common stock of the Parent will be extinguished upon the Debtors' emergence from Chapter 11 and that existing equity holders will not receive consideration in respect of their equity interests. These recent developments could result in significantly lower trading volumes and reduced liquidity for investors seeking to buy or sell shares of the Parent's common stock. Accordingly, any trading in the Parent's common stock during the pendency of the Chapter 11 Cases is highly speculative and poses substantial risks to purchasers of the Parent's common stock.

4.    **Risk of Non-Confirmation of the Plan.**

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes. Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if all Voting Classes voted in favor of the Plan or the requirements for "cram down" are met with respect to any Class that rejected the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for confirmation are not met. If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Equity Interests ultimately would receive with respect to their Allowed Claims or Allowed Equity Interests in a subsequent plan of reorganization.

5.    **Risk of Failing to Satisfy the Vote Requirement.**

In the event that the Debtors are nevertheless unable to obtain sufficient votes from the Voting Classes, the Debtors will seek to accomplish an alternative chapter 11 plan or seek to "cram down" (i.e., achieve non-consensual confirmation of) the Plan on non-accepting Classes. There

US-DOCS\115812051.19

can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to Holders of Allowed Claims as those proposed in the Plan.

6.    **Risk of Re-solicitation of Votes.**

The Bankruptcy Code provides that a debtor may solicit votes of a Chapter 11 plan after disclosure of "adequate information," as defined in the Bankruptcy Code.  Additionally, the Bankruptcy Code provides that a holder of a Claim will not be deemed to have accepted or rejected the Plan if the Bankruptcy Court finds that the Plan was not transmitted to substantially all creditors and other equity interest holders of that same class entitled to vote or that an unreasonably short time was prescribed for voting.

If the Bankruptcy Court concludes that the requirements of the Bankruptcy Code have not been met, then the Bankruptcy Court could deem votes solicited invalid.  If the Bankruptcy Court so concludes, the Plan could not be confirmed without a re-solicitation of votes to accept or reject the Plan.  While the Debtors believe that the requirements of the Bankruptcy Code will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  If a re-solicitation of the Plan is required, there can be no assurance that such re-solicitation would be successful.

7.    **Non-Consensual Confirmation of the Plan May be Necessary.**

If any impaired class of claims or equity interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  Should any Class vote to reject the plan, then these requirements must be satisfied with respect to such rejecting Classes. The Debtors believe that the Plan satisfies these requirements.

8.    **Risks Related to Parties in Interest Objecting to the Debtors' Classification of Claims and Equity Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

9.    **Risks Related to Possible Objections to the Plan.**

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

US-DOCS\115812051.19

10.     **The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors and Reorganized Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is or may become subject to an objection.  Any Holder of a Claim that is or may become subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

11.     **The Effective Date May Not Occur.**

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.  Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

12.     **The Exit Facilities and the Transactions Contemplated Thereby, May Not Become Effective.**

Although the Debtors believe that the Exit Facilities will become effective shortly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Exit Facilities and the transactions contemplated thereunder, will become effective.

13.     **Contingencies May Affect Votes of the Voting Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims and Allowed Equity Interests under the Plan can be affected by a variety of contingencies.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Allowed Equity Interests under the Plan, will not affect the validity of the vote taken by the Voting Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

14.     **The Debtors Cannot State with Certainty What Recovery Will be Available to Holders of Allowed Claims.**

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated amounts contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed.  Accordingly, because certain Claims under the Plan will be paid on a Pro Rata basis, the Debtors cannot state with certainty what recoveries will be available to Holders of Allowed Claims.

US-DOCS\115812051.19

15.    **The Chapter 11 Cases Will Consume a Substantial Portion of the Time and Attention of the Debtors' Management, Which May Have an Adverse Effect on the Debtors' Business and Results of Operations, and the Debtors May Face Increased Levels of Employee Attrition.**

Although the Plan is designed to minimize the length of the Debtors' chapter 11 proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.    The requirements of the Chapter 11 Cases have consumed and will continue to consume a substantial portion of the Debtors' management's time and attention and leave them with less time to devote to the operations of their business. This diversion of management's attention may have a material adverse effect on the conduct of the Debtors' business, and, as a result, on their financial condition and results of operations, particularly if the Chapter 11 Cases are protracted.

As a result of the Chapter 11 Cases, the Debtors may experience employee attrition, and their employees may face considerable distraction and uncertainty.    A loss of key personnel or material erosion of employee morale could adversely affect the Debtors' business and results of operations.    The Debtors' ability to engage, motivate and retain key employees or take other measures intended to motivate and incentivize key employees to remain with the Debtors through the pendency of the Chapter 11 Cases is limited by restrictions on implementation of incentive programs under the Bankruptcy Code.    The loss of services of members of the Debtors' management team could impair their ability to execute their strategy and implement operational initiatives, which would be likely to have a material adverse effect on the Debtors' financial condition, liquidity and results of operations.

16.    **Conversion into Chapter 7 Cases.**

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.    See Section I.C herein, as well as the Liquidation Analysis attached hereto as Exhibit D, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests.

17.    **Releases, Injunctions, and Exculpation Provisions May Not Be Approved.**

The Plan provides for certain releases, injunctions, and exculpations.    However, such releases, injunctions, and exculpations are subject to objection by parties in interest and may not be approved.    If the releases are not approved, certain Released Parties may not support the Plan.

18.    **Failure to Modify Obligations under the CBAs and Retiree Benefits.**

To the extent that the Debtors are unable to obtain a consensual resolution regarding the modification of the CBAs and the retiree benefits, or obtain the requested relief under sections 1113 and 1114 of the Bankruptcy Code, the Debtors may be unable to consummate the Plan and parties, including the DIP Lenders, may terminate their support, financial or otherwise,

106

for the Plan prior to the Confirmation or Consummation of the Plan.  Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

B.     **ADDITIONAL FACTORS AFFECTING THE VALUE OF THE REORGANIZED DEBTORS**

1.     **Claims Could be More than Projected.**

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.  Therefore, the actual amount of Allowed Claims may vary materially from the Debtors' projections and feasibility analysis.

2.     **Cure Amounts and Other Contract Payment Obligations Could Be More than Projected**

There can be no assurance that the estimated cure amounts or other payment obligations of the Debtors or the Reorganized Debtors arising or otherwise resulting from the assumption of Executory Contracts or Unexpired Leases will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially.  Such cure amounts or payment obligations could be significant and material and, if the Debtors are unsuccessful in challenging such amounts, confirmation or the effectiveness of the Plan may be jeopardized.

3.     **Projections and other Forward-Looking Statements Are Not Assured and Actual Results May Vary.**

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions, which might ultimately prove to be incorrect, and projections, which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be Allowed.

4.     **Post-Effective Date Indebtedness.**

Following the Effective Date, the Reorganized Debtors will have approximately $170 million of secured funded indebtedness.  The Reorganized Debtors' ability to service their debt obligations will depend, among other things, on their future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing.  In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

US-DOCS\115812051.19

**C.** **RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN AND/OR RECOVERIES UNDER THE PLAN**

1. **The Valuation of the Reorganized Debtors May Not Be Adopted by the Bankruptcy Court.**

Parties in interest in these Chapter 11 Cases may oppose confirmation of the Plan by alleging that the value of the Reorganized Debtors is higher than estimated by the Debtors and that the Plan thereby improperly limits or extinguishes their rights to recoveries under the Plan. At the Confirmation Hearing, the Bankruptcy Court will hear evidence regarding the views of the Debtors and opposing parties, if any, with respect to the valuation of the Reorganized Debtors. Based on that evidence, the Bankruptcy Court will determine the appropriate valuation for the Reorganized Debtors for purposes of the Plan.

2. **The Estimated Valuation of the Reorganized Debtors, the New Equity Interests, and the Plan Securities and the Estimated Recoveries to Holders of Allowed Claims Are Not Intended to Represent the Private or Public Sale Values.**

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the private or public sale values of the Reorganized Debtors' securities. The estimated recoveries are based on numerous assumptions (the realization of many of which is beyond the control of Reorganized Debtors), including, without limitation: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; and (d) the Debtors' ability to maintain adequate liquidity to fund operations.

3. **There Will Be No Active Trading Market For the New Equity Interests.**

It is anticipated that there will be no active trading market for the New Equity Interests or the Plan Securities. Accordingly, there can be no assurance that any market will develop or as to the liquidity of any market that may develop for any such securities. In addition, on the date of emergence, it is expected that the Reorganized Debtors will not be required under U.S. securities laws to file reports with the SEC or otherwise provide financial or other information to the public which may further impair liquidity and prevent brokers or dealers from publishing quotations.

4. **The Reorganized Debtors May Not Be Able to Achieve Projected Financial Results or Service Their Debt.**

Although the Financial Projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors there is no guarantee that the Financial Projections will be realized. The Reorganized Debtors may not be able to meet their projected financial results or achieve projected revenues and Cash flows assumed in projecting future business prospects. To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and Cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due or may not be able to meet their operational needs. Any one of these failures may preclude the Reorganized Debtors from, among

US-DOCS\115812051.19

other things: (a) taking advantage of future opportunities; (b) growing their businesses; or (c) responding to future changes in the retail and overall glass industry. Further, a failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and Cash flows could lead to Cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital. The Reorganized Debtors may not be able to obtain such working capital when it is required.

5. **Pending Lawsuits May Affect the Value of Securities to Be Issued Under the Plan and Recoveries Under the Plan.**

The Debtors are subject to Claims in various legal proceedings and the Debtors or the Reorganized Debtors may become subject to other legal proceedings in the future. The Debtors believe there is no merit to the pending lawsuits, however, there can be no assurances that the Debtors will be successful in ultimately discharging or satisfying such Claims. The ultimate outcome of each of these matters, including the Debtors' ability to have these matters satisfied and discharged in the bankruptcy proceeding, cannot presently be determined, nor can the liability that may potentially result from a negative outcome be reasonably estimated. Any such liability may require the Debtors or the Reorganized Debtors, as applicable, to reserve or issue additional securities to be issued under the Plan. The liability the Debtors may ultimately incur with respect to any one of these matters in the event of a negative outcome may potentially be material to the Debtors' or the Reorganized Debtors' business, financial condition, or operations and may ultimately affect the value of the Reorganized Debtors' securities to be issued under the Plan and recoveries under the Plan, including by diluting the value of the New Equity Interests being issued pursuant to the Plan. Even if the Debtors are ultimately successful, if any Claim related to a pending lawsuit is not resolved quickly, the Debtors may be required to reserve shares until such Claim is formally Disallowed, which may also, at least temporarily, affect the value of the Reorganized Debtors' securities to be issued under the Plan.

6. **Certain Prepetition Term Loan Lenders Will Control the Reorganized Debtors.**

Consummation of the Plan and the effectuation of the New Stockholders Agreement will result in certain Prepetition Term Loan Lenders acquiring the majority of the New Equity Interests. Accordingly, certain Prepetition Term Loan Lenders will exercise a controlling influence over the business and affairs of the Reorganized Debtors.

D. **RISKS RELATING TO THE CAPITAL STRUCTURE OF THE REORGANIZED DEBTORS**

1. **Upon Emergence from Bankruptcy, the Debtors' Historical Financial Information May Not Be Indicative of Their Future Financial Performance**

The Debtors' capital structure will be significantly altered under the Plan. Under fresh-start reporting rules that may apply to the Debtors upon the Effective Date of the Plan (or any alternative plan of reorganization), the Debtors' assets and liabilities would be adjusted to fair values and their accumulated deficit would be restated to zero. Accordingly, fresh-start reporting rules apply, and the Debtors' financial condition and results of operations following their

emergence from chapter 11 would not be comparable to the financial condition and results of operations reflected in their historical financial statements. Further, a plan of reorganization could materially change the amounts and classifications reported in the Debtors' consolidated historical financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of confirmation of a plan of reorganization.

2.     **Leverage**

Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have a significant amount of secured indebtedness. Following the Effective Date, the Reorganized Debtors expect to have outstanding secured indebtedness of approximately $170 million, which includes amounts expected to be outstanding under the Exit ABL Facility Credit Agreement and the Exit Term Loan Facility Credit Agreement.

The degree to which the Reorganized Debtors will be leveraged could have important consequences because, among other things, it could affect the Reorganized Debtors' ability to satisfy their obligations under their secured indebtedness following the Effective Date; a portion of the Reorganized Debtors' Cash flow from operations will be used for debt service and unavailable to support operations, or for working capital, capital expenditures, expansion, acquisitions or general corporate or other purposes; the Reorganized Debtors' ability to obtain additional debt financing or equity financing in the future may be limited; and the Reorganized Debtors' operational flexibility in planning for, or reacting to, changes in their business may be limited.

3.     **Ability to Service Debt**

Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have significant interest expense and principal repayment obligations. Following the Effective Date, the Reorganized Debtors expect to have outstanding secured indebtedness of approximately $170 million, which includes amounts expected to be outstanding under the Exit ABL Facility Credit Agreement and the Exit Term Loan Facility Credit Agreement. The Reorganized Debtors' ability to service their debt obligations will depend on, among other things, their future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control. Although the Debtors believe the Plan is feasible, there can be no assurance that the Reorganized Debtors will be able to generate sufficient Cash from operations to meet their debt service obligations as well as fund necessary capital expenditures. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

4.     **Obligations Under the Exit Facility Loan Documents**

The Reorganized Debtors' obligations under the Exit Facility Loan Documents will be secured by liens on substantially all of the assets of the Reorganized Debtors (subject to certain exclusions set forth in the Exit Facility Loan Documents). If the Reorganized Debtors become insolvent or are liquidated, or if there is a default under certain financing agreements, including,

110

but not limited to, the Exit Facility Loan Documents, and payment on any obligation thereunder is accelerated, the Exit Facility Lenders would be entitled to exercise the remedies available under the Exit Facility Loan Documents or to a secured lender under applicable law, including foreclosure on the collateral that is pledged to secure the indebtedness thereunder, and they would have a claim on the assets securing the obligations under the applicable facility that would be superior to any claim of the holders of unsecured debt.

5.    **Restrictive Covenants**

The financing agreements governing the Reorganized Debtors' Exit Facility Loans will contain various covenants that may limit the discretion of the Reorganized Debtors' management by restricting the Reorganized Debtors' ability to, among other things, incur additional indebtedness, incur liens, pay dividends or make certain other restricted payments, consummate certain asset sales, enter into certain transactions with affiliates, merge, consolidate, and/or sell or dispose of all or substantially all of their assets.  In addition, it is expected that such agreements will require the Reorganized Debtors to meet certain financial covenants.  As a result of these covenants, the Reorganized Debtors will be limited in the manner in which they conduct their business and they may be unable to engage in favorable business activities or finance future operations or capital needs.

Any failure to comply with the restrictions of the financing agreements may result in an event of default.  An event of default may allow creditors to accelerate the related debt as well as any other debt to which a cross-acceleration or cross-default provision applies.  If the Reorganized Debtors are unable to repay amounts outstanding under their financing agreements when due, whether by acceleration or otherwise, the lenders thereunder could, subject to the terms of the financing agreements, seek to foreclose on the collateral that is pledged to secure the indebtedness outstanding under such agreements.

6.    **The Reorganized Parent will be required to accrue dividends on its New Preferred Equity Interests, which will rank senior to the Interests in the New Equity Interests Pool and are convertible into such securities on terms that can substantially dilute the ownership of the Holders of the Interests in the New Equity Interests Pool.  The cash payment of such dividend obligations or redemption of the New Preferred Equity Interests by the Reorganized Parent could materially and adversely affect its liquidity, results of operations, and financial condition.**

In connection with the Debtors' emergence from the Chapter 11 Cases, the Reorganized Parent expects to issue New Preferred Equity Interests to certain of its lenders as set forth in the Plan.  The Holders of the Reorganized Parent's New Preferred Equity Interests, which will rank senior to Interests in the New Equity Interests Pool, are entitled to receive cumulative preferential dividends, at an annual rate of 13.0% compounding semi-annually, at a stated value of $1,000 per share.  The Holders of the New Preferred Equity Interests may, at any time, convert their liquidation preference of $1,000 per share plus any accrued but unpaid dividends (the "**Liquidation Preference**") into Interests in the New Equity Interests Pool at a per-share conversion price based on the enterprise value of the Debtors at the Effective Date, subject to standard anti-dilution provisions (the "**Holder Optional Conversion**").  The Reorganized Parent

111

US-DOCS\115812051.19

may redeem New Preferred Equity Interests at any time for cash in an amount equal to the sum of the Liquidation Preference, plus a make-whole premium for redemptions occurring prior to the three-year anniversary of the initial issue date of the New Preferred Equity Interests. Upon an actual or deemed liquidation event, which includes a sale of the Reorganized Debtors, the New Preferred Equity Interests would receive the greater of their Liquidation Preference (plus the make-whole premium, if applicable) or the amount they would receive as if their Liquidation Preference of the New Preferred Equity Interests had been converted into Interests in the New Equity Interests Pool in a Holder Optional Conversion. The New Preferred Equity Interests have voting rights as if they had been converted into Interests in the New Equity Interests Pool and will vote as a single class on all matters submitted to the New Equity Interests Pool on an as-converted basis.

If the Reorganized Parent does not redeem, in one or more transactions, all outstanding shares of New Preferred Equity Interests within 54 months of the initial issuance date of the New Preferred Equity Interests (the "**Default Conversion Trigger Date**"), the Holders of the then outstanding shares of New Preferred Equity Interests will have the option to convert their New Preferred Equity Interests into Interests in the New Equity Interests Pool in an amount equal to their pro rata share of 90% of the then outstanding Interests in the New Equity Interests Pool (the "**Default Conversion**") (subject to dilution by management and certain exclusion provisions). If the holders of more than 50% of the then-outstanding New Preferred Equity Interests elect to convert their interests in a Default Conversion, all then outstanding New Preferred Equity Interests will automatically convert to Interests in the New Equity Interests Pool. In the event of a Default Conversion or Holder Optional Conversion, the Holders of Interests in the New Equity Interests Pool will experience immediate and substantial dilution of their securities.

A redemption prior to the Default Conversion Trigger Date could impact the Reorganized Parent's liquidity and reduce the amount of cash flows available for distribution to Holders of Interests in the New Equity Interests Pool or other equity interests junior to the New Preferred Equity Interests, or for working capital, capital expenditures, growth opportunities, acquisitions and other general corporate purposes. The Reorganized Parent's obligations to the Holders of New Preferred Equity Interests could also limit its ability to obtain additional financing or increase the Reorganized Debtors' borrowing costs, which could have an adverse effect on their business and financial results.

Moreover, in order to undertake a redemption prior to the Default Conversion Trigger Date or pay cash dividends, pursuant to the terms of the Exit Term Loan Facility Loan Documents, the Reorganized Parent will be required to concurrently repay its indebtedness under the Exit Term Loan Facility Loan Documents or obtain a waiver from such repayment obligation thereunder. In addition, the Reorganized Parent may be unable to finance a redemption prior to the Default Conversion Trigger Date with cash generated from operation of its business, which could require it to seek additional debt or equity financing to finance such redemption. Any such additional financing may not be available on suitable terms or at all.

The U.S. federal income tax treatment of the New Preferred Equity Interests to the Reorganized Parent and Holders is subject to some uncertainty. See *Section IX - Certain U.S. Federal Income Tax Consequences Of The Plan* for a discussion on the tax implications and other uncertainties in connection with the New Preferred Equity Interests. A term sheet describing the terms of the New Preferred Equity Interests is attached as Exhibit G to this Disclosure Statement.

112

The Debtors and the Ad Hoc Term Lender Group are continuing to negotiate the terms of the New Preferred Equity Interests.

Notwithstanding the foregoing, any redemption of the New Preferred Equity Interests at any time for cash or the payment of any dividends in connection with the New Preferred Equity Interests may require the consent of the Exit ABL Facility Lenders (and such consent may be withheld) under the Exit ABL Facility Loan Documents, or may otherwise be subject to certain conditions and restrictive covenants under the Exit ABL Facility Loan Documents.

E.    **RISK FACTORS THAT COULD NEGATIVELY IMPACT THE DEBTORS' AND REORGANIZED DEBTORS' BUSINESS**

1.    **The COVID-19 pandemic has materially adversely affected, and will continue to materially adversely affect, the Debtors' business, financial condition, liquidity and results of operations.**

The COVID-19 pandemic has resulted in a widespread health crisis that has adversely affected businesses, economies and financial markets worldwide and has caused significant volatility in U.S. and international debt and equity markets and has adversely affected the Debtors' access to and cost of financing.

The Debtors' business, financial condition, liquidity and operating results have been and, depending on when the Debtors emerge from these Chapter 11 Cases, the Reorganized Debtors' business will continue to be, adversely affected by the COVID-19 pandemic.  For example, the COVID-19 pandemic has caused a widespread increase in unemployment and is expected to result in reduced consumer spending and economic slowdown or recession.  Substantially all the Debtors' revenue is generated from sales of products into the foodservice, hospitality and retail industries, and the businesses, as well as that of the Debtors' customers, is negatively affected during times of lower consumer discretionary spending and high unemployment.

COVID-19, and measures taken by governments and organizations to contain its effects, have already caused, and will likely continue to cause, disruption to the Debtors' and Reorganized Debtors' operations, supply chain and the business and operations of the industries they serve.  Such disruption may continue or increase in the future, and limits the ability of the Debtors' and Reorganized Debtors' manufacturing facilities, distribution facilities, partners, vendors and customers to operate efficiently or at all and could result in further reduced sales and profitability.

The Debtors' and Reorganized Debtors' customers are vulnerable to reduced foodservice and hospitality industry patronage as well as periods of economic slowdown or recession and increased unemployment.  Furthermore, many restaurants, hotels and other hospitality providers have temporarily or permanently closed and more may close in the near future in light of the COVID-19 pandemic.

In response to the COVID-19 pandemic, the Debtors have temporarily reduced or suspended their manufacturing and distribution operations at several facilities in North America and elsewhere to comply with governmental orders related to the COVID-19 pandemic and to protect the safety of their employees, and in-line with the lower demand profile for their products.  The Debtors' have also borrowed additional funds under their Prepetition ABL

113

Facility, extended certain repayment obligations under their senior secured credit agreement, furloughed certain employees and have implemented temporary salary reductions for non-furloughed employees to address liquidity concerns.   If the COVID-19 pandemic and government measures intended to slow the spread of COVID-19 continue to result in long-term continued disruptions to the Debtors' operations and the operations of the foodservice and hospitality industries, the Debtors' and Reorganized Debtors' business, financial condition, liquidity and results of operations will be further significantly negatively affected and they may no longer be in compliance with the covenants in their debt agreements, which may require the Debtors or Reorganized Debtors to seek relief from the lenders to remain in compliance with such debt agreements.

To the extent the COVID-19 pandemic adversely affects the Debtors' and Reorganized Debtors' business and financial results, it may also have the effect of heightening many of the other risks described in Item 1A, "Risk Factors" of the Debtors' annual report on Form 10-K for the year ended December 31, 2019, among other risks.  The full extent to which the COVID-19 pandemic will impact the Debtors' and Reorganized Debtors' results is unknown and evolving, and will depend on future developments, which are highly uncertain and cannot be predicted. These include the severity, duration and spread of COVID-19, the success of actions taken by governments and health organizations to combat the disease and treat its effects, and the extent to which, and the timing of, general economic and operating conditions recover.

The Debtors do have reason to believe the business can weather the COVID-19 pandemic. Specifically, the Debtors' weekly gross revenue has risen from an average of $2 million per week in April to $4 million in June and over $6 million in July.  Although these figures are below pre-pandemic levels of approximately $9 million per week, the combination of cost reductions, revenue improvements, and working capital improvements is causing the Debtors to outperform their near term forecasts.  The Debtors finished July at over $42 million in liquidity.  Weekly order levels indicate revenue will continue to improve and the Debtors are seeing particular strength in their retail and business to business channels helping to mitigate weakness in foodservice.

2.   **The Debtors' business requires significant capital investment and maintenance expenditures that the Debtors may be unable to fulfill.**

The Debtors' operations are capital intensive and require a large fixed cost base.  The Debtors' total Cash paid for capital expenditures were $31.2 million and $45.1 million for the years ended December 31, 2019 and 2018, respectively.  The Debtors' business may not generate sufficient operating Cash flow and external financing sources may not be available in an amount sufficient to enable them to make anticipated capital expenditures.

3.   **If the Debtors or Reorganized Debtors are unable to control or pass on to their customers increases in key input costs, including the cost of raw materials, sourced products, utilities, packaging and freight, the profitability of their businesses may be materially and adversely affected.**

Sand, soda ash, lime and corrugated packaging materials are the principal materials the Debtors' use to make their products.  They also rely heavily on natural gas, electricity, water and other utilities.  In addition, the Debtors obtain glass tableware, ceramic dinnerware and metal

114

flatware from third parties.  Increases in the costs of these commodities or products may result from inflationary pressures as well as temporary shortages due to disruptions in supply caused by weather, transportation, production delays or other factors.  If the Debtors or Reorganized Debtors' experience shortages in commodities or sourced products, they may be forced to procure them from alternative suppliers, and may not be able to do so on terms as favorable as current terms or at all.  In addition, the cost of U.S. dollar-denominated purchases (including for raw materials) for operations in the euro zone, Mexico and China may increase due to appreciation of the U.S. dollar against the euro, the Mexican peso or the Chinese renminbi, respectively.  If the Reorganized Debtors are unsuccessful in managing costs or in passing cost increases through to customers through increased prices, their financial condition and results of operations may be materially and adversely affected.

4.      **The profitability of the Debtors' and Reorganized Debtors' business may be materially and adversely impacted if they are unable to fully absorb the high levels of fixed costs associated with the business.**

The high levels of fixed costs of operating glass production plants encourage high levels of output, even during periods of reduced demand, which can lead to excess inventory levels and exacerbate the pressure on profit margins.  In addition, significant portions of selling, general and administrative expenses are fixed costs that neither increase nor decrease proportionately with sales.  The Debtors' and Reorganized Debtors' profitability is dependent, in part, on their ability to spread fixed costs over an increasing number of products sold and shipped, and if they reduce the rate of production then costs per unit increase, negatively impacting gross margins.  Decreased demand or the need to reduce inventories can lead to capacity adjustments that reduce the Debtors' or Reorganized Debtors' ability to absorb fixed costs and, as a result, may materially impact profitability.

5.      **Fluctuation of the currencies in which the Debtors' and Reorganized Debtors' conduct operations could adversely affect financial condition, results of operations and Cash flows.**

The Debtors' and Reorganized Debtors' reporting currency is the U.S. dollar.  A significant portion of net sales, costs, assets and liabilities are denominated in currencies other than the U.S. dollar, primarily the euro, the Mexican peso, the Chinese renminbi and the Canadian dollar.  In the Debtors' Consolidated Financial Statements, they translate local currency financial results into U.S. dollars based on the exchange rates prevailing during the reporting period.  During times of a strengthening U.S. dollar, the reported revenues and earnings of their international operations will be reduced because the local currencies will translate into fewer U.S. dollars.  This could have a material adverse effect on the financial condition of the business, results of operations and cash flow.  In addition, changes in the value, relative to the U.S. dollar, of the various currencies in which the Debtors' and Reorganized Debtors' conduct operations, including the euro, the Mexican peso and the Chinese renminbi, may result in significant changes in the indebtedness of non-U.S. subsidiaries.

US-DOCS\115812051.19

6.     **If the Debtors or Reorganized Debtors have an asset impairment in a business segment, net earnings and net worth could be materially and adversely affected by a write-down of goodwill, intangible assets, fixed assets or right-of-use assets.**

The Debtors have recorded a significant amount of goodwill, which represents the excess of cost over the fair value of the net assets of the business acquired; other identifiable intangible assets, including trademarks and trade names; and fixed assets and right-of-use assets. Impairment of goodwill, identifiable intangible assets, fixed assets or right-of-use assets may result from, among other things, deterioration in performance, adverse market conditions, adverse changes in applicable laws or regulations, including changes that restrict the activities of or affect the products sold by the Debtors' business, and a variety of other factors. Under U.S. GAAP, the Debtors are required to charge the amount of any impairment immediately to operating income.

The Debtors conduct an impairment analysis at least annually related to goodwill and other indefinite lived intangible assets. This analysis requires management to make significant judgments and estimates, primarily regarding expected financial performance, expected growth rates, and discount rates, identifying similar companies with comparable business factors and assessing comparable multiples. The Debtors determine expected financial performance and growth rates based on internally developed forecasts considering future financial plans. The Debtors estimate the discount rate used based on an analysis of comparable company weighted average costs of capital that consider market assumptions obtained from independent sources. The Debtors identify similar companies with comparable business factors such as size, growth, profitability, risk and return on investment. The Debtors identify comparable multiples that they feel are most relevant to the Company. The estimates that management uses in this analysis could be materially impacted by factors such as specific industry conditions, changes in Cash flow from operations and changes in growth trends. In addition, the assumptions management uses are management's best estimates based on projected results and market conditions as of the date of testing. Significant changes in these key assumptions could result in indicators of impairment when completing the annual impairment analysis. The Debtors assess their fixed assets for possible impairment whenever events or changes in circumstances indicate that the carrying value of these assets may not be recoverable. The Debtors and Reorganized Debtors remain subject to future financial statement risk in the event that goodwill, other identifiable intangible assets, fixed assets or right-of-use assets become impaired.

In the second quarter of 2019, the Debtors recorded a $46.0 million non-cash goodwill impairment charge in the Mexico reporting unit of the Latin America reporting segment. Also during the second quarter of 2019, the Debtors recorded a non-cash impairment charge of $0.9 million related to Libbey Holland's indefinite life intangible asset (Royal Leerdam® trade name) in their EMEA reporting segment. In the fourth quarter of 2019, the Debtors recorded a non-cash impairment charge of $18.3 million within the Holland asset group (within their EMEA reporting segment) resulting in a write down of the value of the property, plant and equipment and operating lease right-of-use assets.

116

The results of the Debtors' October 1, 2019 annual impairment test indicated the estimated fair value of their reporting unit (within the U.S. & Canada reporting segment) that has goodwill exceeded the carrying value by approximately 50 percent. As of December 31, 2019, the Debtors had goodwill and other identifiable intangible assets of $50.3 million, net fixed assets of $233.9 million and right-of-use assets of $54.7 million.  There can be no assurance that the Debtors or Reorganized Debtors will not record further impairment charges that may adversely impact their net earnings and net worth.

7. **The Debtors and Reorganized Debtors face inventory risk.**

The Debtors and Reorganized Debtors identify slow-moving and obsolete inventories and estimate appropriate loss provisions accordingly.  No assurance can be given that they will not incur additional inventory charges.  Such charges could materially adversely affect their financial condition and operating results.

8. **Charges related to the Debtors' and Reorganized Debtors' employee pension and post-retirement welfare plans may adversely affect results of operations and financial condition.**

As part of the Debtors' pension expense, they periodically incur pension settlement charges.  The Debtors may incur further expenses related to employee pension and post-retirement welfare plans that could have a material adverse effect on results of operations and financial condition.

9. **If investments in e-commerce, new technology and other capital expenditures do not yield expected returns, results of operations could be adversely affected.**

The Debtors continue to invest in glass tableware production equipment and make other capital expenditures to further improve production efficiency, reduce cost profile and expand and enhance e-commerce capabilities.  To the extent that these investments do not generate targeted levels of returns in terms of profitability, efficiency or improved cost profile, the Debtors' and Reorganized Debtors' financial condition and results of operations could be adversely affected.

10. **Governmental conversion controls over the foreign currencies in which the Debtors and Reorganized Debtors operate could affect their ability to convert the earnings of their foreign subsidiaries into U.S. dollars.**

While the Mexican government does not currently restrict, and for many years has not restricted, the right or ability of Mexican or foreign persons or entities to convert pesos into U.S. dollars or to transfer other currencies out of Mexico, in the future the Mexican government could institute restrictive exchange rate policies or governmental controls over the convertibility of pesos into U.S. dollars or other currencies.  Restrictive exchange rate or conversion policies could limit the Debtors' and Reorganized Debtors' ability to transfer or convert the peso earnings of their Mexican subsidiary into other currencies, upon which the Debtors and Reorganized Debtors rely in part to satisfy their debt obligations through intercompany loans.

In addition, the government of China imposes controls on the convertibility of renminbi into foreign currencies and, in certain cases, the remittance of currency out of China.

117

Shortages in the availability of foreign currency may restrict the ability of Libbey China to remit sufficient foreign currency to make payments to the Debtors and Reorganized Debtors. Under existing Chinese foreign exchange regulations, payments of current account items, including profit distributions, interest payments and expenditures from trade-related transactions, can be made in foreign currencies without prior approval from the Chinese State Administration of Foreign Exchange by complying with certain procedural requirements. However, approval from appropriate government authorities is required where renminbi are to be converted into foreign currencies and remitted out of China to pay capital expenses such as the repayment of bank loans denominated in foreign currencies. In the future, the Chinese government could institute restrictive exchange rate policies for current account transactions. These policies may limit the Debtors' and Reorganized Debtors' ability to remit proceeds received in connection with any strategic transactions the Debtors may undertake in connection with their review of strategic alternatives involving their China business and could adversely affect their results of operations and financial condition.

11. **The Debtors' and Reorganized Debtors' ability to recognize the benefit of deferred tax assets is dependent upon future taxable income and the timing of temporary difference reversals.**

Assessing the recoverability of deferred tax assets requires management to make significant estimates related to expectations of future taxable income and the timing of reversals of temporary differences. To the extent that these factors differ significantly from estimates, the Debtors' and Reorganized Debtors' ability to realize the deferred tax assets could be impacted. If the Plan is effected pursuant to a transaction that is treated for income tax purposes as a taxable sale of assets of the Debtors (i.e., the Taxable Sale Transaction as described in the Plan), the Reorganized Debtors will not succeed to such deferred tax assets.

12. **The Debtors' and Reorganized Debtors' may incur additional tax expense as a result of changes to tax laws, regulations and evolving interpretations thereof.**

The Debtors and Reorganized Debtors are subject to the tax laws, regulations, and legal decisions in various tax jurisdictions. The Debtors' worldwide tax provision is based in part on many material judgments and interpretations of these bodies of law. Tax authorities in the various jurisdictions may not agree with the Debtors' judgments and interpretations and may assess additional taxes which could result in material changes to the Debtors' and Reorganized Debtors' tax liabilities and/or significant legal and consulting fees in defense thereof. Additionally, tax laws, regulations and legal precedents may change over time resulting in material changes to the Debtors' and Reorganized Debtors' tax provisions and deferred tax positions. Changes to tax laws, regulations, and legal precedents could contain statutory changes or interpretations that are inconsistent with the Company's application of the law in the absence of such changes and could result in material adjustments to tax liabilities.

US-DOCS\115812051.19

13.     **Slowdowns or changes in trends in the retail, travel, restaurant, bar and entertainment industries, and in the retail and foodservice channels of distribution generally, may negatively impact demand for the Debtors' and Reorganized Debtors' products.**

The Debtors' and Reorganized Debtors' business is dependent on business and personal discretionary spending in the retail, travel, restaurant and bar or entertainment industries. Business and personal discretionary spending may decline during general economic downturns or during periods of uncertainty about economic conditions. In addition, austerity and other regulatory measures adopted by some governments may cause consumers in some markets that the Debtors serve to reduce or postpone spending. Consumers also may reduce or postpone spending in response to tighter credit, negative financial news, higher fuel and energy costs, higher taxes and healthcare costs and/or declines in income or asset values. Additionally, expenditures in the travel, restaurant and bar or entertainment industries may decline after incidents of terrorism, during periods of geopolitical conflict in which travelers become concerned about safety issues, during periods of severe weather or during periods when travel or entertainment might involve health-related risks such as severe outbreaks, epidemics or pandemics of contagious disease.

Changes in trends, including those impacting the restaurant and bar industry, also may negatively impact demand for the Debtors' and Reorganized Debtors' products. For example, shifts from dining at full-service restaurants to dining at quick-serve restaurants and grocerants (combined grocery stores and restaurants), or from dining at chain restaurants to dining at locally-owned restaurants, as well as a trend toward home delivery of meals and meal kits, may result in reduced demand for products in the foodservice channel of distribution.

Additionally, changes in the buying preferences of consumers and customers may adversely impact the demand for and profitability of the Debtors' and Reorganized Debtors' products. For example, consumer buying preferences continue to shift from buying at brick-and-mortar stores to buying online. Similarly, in the foodservice channel of distribution, end users of the Debtors' and Reorganized Debtors' products such as bars and restaurants increasingly are demonstrating a preference to bypass traditional foodservice distributors in favor of buying online, particularly as they seek to replenish products originally purchased through traditional foodservice distributors. The Debtors launched their e-commerce capability in mid-2017 in response to the shifting buying preferences of consumers in the retail channel of distribution, and initiated their e-commerce capability to the foodservice channel of distribution in late 2019. However, these changes in buying preferences may outpace the Debtors' and Reorganized Debtors' still-developing e-commerce capability. In addition, if and to the extent that brick-and-mortar retail customers and traditional foodservice distribution partners perceive the Debtors' and Reorganized Debtors' e-commerce capabilities as a threat rather than as an opportunity to expand their own businesses, demand for products from brick-and-mortar retail customers and traditional foodservice distribution parties may be adversely affected.

119

US-DOCS\115812051.19

14.     **An inability to meet the demand for new products may adversely impact the Debtors' and Reorganized Debtors' ability to compete effectively and to grow their business.**

The Debtors' and Reorganized Debtors' strategy depends in part on the timing and market acceptance of new product offerings and their ability to continually renew their pipeline of new products and bring those products to market.  This ability may be adversely affected by difficulties or delays in product development, such as the inability to identify viable new products, obtain adequate intellectual property protection, or gain market acceptance of new products, as well as by difficulties or longer-than-expected lead times in sourcing products.  There are no guarantees that new products will prove to be commercially successful or profitable.

15.     **An inability to develop new or expand existing customer relationships may adversely impact the Debtors' and Reorganized Debtors' ability to grow their business.**

The Debtors' and Reorganized Debtors' ability to grow their business depends in part on the ability to develop new customer relationships and to expand relationships with existing customers.  In the foodservice channel of distribution, the Debtors' and Reorganized Debtors' ability to develop new customer relationships and expand relationships with existing customers may be adversely impacted by the increasing trend toward consolidation among foodservice distributors.  Failure to develop and expand such relationships could have a material adverse effect on the Debtors' and Reorganized Debtors' business, results of operations and financial condition.

16.     **Changing industry and market conditions may dictate strategic decisions to restructure some business units and discontinue others.  These decisions may require the Debtors' to record material restructuring charges.**

On February 18, 2019, the Board of Directors approved a plan to pursue strategic alternatives with respect to the Company's business in China, including the sale or closure of its manufacturing and distribution facility located in Langfang, China.  Due to the continued level of uncertainty surrounding the ultimate course of action, the Debtors are unable at this time to estimate an amount or range of amounts of any charges that they may incur in connection with the planned strategic review.

In the past, the Debtors have recorded other restructuring charges related to involuntary employee terminations, various facility abandonments, and various other restructuring activities.  The Debtors continually evaluate ways to reduce their operating expenses through new restructuring opportunities, including more effective utilization of assets, workforce, and operating facilities.  In addition, changing industry and market conditions may dictate strategic decisions to restructure some business units and discontinue others.  As a result, there is a risk, which is increased during economic downturns and with expanded global operations, that the Debtors may incur material restructuring charges in the future.

US-DOCS\115812051.19

17.    **The Debtors and Reorganized Debtors face intense competition and competitive pressures that could adversely affect demand for products and results of operations and financial condition.**

The Debtors' and Reorganized Debtors' business is highly competitive, with the principal competitive factors being customer service, price, product quality, new product development, brand name, delivery time and breadth of product offerings.  Advantages or disadvantages in any of these competitive factors may be sufficient to cause the customer to consider changing providers of the kinds of products that the Debtors and Reorganized Debtors sell.

Competitors include other glass tableware manufacturers, including large multinational companies such as Arc International (a French company), Paşabahçe (a unit of Şişecam Holdings, a Turkish company), Anchor Hocking (a U.S. company), AnHui DeLi Glassware Co., Ltd. (a Chinese company), Vicrila Industrias del Vidrio S.L.U. - VICRILA (a Spanish company), and various other manufacturers in Europe, Asia Pacific and the Americas; a variety of ceramic dinnerware and metalware manufacturers throughout the world, including Oneida Hospitality Group, Steelite and others; and a variety of sourcing or marketing companies.  In addition, other products such as plastic and melamine compete with the Debtors' and Reorganized Debtors' glass tableware and ceramic dinnerware products.

Demand for the Debtors' and Reorganized Debtors' products may be adversely impacted by increased competitive pressures caused by the provision of subsidies by foreign countries to their competitors based in those countries; national and international boycotts and embargoes of other countries or U.S. imports and/or exports; the raising of tariff rates on, or increase of non-tariff trade barriers that apply to imports of their products to foreign countries; the lowering of tariff rates on imports into the U.S. of their foreign competitors' products; and other changes to international agreements that improve access to the U.S. market for their competitors.

In addition, the cost-competitiveness of the Debtors' and Reorganized Debtors' products may be adversely affected by inflationary pressures that cause them to increase the prices of their products in order to maintain their profitability.  In that connection, some competitors may have greater financial and capital resources than the Debtors do and continue to invest heavily to achieve increased production efficiencies.  Competitors may have incorporated more advanced technology in their manufacturing processes, including more advanced automation techniques.  The Debtors' and Reorganized Debtors' labor and energy costs also may be higher than those of some foreign producers of glass tableware.

The cost-competitiveness of the Debtors' and Reorganized Debtors' products, as compared to foreign competition, also may be reduced as a result of major fluctuations in the value of the euro, the Mexican peso, the Chinese renminbi, or the Canadian dollar relative to the U.S. dollar and other major currencies.  For example, if the U.S. dollar appreciates against the euro, the Mexican peso or the Chinese renminbi, the purchasing power of those currencies effectively would be reduced compared to the U.S. dollar, making their U.S.-manufactured products more expensive in the euro zone, Mexico and China, respectively, compared to the products of local competitors, and making products manufactured by their foreign competitors in those locations more cost-competitive with their U.S.-manufactured products.

121

18.     **The Debtors' Mexican pension and U.S. and non-U.S. post-retirement welfare plans are unfunded; in the future, levels of funding of U.S. pension plans could decline and pension expense could materially increase.**

The Debtors' have not funded, and under Mexican law the Debtors are not obligated to fund, their Mexican pension plan.  As of December 31, 2019, the unfunded amount of the projected benefit obligation for the Mexican pension plan was $41.3 million.  In addition, although the Debtors have closed participation in their U.S. pension and post-retirement welfare plans, many of their employees participate in, and many of their former employees are entitled to benefits under, our U.S. and non-U.S. defined benefit pension plans and post-retirement welfare plans.

In connection with the Debtors' employee pension and post-retirement welfare plans, the Debtors and Reorganized Debtors are exposed to market risks associated with changes in the various capital markets.  Changes in long-term interest rates affect the discount rate that is used to measure their obligations and related expense.  The Debtors' total pension and post-retirement welfare expense, including pension settlement charges, for all U.S. and non-U.S. plans was $6.4 million and $7.0 million for the fiscal years ended December 31, 2019 and 2018, respectively.  The Debtors expect total pension and post-retirement welfare expense for all U.S. and non-U.S. plans to be $9.4 million in 2020.  Volatility in the capital markets affects the performance of pension plan asset performance and related pension expense.

Declines in interest rates or the market value of securities held by the Debtors' U.S. pension plan, or certain other changes, could materially reduce the funded status of those plans and affect pension expense and the level and timing of minimum required contributions to the plans under applicable law.

19.     **Natural gas and electricity, the principal fuels the Debtors and Reorganized Debtors use to manufacture their products, are subject to fluctuating prices that could adversely affect results of operations and financial condition.**

Natural gas and electricity are the primary sources of energy in most of the Debtors' and Reorganized Debtors' production processes.  The Debtors do not have long-term contracts for natural gas.  In addition, the price of electricity under long-term contracts for electricity may be variable.  Accordingly, the cost of the Debtors' natural gas and electricity is subject to market variables and fluctuating prices.  Consequently, the Debtors' operating results are strongly linked to the cost of natural gas and electricity.  Prior to the Petition Date, the Debtors utilized natural gas swap contracts with respect to their North American manufacturing facilities, and they aimed to hedge 40 to 70 percent of anticipated natural gas needs there.  However, as of the Petition Date, the Debtors have terminated all of their natural gas swap contracts with respect to their North American manufacturing facilities.  With respect to international facilities, the Debtors utilize fixed-price contracts to fix a portion of their natural gas needs.  In some countries in which the Debtors operate, including China, their ability to put in place fixed-priced contracts or natural gas swap contracts to fix the price of natural gas is limited.  The Debtors spent $49.3 million and $53.5 million on natural gas and electricity for the years ended December 31, 2019 and 2018, respectively.  The Debtors have no way of predicting to what extent natural gas or electricity prices will rise in the future.  To the extent that the Debtors are not able to offset increases in natural gas

122

or electricity prices, such as by passing along the cost to the Debtors' customers, these increases could adversely impact their margins and operating performance.

20. **If the Debtors are unable to renegotiate their CBAs successfully when they expire, organized strikes or work stoppages by unionized employees may have an adverse effect on the operating performance of the Debtors and Reorganized Debtors.**

The Debtors are party to the CBAs that cover most of their manufacturing employees. The agreement with the Debtors' unionized employees in Shreveport, Louisiana, is scheduled to expire on December 15, 2020; and the agreements with the Debtors' unionized employees in Toledo, Ohio, are scheduled to expire on September 30, 2022. The Debtors' Non-Debtor Affiliates also have labor agreements in place with foreign employees of those Non-Debtor entities and work stoppages by these foreign employees at the Non-Debtor Affiliates could potentially disrupt the Debtors' and Reorganized Debtors' businesses.

The Debtors may not be able to successfully negotiate new CBAs without a labor disruption. As described in Section III.D.2-3, as of the date of this Disclosure Statement, the Debtors and the Unions have been unable to reach an agreement around consensual modifications to the CBAs despite numerous negotiating sessions. The Debtors engaged in honest, good-faith efforts to obtain consensual modifications to the CBAs. Notwithstanding the Debtors' willingness to bargain with the Unions to achieve mutually satisfactory modifications to the CBAs, the Unions have rejected each of the Debtors' proposals, leaving the Debtors with no choice but to file the 1113/1114 Motion to comply with the current DIP Milestones. The Debtors remain open to continuing good-faith negotiations with their Unions. However, in the meantime, there may be some labor disruption among the unionized employees as a result of the filing of the 1113/1114 Motion. Unionized employees have gone on strike in the past in connection with the negotiation of their existing CBAs (as happened at the Toledo, Ohio manufacturing plant in 2016). If the Debtors or Reorganized Debtors are unable in the future to negotiate acceptable agreements with unionized employees in a timely manner or if the Debtors or Reorganized Debtors receive an order or ruling unfavorable to the Unions in connection with the 1113/1114 Motion, the Debtors or Reorganized Debtors could experience a significant disruption of operations and possibly a labor strike.

If the Debtors or Reorganized Debtors experience a work stoppage and elect to engage replacement workers, the Debtors or Reorganized Debtors could experience increased costs. In addition, the Debtors or Reorganized Debtors could experience increased operating costs as a result of higher wages or benefits paid to union members upon the execution of new agreements with the Unions. The Debtors or Reorganized Debtors also could experience operating inefficiencies as a result of preparations for disruptions in production, such as increasing production and inventories. Finally, companies upon which the Debtors or Reorganized Debtors are dependent for raw materials, transportation or other services could be affected by labor difficulties. These factors and any such disruptions or difficulties could have an adverse impact on the Debtors' and Reorganized Debtors' operating performance and financial condition.

In addition, while the 1113/1114 Motion process is ongoing, the Debtors are and the Reorganized Debtors will be dependent on the cooperation of their largely unionized workforce to

123

implement and adopt productivity initiatives that are critical to the Debtors' and Reorganized Debtors' ability to improve production efficiency. The effect of strikes and other slowdowns may adversely affect the degree and speed with which the Debtors and Reorganized Debtors can adopt optimization objectives.

The Debtors and their Unions are continuing to actively negotiate over their members' terms and conditions of employment, including, but not limited to, wage and benefit programs, which could result in consensual modifications to their CBAs. The Debtors' or Reorganized Debtors' costs could be impacted either positively or negatively depending on the outcome of negotiations with the Unions concerning the CBAs.

21.     **If the Debtors and Reorganized Debtors are unable to increase output or achieve operating efficiencies, the profitability of the business may be materially and adversely affected.**

The Debtors and Reorganized Debtors may not be successful in increasing output at manufacturing facilities or gaining operating efficiencies that may be necessary in order to ensure that products and prices remain competitive.

22.     **Unexpected equipment failures may lead to production curtailments or shutdowns.**

The Debtors' and Reorganized Debtors' manufacturing processes are dependent upon critical glass-producing equipment, such as furnaces, forming machines and lehrs. This equipment may incur downtime as a result of unanticipated failures, accidents, natural disasters or other *force majeure* events. The Debtors and Reorganized Debtors may in the future experience facility shutdowns or periods of reduced production as a result of such failures or events. Unexpected interruptions in production capabilities would adversely affect productivity and results of operations for the affected period. The Debtors and Reorganized Debtors also may face shutdowns if they are unable to obtain enough energy in the peak demand periods.

23.     **A loss of the services of key personnel could have a material adverse effect on the Debtors' and Reorganized Debtors' business.**

The Debtors' and Reorganized Debtors' continued success depends to a large degree upon their ability to attract and retain key management executives, as well as upon a number of members of technology, operations and sales and marketing staffs. The loss of some key executives or key members of the operating staff, or an inability to attract or retain other key individuals, could materially adversely affect the Debtors and Reorganized Debtors.

24.     **The design and implementation of the Debtors' and Reorganized Debtors' new enterprise resource planning system could face significant difficulties.**

In 2018, the Debtors began the design and implementation of a new enterprise resource planning (ERP) system, requiring significant investment and human resources to deploy. It is possible that the system will be more expensive and take longer to fully implement than originally planned, including increased investment, higher fees and expenses of third parties, delayed implementation scheduling, and more on-going maintenance expense once implemented. If for

124

any reason the implementation is not successful, the Debtors and Reorganized Debtors could be required to expense rather than capitalize related amounts. In addition, potential flaws in the implementation of the ERP system may pose risks to the Debtors' and Reorganized Debtors' ability to operate successfully and efficiently. These risks include, but are not limited to, inefficient use of employees, distractions to core business, adverse customer reactions, loss of key information, delays in decision making, and unforeseen additional costs due to the inability to integrate vital information processes.

25.     **The Debtors and Reorganized Debtors rely on increasingly complex information systems for management of manufacturing, distribution, sales and other functions. If the Debtors' and Reorganized Debtors' information systems fail to perform these functions adequately, or if they experience an interruption in their operation, their business and results of operations could suffer.**

All of the Debtors' and Reorganized Debtors' major operations, including manufacturing, distribution, sales and accounting, are dependent upon complex information systems, including without limitation their ERP system. The Debtors' and Reorganized Debtors' information systems are vulnerable to damage or interruption from:

- earthquake, fire, flood, hurricane and other natural disasters;

- power loss, computer systems failure, internet and telecommunications or data network failure; and

- hackers, computer viruses or software bugs.

In 2018, the Debtors began the phased implementation of a new ERP system. Any damage to, significant disruption in the operation of, or failure of the information systems, including the new ERP system, to perform as expected could disrupt business; result in decreased sales, increased overhead costs, excess inventory and product shortages; and otherwise adversely affect operations, financial performance and condition. The Debtors and Reorganized Debtors will take significant steps to mitigate the potential impact of each of these risks, but there can be no assurance that these procedures will be completely successful.

In addition, although the Debtors and Reorganized Debtors take steps to secure management information systems, including computer systems, intranet and internet sites, email and other telecommunications and data networks, the security measures they have implemented may not be effective and their systems may be vulnerable to theft, loss, damage and interruption from a number of potential sources and events, including unauthorized access or security breaches and cyber-attacks. The Debtors' and Reorganized Debtors' reputation, brand, and financial condition could be adversely affected if, as a result of a significant cyber event or otherwise, their operations are disrupted or shutdown; their confidential, proprietary information is stolen or disclosed; data is manipulated or destroyed; they incur costs or are required to pay fines in connection with stolen customer, employee, or other confidential information; they must dedicate significant resources to system repairs or increase cyber security protection; or they otherwise incur significant litigation or other costs.

125

26.     **A severe outbreak, epidemic or pandemic of a contagious disease in a location where the Debtors and Reorganized Debtors have a facility, or from where they source raw materials or finished goods, could adversely impact their operations and financial condition.**

The Debtors' and Reorganized Debtors' facilities and suppliers' facilities may be impacted by the outbreak of certain public health issues, including epidemics, pandemics and other contagious diseases, including COVID-19.  If a severe outbreak were to occur where they or their suppliers have facilities, it could adversely impact their operations and financial condition.

27.     **The Debtors' and Reorganized Debtors' exploration and pursuit of strategic alternatives for business in China may not be successful.**

In February 2019, the Debtors announced the pursuit of strategic alternatives for their business in China, including a potential sale or closure of their manufacturing and distribution facility in Langfang, China.  There can be no assurance that the strategic exploration process will result in a transaction or other outcome.

28.     **The Debtors and Reorganized Debtors may not be able to effectively integrate future businesses they acquire or joint ventures into which they enter.**

Any future acquisitions that the Debtors' and Reorganized Debtors' might make or joint ventures into which they might enter are subject to various risks and uncertainties, including:

- the inability to integrate effectively the operations, products, technologies and personnel of the acquired companies (some of which may be spread out in different geographic regions) and to achieve expected synergies;

- the potential disruption of existing business and diversion of management's attention from day-to-day operations;

- the inability to maintain uniform standards, controls, procedures and policies or correct deficient standards, controls, procedures and policies, including internal controls and procedures sufficient to satisfy regulatory requirements of a public company in the U.S.;

- the incurrence of contingent obligations that were not anticipated at the time of the acquisitions;

- the failure to obtain necessary transition services such as management services, information technology services and others;

- the need or obligation to divest portions of the acquired companies; and

- the potential impairment of relationships with customers.

In addition, the Debtors and Reorganized Debtors cannot provide assurance that the integration and consolidation of newly acquired businesses or joint ventures will achieve any

126

anticipated cost savings and operating synergies. The inability to integrate and consolidate operations and improve operating efficiencies at newly acquired businesses or joint ventures could have a material adverse effect on their business, financial condition and results of operations.

29.     **The Debtors and Reorganized Debtors are subject to risks associated with operating in foreign countries.**

The Debtors and Reorganized Debtors operate manufacturing and other facilities throughout the world. As a result of their international operations, they are subject to risks associated with operating in foreign countries, including:

- difficulties in staffing and managing multinational operations;

- changes in government policies and regulations;

- limitations on their ability to enforce legal rights and remedies;

- political, social and economic instability and uncertainties arising from the global geopolitical environment, including the United Kingdom referendum in favor of exiting the European Union and the evolving U.S. political, regulatory and economic landscape following the 2016 elections and upcoming 2020 elections;

- drug-related violence, particularly in Mexico;

- war, civil disturbance or acts of terrorism;

- taking of property by nationalization or expropriation without fair compensation;

- imposition or changing of tariffs or other trade barriers, such as the evolving trade dispute between the United States and China;

- imposition or increase of withholding and other taxes on remittances and other payments by foreign subsidiaries;

- ineffective intellectual property protection;

- disadvantages of competing against companies from countries that are not subject to U.S. laws and regulations including the U.S. Foreign Corrupt Practices Act ("**FCPA**");

- potentially adverse tax consequences;

- impositions or increase of investment and other restrictions or requirements by foreign governments; and

- limitations on their ability to achieve the international growth contemplated by their strategy.

127

30.   **High levels of inflation in countries in which the Debtors and Reorganized Debtors operate or sell products could adversely affect operating results and cash flows.**

Increases in inflation caused by or associated with currency devaluations or other economic conditions may result in reduced discretionary spending by consumers and therefore reduced demand for their products, as well as higher input costs for their businesses, as a result of which their results of operations and financial condition may be negatively impacted.

31.   **Increasing legal and regulatory complexity will continue to affect operations and results in potentially material ways.**

The Debtors' and Reorganized Debtors' legal and regulatory environment worldwide exposes them to complex compliance, litigation and similar risks that affect their operations and results in ways that potentially may be material.  In many of the Debtors' and Reorganized Debtors' markets, including the U.S. and Europe, they are subject to increasing regulation, which has increased their cost of doing business.  In developing markets, including in China, they face the risks associated with new and untested laws and judicial systems.  Among the more important regulatory and litigation risks they face and must manage are the following:

- The cost, compliance and other risks associated with the often conflicting and highly prescriptive regulations they face, especially in the U.S., where inconsistent standards imposed by local, state and federal authorities can increase exposure to litigation or governmental investigations or proceedings;

- The impact of new, potential or changing regulation that can affect business plans, such as those relating to the content and safety of products, as well as the risks and costs of labeling and other disclosure practices;

- The risks and costs to them and their supply chain of increased focus by U.S. and overseas governmental authorities and non-governmental organizations on environmental matters, such as climate change, the reduction of greenhouse gases and water consumption, including as a result of initiatives that effectively impose a tax on carbon emissions;

- The impact of litigation trends, particularly in major markets; the relative level of defense costs, which vary from period to period depending on the number, nature and procedural status of pending proceedings; and the cost and other effects of settlements or judgments, which may require them to make disclosures or take other actions that may affect perceptions of their brand and products;

- The increasing costs and other effects of compliance with U.S. and overseas regulations affecting workforce and labor practices, including regulations relating to health and safety, wage and hour practices, immigration, healthcare, retirement and other employee benefits and unlawful workplace discrimination;

128

- The cost and disruption of responding to governmental audits, investigations or proceedings (including audits of abandoned and unclaimed property, tax audits and audits of pension plans and their compliance with wage and hour laws), whether or not they have merit, and the cost to resolve or contest the results of any such governmental audits, investigations or proceedings;

- The legal and compliance risks associated with information technology, such as the costs of compliance with privacy, consumer protection and other laws (including without limitation the General Data Protection Regulation adopted by the European Union), the potential costs associated with alleged security breaches (including the loss of consumer confidence that may result and the risk of criminal penalties or civil liability to consumers or employees whose data is alleged to have been collected or used inappropriately) and potential challenges to the associated intellectual property rights or to their use of that intellectual property;

- The impact of changes in financial reporting requirements, accounting standards, pronouncements, principles or practices, including with respect to critical accounting policies and estimates;

- The impact of changes in tax accounting or tax laws (or authoritative interpretations relating to any of these matters), and the impact of settlements of pending or any future adjustments proposed by any taxing authorities in connection with tax audits, all of which will depend on their timing, nature and scope.  For example, the Company and its subsidiaries are subject to examination by various countries' tax authorities, which may lead to proposed or assessed adjustments to their taxes.;

- The impact of changes in international trade agreements and tariffs, including the uncertainty surrounding the potential impact of Brexit and the various "trade-wars" between the U.S. and other countries; and

- The impact of new accounting standards or pronouncements, which could adversely affect operating results or cause unanticipated fluctuations in results in future periods.  The accounting rules and regulations with which they must comply are complex and continually changing.  In addition, many companies' accounting policies are being subjected to heightened scrutiny by regulators and the public. While they believe that their financial statements have been prepared in accordance with U.S. generally accepted accounting principles, they cannot predict the impact of future changes to accounting principles or to their accounting policies on their financial statements going forward.

32. **The Debtors and Reorganized Debtors are subject to various environmental legal requirements and may be subject to new legal requirements in the future; these requirements could have a material adverse effect on operations.**

The Debtors' and Reorganized Debtors' operations and properties, both in the U.S. and abroad, are subject to extensive laws, ordinances, regulations and other legal requirements relating to environmental protection, including legal requirements governing investigation and clean-up of

129

contaminated properties as well as water discharges, air emissions, waste management and workplace health and safety. These legal requirements frequently change and vary among jurisdictions. For example, Chinese restrictions on air emissions have continued to evolve in the face of the extreme air pollution in China. Compliance with these requirements, or the failure to comply with these requirements, may have a material adverse effect on operations.

The Debtors have incurred, and expect to incur, costs to comply with environmental legal requirements, including requirements limiting greenhouse gas emissions, and these costs could increase in the future. Many environmental legal requirements provide for substantial fines, orders (including orders to cease operations) and criminal sanctions for violations. Also, certain environmental laws impose strict liability and, under certain circumstances, joint and several liability on current and prior owners and operators of these sites, as well as persons who sent waste to them, for costs to investigate and remediate contaminated sites. These legal requirements may apply to conditions at properties that they presently or formerly owned or operated, as well as at other properties for which they may be responsible, including those at which wastes attributable to them were disposed. A significant order or judgment against them, the loss of a significant permit or license or the imposition of a significant fine may have a material adverse effect on operations.

33. **The Debtors' and Reorganized Debtors' products and operations are subject to various health and safety requirements and may be subject to new health and safety requirements in the future; these requirements could have a material adverse effect on their operations.**

The Debtors' and Reorganized Debtors' products and operations are subject to certain legal requirements relating to health and safety, including occupational health and safety. These legal requirements frequently change and vary among jurisdictions. Compliance with these requirements, or the failure to comply with these requirements, may have a material adverse effect on the Debtors' and Reorganized Debtors' operations. If any of their products becomes subject to new regulations, or if any of their products becomes specifically regulated by additional governmental or other regulatory entities, the cost of compliance could be material. For example, the U.S. Consumer Product Safety Commission, or CPSC, regulates many consumer products, including glass tableware products that are externally decorated with certain ceramic enamels. New regulations or policies by the CPSC could require them to change their manufacturing processes, which could materially raise their manufacturing costs. In addition, such new regulations could reduce sales of their glass tableware products. Furthermore, a significant order or judgment against them by any governmental or regulatory entity relating to health or safety matters, or the imposition of a significant fine relating to such matters, may have a material adverse effect on their operations. The CPSC has received notice of these Chapter 11 Cases and will be served with notice of the Confirmation Hearing.

34. **The Debtors are subject to complex corporate governance, public disclosure and accounting requirements to which most of their competitors are not subject.**

The Debtors are subject to changing rules and regulations of federal and state governments, as well as the stock exchange on which their common stock is listed. These entities, including the

130

Public Company Accounting Oversight Board ("**PCAOB**"), the SEC, the NYSE American exchange, and the Financial Industry Regulatory Authority, which oversees the OTC marketplace, have issued a significant number of new and increasingly complex requirements and regulations over the course of the last several years and continue to develop additional regulations and requirements in response to laws enacted by the U.S. Congress.  For example, the Sarbanes-Oxley Act of 2002 and the rules and regulations subsequently implemented by the SEC and the PCAOB, imposed and may impose further compliance burdens and costs on us.  Also, in July 2010, the Dodd-Frank Wall Street Reform and Protection Act (the "**Dodd-Frank Act**") was signed into law. The Dodd-Frank Act includes significant corporate governance and executive compensation-related provisions and required the SEC to adopt additional rules and regulations in these areas. The Debtors' efforts to comply with these legal and regulatory requirements have resulted in an increase in expenses and a diversion of management's time from other business activities.  Also, those laws, rules and regulations may make it more difficult and expensive for them to attract and retain key employees and directors and to maintain director and officer liability insurance, and they may be required to accept reduced coverage or incur substantially higher costs to maintain coverage.

Their competitors generally are not subject to these rules and regulations, because they do not have securities that are publicly traded on a U.S. securities exchange.  As a result, their competitors generally are not subject to the risks identified above.  In addition, the public disclosures that the Debtors are required to provide pursuant to these rules and regulations may furnish their competitors with greater competitive information regarding the Debtors' operations and financial results than the Debtors are able to obtain regarding their competitors' operations and financial results, thereby placing the Debtors at a competitive disadvantage.

35. **Estimates and assumptions that the Debtors and Reorganized Debtors make in accounting for their results from operations are dependent on future results, involve significant judgments, may be imprecise and may differ materially from actual results.**

Several estimates and assumptions are made that affect the accounting for and recognition of assets, liabilities, revenues and expenses.  These estimates and assumptions must be made due to certain information used in preparation of the Debtors' financial statements which is dependent on future events, cannot be calculated with a high degree of precision from data available or is not capable of being readily calculated based on generally accepted methodologies.  The Debtors believe that accounting for property, plant and equipment, operating lease right-of-use assets, goodwill, intangible assets, pension and other post-employment benefit plans, contingencies and litigation, and income taxes involves significant judgments and estimates used in the preparation of their Consolidated Financial Statements.  Actual results for all estimates could differ materially from the estimates and assumptions that the Debtors use, which could have a material adverse effect on their financial condition and results of operations.

36. **The Debtors' and Reorganized Debtors' financial results and operations may be adversely affected by violations of anti-bribery laws.**

The FCPA and similar anti-bribery laws in other jurisdictions generally prohibit companies and their intermediaries from making improper payments to non-U.S. officials for the purpose of

131

obtaining or retaining business.  The Debtors' and Reorganized Debtors' policies mandate compliance with these anti-bribery laws.  The Debtors and Reorganized Debtors operate in many parts of the world that have experienced governmental corruption to some degree and, in certain circumstances, strict compliance with anti-bribery laws may conflict with local customs and practices.  The Debtors cannot assure you that their internal controls and procedures always will protect them from the reckless or criminal acts committed by their employees or agents.  If the Debtors or Reorganized Debtors were found to be liable for FCPA violations (either due to their own acts or their inadvertence or due to the acts or inadvertence of others), they could be liable for criminal or civil penalties or other sanctions, which could have a material adverse effect on their business.

37.     **The Debtors' and Reorganized Debtors'** *failure to protect their intellectual property or prevail in any intellectual property* **litigation could materially and adversely affect their competitive position, reduce net sales or otherwise harm their business.**

The Debtors' and Reorganized Debtors' success depends in part on their ability to protect their intellectual property rights.  They rely on a combination of patent, trademark, copyright and trade secret laws, licenses, confidentiality and other agreements to protect their intellectual property rights.  However, this protection may not be fully adequate.  Their intellectual property rights may be challenged or invalidated, an infringement suit by them against a third party may not be successful and/or third parties could adopt trademarks similar to their own.  In particular, third parties could design around or copy the Debtors' or Reorganized Debtors' proprietary furnace, manufacturing and mold technologies, which are important contributors to their competitive position in the glass tableware industry.  They may be particularly susceptible to these challenges in countries where protection of intellectual property is not strong.  In addition, they may be accused of infringing or violating the intellectual property rights of third parties.  Any such claims, whether or not meritorious, could result in costly litigation and divert the efforts of their personnel.  Their failure to protect their intellectual property or prevail in any intellectual property litigation could materially and adversely affect their competitive position, reduce net sales or otherwise harm their business.

38.     **The Debtors' and Reorganized Debtors' financial results may be adversely impacted by product liability claims, recalls or other litigation that is determined adversely to them.**

The Debtors are involved in various routine legal proceedings arising in the ordinary course of their business.  They do not consider any pending legal proceeding as material.  However, their financial results could be adversely affected by monetary judgments and the cost to defend legal proceedings in the future, including product liability claims related to the products they manufacture.  Although they maintain product liability insurance coverage, potential product liability claims are subject to a self-insured retention or could be excluded under the terms of the policy.

132

**F.      RISKS ASSOCIATED WITH FORWARD-LOOKING STATEMENTS**

1.      **The Financial Information Contained Herein Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.**

**The financial information contained in this Disclosure Statement has not been audited.**  In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

2.      **Financial Projections and Other Forward-Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary.**

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward-looking, and which projections are necessarily based on certain assumptions and estimates.  Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the Financial Projections.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of confirmation and consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Reorganized Debtors' ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; (e) the Debtors' and Reorganized Debtors' ability to maintain market strength and receive vendor support by way of favorable commercial terms; and (f) anticipated future commodity prices.

DUE TO THE INHERENT UNCERTAINTIES ASSOCIATED WITH PROJECTING FINANCIAL RESULTS GENERALLY, THE PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSIDERED ASSURANCES OR GUARANTEES OF THE AMOUNT OF FUNDS OR THE AMOUNT OF CLAIMS THAT MAY BE ALLOWED IN THE VARIOUS CLASSES. WHILE THE DEBTORS BELIEVE THAT THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE REASONABLE, THERE CAN BE NO ASSURANCE THAT THEY WILL BE REALIZED.

133

G.    **DISCLOSURE STATEMENT DISCLAIMER**

1.    **The Information Contained Herein Is for Soliciting Votes Only.**

The information contained in this Disclosure Statement is for purposes of soliciting votes on the Plan and may not be relied upon for any other purpose.

2.    **This Disclosure Statement Was Not Approved by the SEC.**

This Disclosure Statement has not been filed with the SEC or any state regulatory authority. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

3.    **The Debtors Relied on Certain Exemptions from Registration Under the Securities Act.**

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws. All shares of New Equity Interests issued to Holders of Allowed Claims on account of their respective Allowed Claims will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 1145(a) of the Bankruptcy Code. To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable nonbankruptcy law, the distribution and issuance, as applicable, of the Plan Securities and Documents will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code or section 4(a)(2) of the Securities Act.

4.    **This Disclosure Statement Contains Forward-Looking Statements.**

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The Liquidation Analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

5.    **No Legal or Tax Advice Is Provided to You by this Disclosure Statement.**

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal,

134

tax and other matters concerning his or her Claim or Equity Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

6.      **No Admissions Are Made by This Disclosure Statement.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, any Debtor) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Allowed Equity Interests or any other parties in interest.

7.      **No Reliance Should be Placed on any Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement.  The Debtors or the Reorganized Debtors may seek to investigate, file and prosecute Claims or Causes of Action and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims, Causes of Action or objections to Claims.

8.      **Nothing Herein Constitutes a Waiver of any Right to Object to Claims or Recover Transfers and Assets.**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or its Estate are specifically or generally identified herein.

9.      **The Information Used Herein Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

10.     **The Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors

135

US-DOCS\115812051.19

nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11.     **No Representations Made Outside this Disclosure Statement Are Authorized.**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to counsel to the Debtors and the United States Trustee.

# VII.
# ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

A.    **LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

If the Plan or an alternative chapter 11 plan of reorganization cannot be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtors' assets.  A discussion of the effect a chapter 7 liquidation would have on the recovery of Holders of Claims is set forth in Section V.C herein, titled "Statutory Requirements for Confirmation of the Plan."  The Debtors believe that liquidation under chapter 7 would result in (i) smaller or equal distributions being made to creditors entitled to a recovery than those provided for in the Plan based on the liquidation value of the Debtors' assets and because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations, and (iii) the failure to realize the greater, going-concern value of all of the Debtors' assets.

B.    **FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION**

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different chapter 11 plan of reorganization.  Such a plan might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of the Debtors' assets.  As discussed above, during the negotiations prior to the filing of the Chapter 11 Cases and the Plan, the Debtors explored various alternatives to the Plan.

The Debtors believe that the Plan and the associated Exit Facilities enable the Debtors to emerge from chapter 11 successfully and expeditiously, preserving their businesses and allowing their creditors to realize the highest recoveries under the circumstances.  In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed.  Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation. Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to creditors than the Plan because the Plan provides for a greater return to creditors.

The prolonged continuation of the Chapter 11 Cases is likely to adversely affect the Debtors' businesses and operations.  So long as the Chapter 11 Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations.  In addition, the longer the Chapter 11 Cases continue, the more likely it is that the Debtors' vendors and service providers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.  Furthermore, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the proceedings.  In addition, the Debtors may no longer be permitted to use cash collateral on a consensual basis.  Under these circumstances, it is unlikely

137

the Debtors could successfully reorganize without damage to their business operations and material decreases in recoveries for creditors.

138

US-DOCS\115812051.19

# VIII.
## EXEMPTIONS FROM SECURITIES ACT REGISTRATION

### SECTION 1145 OF THE BANKRUPTCY CODE AND SECTION 4(A)(2) OF THE SECURITIES ACT

The Plan provides for the Reorganized Debtors to distribute New Equity Interests to certain Holders of Allowed Claims in Class 5.

All shares of New Equity Interests issued to Holders of Allowed Claims on account of their respective Claims will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 1145(a) of the Bankruptcy Code.

1.   **Securities Issued in Reliance on Section 1145 of the Bankruptcy Code**

Under the Plan, the Plan Securities and Documents will be issued to certain Holders of Allowed Prepetition Term Loan Claims (to the extent provided under Article V of the Plan), as applicable, in reliance upon section 1145(a)(1) of the Bankruptcy Code (collectively, the "**1145 Securities**").  Section 1145(a)(1) of the Bankruptcy Code provides that the securities registration requirements of federal and state securities laws do not apply to the offer or sale of a security by a debtor if:

- the offer or sale occurs under a plan of reorganization;

- the recipients of such security hold a claim against, an interest in or claim for administrative expense in the case concerning the debtor; and

- such security is offered in exchange for a claim against, an interest in or claim for administrative expense in the case concerning the debtor, or is offered principally in such exchange and partly for cash and property.

2.   **Resale of 1145 Securities**

Pursuant to section 1145(c) of the Bankruptcy Code, an offer or sale of the 1145 Securities is deemed to be a public offering.  The 1145 Securities may be resold without registration under either (a) state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states or (b) the Securities Act pursuant to an exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" (as such term is defined in the Bankruptcy Code) with respect to the 1145 Securities.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of such securities;

139

- offers to buy those securities from the holders of the securities, if the offer to buy is (i) with a view to distributing such securities and (ii) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is used in the Securities Act.

The term "issuer" is defined in section 2(a)(4) of the Securities Act; however, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to section 2(a)(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by or are under common control with, an issuer of securities. "Control" (as defined in Rule 405 of the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of the securities of a reorganized debtor may be presumed to be a "control person."

3.    **Resale of the 1145 Securities by "Underwriters"**

Resales by persons who receive any Plan Securities who are deemed to be "underwriters" (as such term is defined in the Bankruptcy Code) (collectively, the "**Restricted Holders**") would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act. Restricted Holders would, however, be permitted to sell the New Equity Interests or the other 1145 Securities, as applicable, without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below, any other registration exemption under the Securities Act, or if such securities are registered with the SEC pursuant to a registration agreement or otherwise. Any person who is an "underwriter" but not an "issuer" with respect to an offer of the 1145 Securities is, in addition, entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b)(1) of the Bankruptcy Code.

4.    **Resale of Plan Securities Issued Pursuant to Section 4(a)(2)**

Plan Securities issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be "restricted securities." Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of restricted securities would, however, be permitted to resell such Plan Securities without registration if they are able to comply with the applicable provisions of Rule 144, as described further below, or any other registration exemption under the Securities Act, or if such Plan Securities are registered with the SEC.

140

5. **Rule 144**

Under certain circumstances, Restricted Holders and holders of "restricted securities" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions under Rule 144 of the Securities Act, to the extent available and in compliance with applicable state and foreign securities laws.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an affiliate of the issuer. An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is available certain current public information regarding the issuer, and may sell the securities after a one-year holding period whether or not there is current public information regarding the issuer. Adequate current public information is available for a reporting issuer if the issuer has been required to and has filed all periodic reports required under section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, during the twelve months preceding the sale of the restricted securities. If the issuer is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available. The Debtors currently expect that the Reorganized Debtors will not be required to file periodic reports under the Exchange Act and that resales by non-affiliates will be permitted by Rule 144 only after the twelve month holding period expires.

An affiliate may resell restricted securities after the applicable six- or twelve-month holding period. However, an affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144. First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the greater of 1% or the average weekly reported volume of trading in such restricted securities during the four weeks preceding the filing of a notice of proposed sale on Form 144. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction. The broker must receive no more than the usual commission and cannot solicit orders for the sale of the restricted securities except in certain situations. Third, if the sale exceeds 5,000 restricted securities or has an aggregate sale price greater than $50,000, an affiliate must file with the SEC three copies of a notice of proposed sale on Form 144. The sale must occur within three months of filing the notice unless an amended notice is filed.

The Debtors believe that the Rule 144 exemption will not be available with respect to any Plan Securities issued pursuant to section 4(a)(2) of the Securities Act (whether held by non-affiliates or affiliates) until at least twelve months after the Effective Date. Accordingly, Holders of such Plan Securities will be required to hold their Plan Securities for at least twelve months and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144.

141

Pursuant to the Plan, certificates evidencing Plan Securities issued pursuant to section 4(a)(2) of the Securities Act will bear a legend substantially in the form below (the "**Legend**"):

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS ("STATE ACTS") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR STATE ACTS COVERING SUCH SECURITIES OR THE SECURITIES ARE SOLD AND TRANSFERRED IN A TRANSACTION THAT IS EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE ACT OR STATE ACTS."

**WHETHER OR NOT ANY PARTICULAR PERSON WOULD BE DEEMED TO BE AN "UNDERWRITER" OF SECURITIES TO BE ISSUED PURSUANT TO THE PLAN OR AN "AFFILIATE" OF REORGANIZED PARENT WOULD DEPEND UPON VARIOUS FACTS AND CIRCUMSTANCES APPLICABLE TO THAT PERSON. ACCORDINGLY, THE DEBTORS EXPRESS NO VIEW AS TO WHETHER ANY SUCH PERSON WOULD BE SUCH AN "UNDERWRITER" OR AN "AFFILIATE." IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE OF REORGANIZED PARENT, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES OF REORGANIZED PARENT. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

Additionally, any of the 1145 Securities held by an identified Restricted Holder will be subject to bear the Legend on any certificates evidencing such 1145 Securities.

US-DOCS\115812051.19

# IX.
# CERTAIN U.S. FEDERAL INCOME
# TAX CONSEQUENCES OF THE PLAN

### A.   INTRODUCTION

The following discussion summarizes certain U.S. federal income tax consequences expected to result from the consummation of the Plan. This discussion is only for general information purposes and only describes the expected tax consequences to the Debtors and to Holders of Prepetition Term Loan Claims (which, for purposes of this discussion, includes both the secured portion and the unsecured deficiency portion) and General Unsecured Claims. It is not a complete analysis of all potential U.S. federal income tax consequences and does not address any tax consequences arising under any U.S. state, U.S. local or non-U.S. tax laws or U.S. federal estate or gift tax laws. This discussion is based on the U.S. Internal Revenue Code of 1986, as amended (the "**Tax Code**"), regulations promulgated thereunder by the U.S. Department of the Treasury ("**Treasury Regulations**"), judicial decisions, and published rulings and administrative pronouncements of the U.S. Internal Revenue Service (the "**IRS**"), all as in effect on the date of this Disclosure Statement. These authorities may change, possibly retroactively, resulting in U.S. federal income tax consequences different from those discussed below. No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary position regarding the U.S. federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

This discussion assumes that the Holders of the Prepetition Term Loan Claims will not receive any share of the General Unsecured Recovery Cash Pool in excess of $100,000 with respect to the unsecured deficiency portion of their Prepetition Term Loan Claims.

This discussion assumes that Holders of the Prepetition Term Loan Claims have held such property as "capital assets" within the meaning of Section 1221 of the Tax Code (generally, property held for investment) and will hold the new common stock in the Reorganized Parent authorized to be issued pursuant to the Plan (the "**New Common Equity Interests**") as capital assets. In addition, this discussion assumes that the Debtors' obligations under the Exit Facility Loans, the Prepetition Term Loan Claims and General Unsecured Claims will be treated as debt for U.S. federal income tax purposes.

Except as specifically set forth below, this discussion does not address the tax consequences to the Reorganized Parent of issuing, or to any holder of receiving, owning and disposing of, the New Preferred Equity Interests. Based on the New Preferred Equity Interest term sheet attached as Exhibit G to this Disclosure Statement, the Debtors intend to take the position that the New Preferred Equity Interests are treated as common stock for purposes of Section 305 of the Tax Code. The Debtors' position is not, however, binding on the IRS. Holders of the New Preferred Equity Interests should consult their tax advisors regarding the U.S. federal income tax consequences of receiving, owning and disposing of the New Preferred Equity Interests.

This discussion does not address all U.S. federal income tax considerations that may be relevant to a particular Holder in light of that Holder's particular circumstances, including the

143

impact of the tax on net investment income imposed by Section 1411 of the Tax Code and the effects of Section 451(b) of the Tax Code conforming the timing of certain income accruals to financial statements.  In addition, it does not address considerations relevant to Holders subject to special rules under the U.S. federal income tax laws, such as "qualified foreign pension funds" (as defined in Section 897(l)(2) of the Tax Code), entities all of the interests of which are held by qualified foreign pension funds, financial institutions, insurance companies, brokers, dealers or traders in securities, commodities or currencies, tax-exempt organizations, tax-qualified retirement plans, partnerships and other pass-through entities, Holders subject to the alternative minimum tax, Holders who utilize the installment method of reporting with respect to their Claims, Holders holding Claims as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated investment, Holders who received New Equity Interests pursuant to the New Management Incentive Plan or otherwise as compensation, U.S. Holders (as defined below) who have a functional currency other than the U.S. dollar.

**HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN AND THE OWNERSHIP AND DISPOSITION OF NEW COMMON EQUITY INTERESTS AND NEW PREFERRED EQUITY INTERESTS RECEIVED PURSUANT TO THE PLAN, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER ANY U.S. STATE, U.S. LOCAL OR NON-U.S. TAX LAWS, OR ANY OTHER U.S. FEDERAL TAX LAWS.  THE DEBTORS AND THE REORGANIZED DEBTORS SHALL NOT BE LIABLE TO ANY PERSON WITH RESPECT TO THE TAX LIABILITY OF A HOLDER OR ITS AFFILIATES.**

**B.      U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS**

The tax consequences of the implementation of the Plan to the Debtors will differ depending on whether the Restructuring Transactions are implemented in a manner intended to be non-taxable to the Debtors (the "**Recapitalization Structure**") or as a taxable sale (or deemed taxable sale) for U.S. federal income tax purposes of the assets and/or stock of the Debtors and certain of their subsidiaries as described in section IX.B.2. below, including as a result of the Taxable Sale Transaction (the "**Sale Structure**").  The Debtors have not yet determined how the Restructuring Transactions will be structured, whether in whole or in part.  Such decision will depend on, among other things, the tax profile of the Debtors and their subsidiaries following the implementation of the Restructuring Transactions. The Restructuring Transactions Steps, which will be included with a Plan Supplement, will describe the manner in which those transactions will be implemented.

1.      **Recapitalization Structure**

The Recapitalization Structure would not be expected to result in the Debtors recognizing any taxable gain or loss.  Subject to the discussion below regarding attribute reduction as a result of excluded cancellation of indebtedness ("**COD**") income, the Debtors' tax basis in their assets would remain unchanged.  Further, the Debtors' existing interest deductions suspended under Section 163(j) of the Tax Code ("**Suspended Interest Expense**") may remain available for use following the implementation of the Plan, subject to the discussion below regarding Section 382 of the Tax Code.  Except as otherwise noted, the discussion in sections IX.B.1.a and IX.B.1.b

144

assume that the Prepetition Term Loans Exchange (as defined below) will be pursuant to the Recapitalization Structure.

(a)    Cancellation of Indebtedness and Reduction of Tax Attributes

The Debtors generally should realize COD income to the extent the adjusted issue price of the Claims exchanged pursuant to the Plan exceeds the sum of (a) the amount of cash and the fair market value of any other property (including the New Common Equity Interests and New Preferred Equity Interests) treated as received in exchange for such Claims and (b) the issue price of the Exit Facility Loans.  The amount of COD income that will be realized by the Debtors is uncertain because it will depend on the fair market value of the New Common Equity Interests and New Preferred Equity Interests and the issue price of the Exit Facility Loans on the Effective Date.

Under Section 108 of the Tax Code, COD income realized by a debtor will be excluded from gross income if the discharge of debt occurs in a case brought under the Bankruptcy Code, the debtor is under the court's jurisdiction in such case and the discharge is granted by the court or is pursuant to a plan approved by the court (the "**Bankruptcy Exception**").  Because the Bankruptcy Exception should apply to the transactions consummated pursuant to the Plan, the Debtors should be entitled to exclude from gross income COD income realized as a result of the implementation of the Plan.

Under Section 108(b) of the Tax Code, a debtor that excludes COD income from gross income under the Bankruptcy Exception generally must reduce certain tax attributes by the amount of the excluded COD income.  Attributes subject to reduction include net operating losses ("**NOLs**"), NOL carryforwards and certain other losses, credits and carryforwards, and the debtor's tax basis in its assets (including stock of subsidiaries).  The reduction in tax attributes occurs only after the taxable income (or loss) for the taxable year of the debt discharge has been determined.  In addition, current law allows for the carryback of 2020 NOLs to offset taxable income in prior tax years, thereby resulting in a refund of all or a portion of the taxes paid in such tax years. Such carryback is available before determining the amount of NOLs subject to reduction from excluded COD income. The reduction in a debtor's tax basis in its assets generally will not exceed the excess of (i) its tax basis in assets held immediately after the discharge of indebtedness over (ii) the amount of liabilities remaining immediately after the discharge of indebtedness (the "**Liability Floor**").  If the debtor is a member of a consolidated group and is required to reduce its basis in the stock of another group member, a "look-through rule" generally requires a corresponding reduction in the tax attributes of the lower-tier member.  If the amount of a debtor's excluded COD income exceeds the amount of attribute reduction resulting from the application of the foregoing rules, certain other tax attributes of the consolidated group may also be subject to reduction. NOLs for the taxable year of the discharge and NOL carryovers to such year generally are the first attributes subject to reduction.  However, a debtor may elect under Section 108(b)(5) of the Tax Code (the "**Section 108(b)(5) Election**") to reduce its basis in its depreciable property first.  If the debtor is a member of a consolidated group, the debtor may treat stock in another group member as depreciable property for purposes of the Section 108(b)(5) Election, provided the lower-tier member consents to a corresponding reduction in its basis in its depreciable property. If a debtor makes a Section 108(b)(5) Election, the Liability Floor does not apply.  The Debtors do not anticipate making a Section 108(b)(5) Election.

145

The Debtors believe that for U.S. federal income tax purposes, the Debtors' consolidated group (the "**Debtor Group**") likely has not generated significant NOLs for the tax year ending December 31, 2019, though it does believe that it generated approximately $17.1 million of Suspended Interest Expense. The Debtors believe that the Debtor Group likely will generate additional NOLs and Suspended Interest Expense for the tax year ending December 31, 2020. However, the amount of the Debtor Group's 2020 NOLs and Suspended Interest Expense will not be determined until the Debtor Group prepares its consolidated U.S. federal income tax returns for such tax year.  Moreover, the Debtor Group's NOLs and Suspended Interest Expense are subject to audit and possible challenge by the IRS. Accordingly, the amount of the Debtor Group's NOLs and Suspended Interest Expense ultimately may vary from the amounts described above.

The Debtors currently anticipate that, subject to any future changes in the law, the Debtor Group's 2020 NOLs may be carried back to offset taxable income in the 2019 tax year, which may result in the receipt of tax refunds in 2021.  If any 2020 NOLs are unable to be carried back to prior tax years, the Debtors will carry forward such NOLs under the Recapitalization Structure, and such NOLs will be subject to reduction from excluded COD income.  In addition, the Debtors currently anticipate that the application of Section 108(b) of the Tax Code (assuming no Section 108(b)(5) Election is made) will result in a reduction in the tax basis of their assets.  However, the ultimate effect of the attribute reduction rules is uncertain because, among other things, it will depend on the amount of COD income realized by the Debtors.

If the Sale Structure is utilized, the assets of Libbey Glass Inc. and its subsidiaries generally are expected to be treated as sold to the Reorganized Debtors (or newly-formed entities that will directly or indirectly own equity interests in the Reorganized Debtors post-Effective Date) for tax purposes.  Accordingly, although Section 108(b) of the Tax Code would not be expected to reduce the basis of any assets of the Reorganized Debtors in connection with the Sale Structure, the Reorganized Debtors (or such newly-formed entities) would not succeed to any of the Pre-Change Tax Attributes (as defined below) of the Debtor Group, including any Suspended Interest Expense, and their basis in the assets would be equal to their fair market value on the Effective Date.

(b)      <u>Section 382 Limitation on Net Operating Losses and Built-In Losses</u>

Under Section 382 of the Tax Code, if a corporation or a consolidated group of corporations with NOLs, Suspended Interest Expense, or built-in losses (a "**loss corporation**") undergoes an "ownership change," the loss corporation's use of its pre-change NOLs and Suspended Interest Expense (and certain other tax attributes) (the "**Pre-Change Tax Attributes**") generally will be subject to an annual limitation in the post-change period.  In general, an "ownership change" occurs if the percentage of the value of the loss corporation's stock owned by one or more direct or indirect "five percent shareholders" increases by more than fifty percentage points over the lowest percentage of value owned by the five percent shareholders at any time during the applicable testing period (an "**Ownership Change**").  The testing period generally is the shorter of (i) the three-year period preceding the testing date or (ii) the period of time since the most recent Ownership Change of the corporation.

Subject to the special bankruptcy rules discussed below, the amount of the annual limitation on a loss corporation's use of its Pre-Change Tax Attributes is generally equal to the product of the applicable long-term tax-exempt rate (as published by the IRS for the month in

146

which the Ownership Change occurs) and the value of the loss corporation's outstanding stock immediately before the Ownership Change (excluding certain capital contributions).

If a loss corporation has a net unrealized built-in gain ("**NUBIG**") immediately prior to the Ownership Change, the annual limitation may be increased as certain gains are recognized (or, unless certain provisions of proposed Treasury Regulations are enacted and apply to the Recapitalization Structure, treated as being recognized pursuant to the safe harbors provided in IRS Notice 2003-65) during the five-year period beginning on the date of the Ownership Change (the "**Recognition Period**").

If a loss corporation has a net unrealized built-in loss ("**NUBIL**") immediately prior to the Ownership Change, certain losses (and deductions) recognized during the Recognition Period also would be subject to the annual limitation and thus may reduce the amount of Pre-Change Tax Attributes that could be used by the loss corporation during the Recognition Period.

A NUBIG or NUBIL is generally the difference between the fair market value of a loss corporation's assets (or, if greater, the amount of a loss corporation's relevant liabilities) and its tax basis in the assets, subject to a statutorily-defined threshold amount. The amount of a loss corporation's NUBIG or NUBIL must be adjusted for built-in items of income or deduction that would be attributable to a pre-change period if recognized during the Recognition Period. The NUBIG or NUBIL of a consolidated group generally is calculated on a consolidated basis, subject to special rules.

If a loss corporation has a NUBIG immediately prior to an Ownership Change, any recognized built-in-gains ("**RBIGs**") will increase the annual limitation in the taxable year the RBIG is recognized or deemed recognized. An RBIG generally is any gain (and certain income) with respect to an asset held immediately before the date of the Ownership Change that is recognized during the Recognition Period to the extent of the fair market value of the asset over its tax basis immediately prior to the Ownership Change. However, the aggregate amount of all RBIGs that are recognized during the Recognition Period may not exceed the NUBIG. On the other hand, if a loss corporation has a NUBIL immediately prior to an Ownership Change, any recognized built-in losses ("**RBILs**") will be subject to the annual limitation in the same manner as Pre-Change Tax Attributes. An RBIL generally is any loss (and certain deductions) with respect to an asset held immediately before the date of the Ownership Change that is recognized during the Recognition Period to the extent of the excess of the tax basis of the asset over its fair market value immediately prior to the Ownership Change. However, the aggregate amount of all RBILS that are recognized during the Recognition Period may not exceed the NUBIL. RBIGs and RBILs may be recognized during the Recognition Period for depreciable and amortizable assets that are not actually disposed. The Debtors cannot determine at this time if the Debtor Group will have a NUBIL on the Effective Date.

An Ownership Change prior to the Effective Date would result in an annual limitation on the Debtors' use of the Debtor Group's Pre-Change Tax Attributes and RBILs arising during the Recognition Period, in each case, attributable to the period prior to such date. It is likely that any change in ownership prior to the Effective Date would result in a significant portion of the Debtor Group's Pre-Change Tax Attributes and RBILs being unusable in periods after such Ownership Change. The Debtors expect the consummation of the Recapitalization Structure will result in an

147

Ownership Change of the Debtor Group. Because the Ownership Change will occur in a case brought under the Bankruptcy Code, one of the following two special rules should apply in determining the Debtor Group's ability to utilize in post-Effective Date tax periods Pre-Change Tax Attributes and RBILs attributable to tax periods preceding the Effective Date provided there is no Ownership Change of the Debtor prior to the Effective Date.

Under Section 382(l)(5) of the Tax Code, an Ownership Change in bankruptcy will not result in any annual limitation on the debtor's Pre-Change Tax Attributes and RBILs arising during the Recognition Period if the stockholders and qualified creditors of the debtor receive at least 50% of the stock (by vote and value) of the reorganized debtor in the bankruptcy reorganization as a result of being shareholders or creditors of the debtor. Instead, the debtor's Pre-Change Tax Attributes are reduced by the amount of any interest deductions with respect to debt converted into stock in the bankruptcy reorganization that were allowed in the three full taxable years preceding the taxable year in which the Ownership Change occurs and in the part of the taxable year prior to and including the date of the Ownership Change attributable to the bankruptcy reorganization (the "**Plan Ownership Change**"). However, if any Pre-Change Tax Attributes or RBILs of the debtor already are subject to an annual usage limitation under Section 382 of the Tax Code at the time of an Ownership Change subject to Section 382(l)(5) of the Tax Code, those Pre-Change Tax Attributes and RBILs will continue to be subject to such limitation.

A qualified creditor is any creditor who has held the debt of the debtor for at least eighteen months prior to the petition date or who has held "ordinary course indebtedness" that has been owned at all times by such creditor. A creditor who does not become a direct or indirect five percent shareholder of the reorganized debtor generally may be treated by the debtor as having always held any debt owned immediately before the Ownership Change, unless the creditor's participation in formulating the plan of reorganization makes evident to the debtor that the creditor has not owned the debt for the requisite period.

A debtor may elect not to apply Section 382(l)(5) of the Tax Code to an Ownership Change that otherwise satisfies its requirements. This election must be made on the debtor's U.S. federal income tax return for the taxable year in which the Ownership Change occurs. If Section 382(l)(5) of the Tax Code applies to an Ownership Change (and the debtor does not elect out), any subsequent Ownership Change of the debtor within the two-year period following the date of the Plan Ownership Change will result in the debtor being unable to use any Pre-Change Attributes or RBILs in any taxable year ending after such subsequent Ownership Change to offset future taxable income.

If an Ownership Change pursuant to a bankruptcy plan does not satisfy the requirements of Section 382(l)(5) of the Tax Code, or if a debtor elects not to apply Section 382(l)(5) of the Tax Code, the debtor's use of its Pre-Change Tax Attributes and RBILs arising during the Recognition Period will be subject to an annual limitation as determined under Section 382(l)(6) of the Tax Code. In such case, the amount of the annual limitation generally will be equal to the product of the applicable long-term tax-exempt rate (0.89% for August 2020) and the value of the debtor's outstanding stock immediately after the bankruptcy reorganization, provided such value may not exceed the value of the debtor's gross assets immediately before the Ownership Change, subject to certain adjustments. However, if any Pre-Change Tax Attributes or RBILs

148

of the debtor already are subject to an annual limitation at the time of an Ownership Change subject to Section 382(l)(6) of the Tax Code, those Pre-Change Tax Attributes and RBILs will be subject to the lower of the two annual limitations.

The Debtors are unable to determine whether the Ownership Change expected to result from the consummation of the Recapitalization Structure may satisfy the requirements of Section 382(l)(5) of the Tax Code, as such determination will depend on the extent to which Holders of the Prepetition Term Loan Claims immediately prior to consummation of the Recapitalization Structure may be treated as qualified creditors for purposes of Section 382(l)(5) of the Tax Code.   Even if the Recapitalization Structure satisfies the requirements of Section 382(l)(5) of the Tax Code, the Debtors anticipate electing out of Section 382(l)(5) of the Tax Code, in which case, the Debtor Group's Pre-Change Tax Attributes remaining after reduction for excluded COD income along with RBILs (if any) arising during the Recognition Period will be subject to an annual limitation generally equal to the product of the long-term tax-exempt rate for the month in which the Plan Ownership Change occurs and the value of the Debtor's outstanding stock immediately after consummation of the Recapitalization Structure. Pre-Change Tax Attributes and RBILs not utilized in a given year due to the annual limitation may be carried forward for use in future years until their expiration dates (with any RBIL disallowed during the Recognition Period permitted to be carried forward under rules similar to those applying to NOL carryforwards).  To the extent the annual limitation of the Reorganized Debtors' consolidated group exceeds the its taxable income (for purposes of Section 382 of the Tax Code) in a given year, the excess will increase the annual limitation in future taxable years.

2. **Sale Structure**

Under the Sale Structure, the assets of Libbey Glass Inc. and its subsidiaries generally would be transferred (or deemed transferred) to the Reorganized Debtors (including, for purposes of this discussion of the Sale Structure, any newly-formed entities that will directly or indirectly own equity interests in the Reorganized Debtors post-Effective Date) in a transaction that generally would be treated as a taxable asset sale for U.S. federal income tax purposes. The tax consequences to the Debtors of the Sale Structure will depend on a number of factors, including the fair market value of the Debtors' assets, the Debtors' tax basis in their assets, and the manner in which the Sale Structure is implemented.  In the Sale Structure, none of the Reorganized Debtors or their affiliates would succeed to the remaining Pre-Change Tax Attributes, and the assets of some or all of the Reorganized Debtors would have basis equal to their fair market value on the Effective Date.

3. **Uncertainty of Debtors' Tax Treatment**

The U.S. federal income tax considerations relating to the Plan are complex and subject to uncertainties.  No assurance can be given that the IRS will agree with the Debtors' interpretations of the tax rules applicable to, or tax positions taken with respect to, the transactions undertaken to effect the Plan.  If the IRS were to successfully challenge any such interpretation or position, the Debtors may recognize additional taxable income for U.S. federal income tax purposes, and the Debtors may not have sufficient deductions, losses or other attributes for U.S. federal income tax purposes to fully offset such income, resulting in the payment of cash taxes.

US-DOCS\115812051.19

C.      U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS

1.      **Definition of U.S. Holder and Non-U.S. Holder**

A "U.S. Holder" is a Holder of Prepetition Term Loan Claims, General Unsecured Claims, or New Common Equity Interests that, for U.S. federal income tax purposes, is or is treated as:

- an individual who is a citizen or resident of the United States;

- a corporation created or organized under the laws of the United States, any state thereof, or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income tax regardless of its source; or

- a trust that (1) is subject to the primary supervision of a U.S. court and the control of one or more "United States persons" (within the meaning of Section 7701(a)(30) of the Tax Code), or (2) has a valid election in effect to be treated as a United States person for U.S. federal income tax purposes.

A "Non-U.S. Holder" means a Holder of Prepetition Term Loan Claims, General Unsecured Claims or New Common Equity Interests that is not a U.S. Holder and is, for U.S. federal income tax purposes, an individual, corporation, estate or trust.

If a partnership or other entity or arrangement classified as a partnership for U.S. federal income tax purposes holds the Prepetition Term Loan Claims, General Unsecured Claims or New Common Equity Interests, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.  Beneficial owners of the Prepetition Term Loan Claims, General Unsecured Claims or New Common Equity Interests who are partners in a partnership holding any of such instruments should consult their tax advisors.

2.      **U.S. Holders of Prepetition Term Loan Claims**

(a)      Exchange of Prepetition Term Loan Claims for New Common Equity Interests

(i)      *Treatment of Prepetition Term Loans Exchange*

The treatment of the exchange of Prepetition Term Loan Claims for New Common Equity Interests (the "**Prepetition Term Loans Exchange**") will depend, in part, on the steps undertaken pursuant to the Restructuring Transactions. If the Sale Structure is implemented, the Debtors intend to take the position that the Prepetition Term Loans Exchange is a taxable exchange under Section 1001 of the Tax Code.  See discussion below under "—*Recognition of Gain or Loss in Taxable Exchange*".

If the Recapitalization Structure is implemented in a manner intended to qualify as a "reorganization" for U.S. federal income tax purposes, the treatment of U.S. Holders will depend on whether the Prepetition Term Loans constitute "securities" for purposes of the provisions of the Tax Code governing reorganizations.  Neither the Tax Code nor the Treasury Regulations

150

US-DOCS\115812051.19

define the term "security," and it has not been clearly defined by judicial decisions. The test of whether a debt obligation is a security involves an overall evaluation of the nature of the obligation, with the term of the obligation usually regarded as one of the most significant factors. Debt obligations with a term of five years or less generally have not qualified as securities, whereas debt obligations with a term of ten years or more generally have qualified as securities. Another important factor in determining whether a debt obligation is a security is the extent to which the obligation is senior to or subordinated to other liabilities of the issuer.

At issuance, the Prepetition Term Loans likely would have qualified as a security because the notes are secured obligations with an original term of 7 years. It is unclear whether intervening events could change that analysis. Accordingly, although not free from doubt and subject to further evaluation, the Debtors currently are of the view, and expect to take the position, that with respect to the exchange of the Prepetition Term Loan Claims for New Common Equity Interests in the Recapitalization Structure, the Prepetition Term Loans Exchange constitutes a tax-free recapitalization for U.S. federal income tax purposes. See discussion below under "—*Recognition of Gain or Loss in Non-Taxable Exchange*".

If the Prepetition Term Loans, however, are not treated as securities for U.S. federal income tax purposes, the Prepetition Term Loans Exchange would be treated as a fully taxable exchange to a U.S. Holder. See discussion below under "—*Recognition of Gain or Loss in Taxable Exchange*".

(ii)     *Recognition of Gain or Loss in Non-Taxable Exchange*

As discussed above, if the Recapitalization Structure is implemented and the Prepetition Term Loans constitute "securities," although not free from doubt, U.S. Holders of Prepetition Term Loan Claims likely should not recognize gain or loss in the Prepetition Term Loans Exchange. Accordingly, (i) a U.S. Holder's initial tax basis in the New Common Equity Interests, other than any New Common Equity Interests treated as received in satisfaction of accrued but untaxed interest, should be equal to its adjusted tax basis in the Prepetition Term Loans exchanged therefor (allocated to the New Common Equity Interests in proportion to their fair market value as of the Effective Date) and (ii) a U.S. Holder's holding period in such New Common Equity Interests should include the U.S. Holder's holding period in the Prepetition Term Loans. A U.S. Holder's tax basis and holding period in such New Common Equity Interests would generally be required to be calculated separately for each block of Prepetition Term Loans exchanged therefor.

(iii)     *Recognition of Gain or Loss in Taxable Exchange*

To the extent the Prepetition Term Loans Exchange is treated as a taxable exchange under Section 1001 of the Tax Code, other than with respect to any amounts received that are attributable to accrued but untaxed interest, a U.S. Holder who is subject to this treatment would recognize gain or loss equal to the difference between (i) the fair market value of the New Common Equity Interests received and (ii) such U.S. Holder's adjusted tax basis in its Prepetition Term Loans surrendered in the exchange. The gain or loss generally would be long-term capital gain or loss if the U.S. Holder held its Prepetition Term Loans for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations. Such U.S. Holder's tax basis in

151

the New Common Equity Interests should equal the fair market value thereof.  A U.S. Holder's holding period for the New Common Equity Interest would begin on the day following the receipt thereof.

(iv)   *Accrued but Untaxed Interest*

Regardless of whether the Prepetition Term Loans Exchange is treated as a taxable or non-taxable exchange, a portion of the New Common Equity Interests received by a U.S. Holder of a Prepetition Term Loan Claim may be attributable to accrued interest on such a Claim.  See discussion below in "—*Treatment of Accrued Interest to Holders*."  The tax basis of any New Common Equity Interests treated as received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest, but in no event should such basis exceed the fair market value of the New Common Equity Interests received in satisfaction of accrued but untaxed interest.  The holding period for the New Common Equity Interests treated as received in satisfaction of accrued but untaxed interest should not include the holding period of the Prepetition Term Loans, and should begin on the day following the receipt of such New Common Equity Interests.

(v)   *Market Discount*

To the extent the Prepetition Term Loans Exchange is treated as a taxable exchange, a U.S. Holder that acquired a Prepetition Term Loan at any time other than at its original issuance at a market discount generally will be required to treat gain, if any, recognized on the Prepetition Term Loans Exchange as ordinary income to the extent of accrued market discount, unless an election to include market discount in income currently as it accrues was made by the U.S. Holder.  A U.S. Holder will be considered to have acquired a Prepetition Term Loan at a market discount if its tax basis in such loan immediately after acquisition was less than the sum of all amounts payable thereon (other than payments of qualified stated interest) after the acquisition date, unless the difference is less than 0.25% of the Prepetition Term Loan's stated redemption price at maturity multiplied by the number of complete years from the acquisition date to maturity (in which case, the difference is de minimis market discount).

However, if the Prepetition Term Loans Exchange is treated as non-taxable exchange, special rules apply whereby a U.S. Holder that acquired a Prepetition Term Loan at a market discount generally should not be required to recognize any accrued market discount as income at the time of the Prepetition Term Loans Exchange to the extent it receives New Common Equity Interests in exchange for the Prepetition Term Loan.  Rather, any gain realized by the U.S. Holder on a subsequent taxable disposition of the New Common Equity Interests received in the exchange will be ordinary income to the extent of the amount of market discount accrued on the Prepetition Term Loan prior to the exchange that is allocable to such New Common Equity Interests.

(b)   New Common Equity Interests

*Distributions.*  A U.S. Holder of New Common Equity Interests generally will be required to include in gross income as ordinary dividend income the amount of any distributions paid on the New Common Equity Interests to the extent such distributions are paid out of the

152

Reorganized Parent's current or accumulated earnings and profits as determined for U.S. federal income tax purposes. Distributions not treated as dividends for U.S. federal income tax purposes will constitute a return of capital and will first be applied against and reduce a U.S. Holder's adjusted tax basis in the New Common Equity Interests, but not below zero. Any excess amount will be treated as gain from a sale or exchange of the New Common Equity Interests. U.S. Holders that are treated as corporations for U.S. federal income tax purposes may be entitled to a dividends received deduction with respect to distributions out of earnings and profits.

*Sale or Other Taxable Disposition*. A U.S. Holder of New Common Equity Interests will recognize gain or loss upon the sale or other taxable disposition of New Common Equity Interests equal to the difference between the amount realized upon the disposition and the U.S. Holder's adjusted tax basis in the New Common Equity Interests. Subject to the rules discussed above in "—*U.S. Holders of Prepetition Term Loan Claims—Exchange of Prepetition Term Loan Claims for New Common Equity Interests—Market Discount*" and the recapture rules under Section 108(e)(7) of the Tax Code, any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the U.S. Holder has held the New Common Equity Interests for more than one year as of the date of disposition. Under the recapture rules in Section 108(e)(7) of the Tax Code, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Common Equity Interests as ordinary income if the U.S. Holder took a bad debt deduction with respect to the Prepetition Term Loans. U.S. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

3.        **U.S. Holders of General Unsecured Claims**

A U.S. Holder of a General Unsecured Claim should generally be treated as receiving its distributions of Cash, if any, from the General Unsecured Recovery Cash Pool in a taxable exchange under Section 1001 of the Tax Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest, each U.S. Holder of such General Unsecured Claims should recognize gain or loss equal to the difference between the (a) amount of Cash, if any, from the General Unsecured Recovery Cash Pool actually or constructively received in exchange for the General Unsecured Claim, and (b) such U.S. Holder's adjusted basis, if any, in such General Unsecured Claim. A U.S. Holder's ability to deduct any loss recognized on the exchange of its General Unsecured Claims will depend on such U.S. Holder's own circumstances and may be restricted under the Tax Code.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the General Unsecured Claim; (ii) the tax status of the U.S. Holder of such Claim; (iii) whether such Claim has been held for more than one year; (iv) the extent to which the U.S. Holder previously claimed a loss or bad debt deduction with respect to such Claim; and (v) whether such Claim was acquired at a market discount. A U.S. Holder that purchased its General Unsecured Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code. Under those rules (subject to a de minimis exception), assuming that such U.S. Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such General

153

US-DOCS\115812051.19

Unsecured Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such General Unsecured Claim as of the date of the exchange.

A portion of the consideration received by a U.S. Holder of a General Unsecured Claim may be attributable to accrued interest on such a Claim.  See discussion below in "—*Treatment of Accrued Interest to Holders.*"

> 4.      **Non-U.S. Holders**

The rules governing U.S. federal income taxation of a Non-U.S. Holder are complex. The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations.  Non-U.S. Holders should consult with their own tax advisors to determine the effect of U.S. federal, state, and local tax laws, as well as any other applicable non-U.S. tax laws and/or treaties, with regard to their participation in the transactions contemplated by the Plan, their ownership of Claims, and the ownership and disposition of New Common Equity Interests.

Whether a Non-U.S. Holder realizes gain or loss on an exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

> (a)      <u>Gain Recognition</u>

Any gain recognized by a Non-U.S. Holder on the Prepetition Term Loans Exchange, the exchange of General Unsecured Claims or a subsequent sale or other taxable disposition of the New Common Equity Interests generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the relevant sale, exchange or other taxable disposition occurs and certain other conditions are met, (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if required by an applicable income tax treaty, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) or (c) the New Common Equity Interests constitute a U.S. real property interest ("**USRPI**") by reason of the Reorganized Parent  being treated as a U.S. real property holding corporation ("**USRPHC**") for U.S. federal income tax purposes, in the circumstances described below.

If the first exception applies, to the extent that any gain is recognized, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed its capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain recognized in the same manner as a U.S. Holder.  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such Non-U.S. Holder is a corporation for U.S. federal income tax purposes, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

US-DOCS\115812051.19

With respect to the third exception above, generally, a corporation is a USRPHC if, at any time within the shorter of the five-year period ending on the effective date of the applicable disposition or the period of time the Non-U.S. Holder held the interest in such corporation, the fair market value of the corporation's U.S. real property interests equals or exceeds 50% of the sum of the fair market value of the corporation's worldwide real property interests and its other assets used or held for use in a trade or business. The Debtors believe that Libbey Inc. currently is not, and the Reorganized Parent will not be, a USRPHC at the Effective Date. However, because the determination of whether Libbey Inc. and the Reorganized Parent constitute USRPHCs depends on the fair market value of their respective USRPIs relative to the fair market value of their respective non-U.S. real property interests and their respective other business assets, there can be no assurance that Libbey Inc. and Reorganized Parent will not be USRPHCs at the Effective Date or that the Reorganized Parent will not become one in the future.

If in the calendar year of a disposition of New Common Equity Interests by a Non-U.S. Holder, the New Common Equity Interests are considered to be regularly traded on an established securities market within the meaning of the Tax Code, only a Non-U.S. Holder that actually or constructively owns, or owned at any time during the shorter of the five-year period ending on the date of the disposition or the Non-U.S. Holder's holding period for the New Common Equity Interests, more than 5% of the New Common Equity Interests will be taxable on gain realized on the disposition of New Common Equity Interests as a result of Reorganized Parent's status as a USRPHC. If the New Common Equity Interests were not considered to be regularly traded on an established securities market within the meaning of the Tax Code during the calendar year in which the relevant disposition by a Non-U.S. Holder occurs, such holder (regardless of the percentage of stock owned) would be subject to U.S. federal income tax on a taxable disposition of the New Common Equity Interests, and a 15% withholding tax would apply to the gross proceeds from such disposition.

        (b)    <u>Interest</u>

Subject to discussions below regarding FATCA (as defined below) and backup withholding, payments to a Non-U.S. Holder with respect to the Prepetition Term Loan Claims that are attributable to interest that is not effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person. Interest income, however, may be subject to U.S. withholding tax if, at the applicable time:

- the Non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of voting stock of Libbey Glass Inc. or its successor;

- the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" (each, within the meaning of the Tax Code) with respect to Libbey Glass Inc. or its successor; or

- the Non-U.S. Holder is a bank receiving interest described in Section 881(c)(3)(A) of the Tax Code.

If interest paid to a Non-U.S. Holder is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if required by an applicable income tax treaty, such interest is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States), the Non-U.S. Holder generally will not be subject to U.S. federal withholding tax but will be subject to U.S. federal income tax with respect to such interest in the same manner as a U.S. Holder under rules similar to those discussed above with respect to gain that is effectively connected with the conduct of a trade or business in the United States (see *"—Gain Recognition"* above).

A Non-U.S. Holder that does not qualify for the above exemption with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax on such interest at a 30% rate, unless such Non-U.S. Holder is entitled to a reduction in or exemption from withholding on such interest as a result of an applicable income tax treaty.  To claim such entitlement, the Non-U.S. Holder must provide the applicable withholding agent with a properly executed IRS Form W-8BEN or W-8BEN-E claiming a reduction in or exemption from withholding tax on such payments of interest under the benefit of an income tax treaty between the United States and the country in which the Non-U.S. Holder resides or is established.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

(c)  Dividends on New Common Equity Interests

Any distributions made with respect to New Common Equity Interests that constitute dividends for U.S. federal income tax purposes (see *"—U.S. Holders Of Prepetition Term Loan Claims—New Common Equity Interests—Distributions"*) that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if required by an applicable income tax treaty, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate or exemption from tax, if applicable) of the gross amount of the dividends.  A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by providing the applicable withholding agent with a properly executed IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to New Common Equity Interests held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if required by an applicable income tax treaty, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax with respect to such dividends in the same manner as a U.S. Holder under rules similar to those discussed above with respect to gain that is effectively connected with the conduct of a trade or business in the United States (see "*—Gain Recognition*" above).  To claim such exemption, the Non-U.S. Holder must furnish to the applicable withholding agent a valid IRS Form W-8ECI, certifying that the dividends are effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States.

156

(d)      Additional Withholding Tax on Payments Made to Foreign Accounts

Withholding taxes may be imposed under Sections 1471 to 1474 of the Tax Code (such Sections commonly referred to as the Foreign Account Tax Compliance Act, or "**FATCA**") on certain types of payments made to non-U.S. financial institutions and certain other non-U.S. entities.  Specifically, a 30% withholding tax may be imposed on payments with respect to the Prepetition Term Loan Claims and General Unsecured Claims that are attributable to interest, payments of dividends (including constructive dividends) on New Common Equity Interests or (subject to the proposed Treasury Regulations discussed below) gross proceeds from the sale or other disposition of Prepetition Term Loan Claims, General Unsecured Claims or New Common Equity Interests paid to a "foreign financial institution" or a "non-financial foreign entity" (each as defined in the Tax Code), unless (1) the foreign financial institution undertakes certain diligence and reporting obligations, (2) the non-financial foreign entity either certifies it does not have any "substantial United States owners" (as defined in the Tax Code) or furnishes identifying information regarding each substantial United States owner, or (3) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules. If the payee is a foreign financial institution and is subject to the diligence and reporting requirements in (1) above, it must enter into an agreement with the U.S. Department of the Treasury requiring, among other things, that it undertake to identify accounts held by certain "specified United States persons" or "United States-owned foreign entities" (each as defined in the Tax Code), annually report certain information about such accounts, and withhold 30% on certain payments to non-compliant foreign financial institutions and certain other account holders.  Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Under the applicable Treasury Regulations and administrative guidance, withholding under FATCA generally applies to payments attributable to interest on the Prepetition Term Loan Claims and General Unsecured Claims and payments of dividends on New Common Equity Interests.  While withholding under FATCA would have applied also to payments of gross proceeds from the sale or other disposition of certain stock or securities, proposed Treasury Regulations eliminate FATCA withholding on payments of gross proceeds entirely.

5.      **Treatment of Accrued Interest to Holders**

To the extent a Holder of a Claim receives consideration that is attributable to indebtedness and unpaid accrued interest thereon, the Debtors intend to take the position, and the Plan provides, that for U.S. federal income tax purposes, such consideration should be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing unpaid accrued interest.  However, the IRS could take the position that consideration received by a Holder should be allocated in some way other than as provided in the Plan. To the extent any property received pursuant to the Plan is considered attributable to unpaid accrued interest, a Holder will recognize ordinary income to the extent the value of the property exceeds the amount of unpaid accrued interest previously included in gross income by the Holder. A Holder's tax basis in such property (other than cash) should be equal to the amount of interest income treated as satisfied by the receipt of the property, and its holding period in the property should begin on the day after the Effective Date.  A Holder

157

generally will be entitled to recognize a loss to the extent any accrued interest previously included in its gross income is not paid in full.  HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE EXTENT TO WHICH CONSIDERATION RECEIVED UNDER THE PLAN SHOULD BE TREATED AS ATTRIBUTABLE TO UNPAID ACCRUED INTEREST.

6.     **Information Reporting and Backup Withholding**

The Debtors and applicable withholding agents may be obligated to furnish information to the IRS regarding the consideration received by Holders (other than corporations and other exempt Holders such as certain Non-U.S. Holders) pursuant to the Plan.  In addition, the Reorganized Debtors will be required to report annually to the IRS with respect to each Holder (other than corporations and other exempt Holders such as certain Non-U.S. Holders) the amount of distributions paid on the New Common Equity Interests and the amount of any tax withheld from payment thereof, regardless of whether such distributions constitute dividends or whether any tax was actually withheld.

Holders may be subject to backup withholding (currently, at a rate of 24%) on the consideration received pursuant to the Plan.  Backup withholding may also apply to dividends paid on the New Common Equity Interests and proceeds received upon sale or other disposition of the New Common Equity Interests.  Certain Holders (including corporations and certain Non-U.S. Holders) generally are not subject to backup withholding.  A Holder that is not otherwise exempt generally may avoid backup withholding by furnishing to the Reorganized Debtors and applicable withholding agents such Holder's taxpayer identification number and certifying, under penalties of perjury, that the taxpayer identification number provided is correct and that the Holder has not been notified by the IRS that it is subject to backup withholding.

Backup withholding is not an additional tax.  Taxpayers may use amounts withheld as a credit against their U.S. federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

**THE FOREGOING DISCUSSION OF U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, AND LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN.  NONE OF THE DEBTORS, THE REORGANIZED DEBTORS OR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, AND LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.**

US-DOCS\115812051.19

## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than that which is proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

Libbey Glass Inc.

By:      [●]

Title:    [●]

Dated:  August 20, 2020

Prepared by:

**RICHARDS, LAYTON & FINGER, P.A.**
John H. Knight (Bar No. 3848)
Russell C. Silberglied (Bar No. 3462)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

**LATHAM & WATKINS LLP**
George A. Davis
Keith A. Simon
David Hammerman
Anu Yerramalli
Madeleine C. Parish
885 Third Avenue
New York, New York 10022
Telephone: (212) 906-1200
Facsimile: (212) 751–4864

*Counsel for the Debtors and Debtors in Possession*

US-DOCS\115812051.19

# **EXHIBIT A**

Plan of Reorganization

US-DOCS\115812051.19

# **EXHIBIT B**

Disclosure Statement Order

## **EXHIBIT C**

Financial Projections

US-DOCS\115812051.19

## **EXHIBIT D**

Liquidation Analysis

US-DOCS\115812051.19

## **EXHIBIT E**


Valuation Analysis

US-DOCS\115812051.19

## **EXHIBIT F**

Exit Term Loan Facility Term Sheet

US-DOCS\115812051.19

**NOT A COMMITMENT TO LEND**

## LIBBEY GLASS INC.
## $150 MILLION SENIOR SECURED EXIT TERM LOAN FACILITY
### SUMMARY OF TERMS AND CONDITIONS

On June 1, 2020, Libbey Inc., Libbey Glass Inc. and certain of their subsidiaries (collectively, the "***Debtors***") filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") commencing their respective cases under Chapter 11 of the Bankruptcy Code (collectively, the "***Cases***"). The Debtors intend to effectuate their restructuring in the Cases pursuant to a joint plan of reorganization to be confirmed by the Bankruptcy Court, which joint plan of reorganization shall be in form and substance acceptable to, *inter alia*, the Exit Term Loan Lenders (as defined below) (the "***Plan***").

This term sheet (this "***Term Sheet***") is a summary of certain material terms and conditions for a $150 million senior secured exit term loan facility (the "***Exit Term Loan Facility***") to be entered into by the reorganized Debtors in connection with the effectiveness of the Plan.

This Term Sheet is non-binding, is being presented for discussion purposes only, is entitled to protection from any use or disclosure to any person or entity pursuant to Federal Rule of Evidence 408 and any other rule of similar import, and does not purport to summarize all of the terms, conditions, covenants and other provisions that may be contained in the fully negotiated and executed definitive documentation in connection with the Exit Term Loan Facility. The transactions described in this Term Sheet are subject in all respects to, among other things, confirmation of the Plan by the Bankruptcy Court (the date of such confirmation, the "***Confirmation Date***") and the negotiation, execution and delivery of definitive documentation satisfactory in form and substance to the Borrower (as defined below), the Exit Term Loan Lenders and the Exit Term Loan Agent (as defined below), and satisfaction or waiver of the conditions precedent set forth therein. This Term Sheet does not constitute a commitment to lend or to provide or arrange any other financing. Only execution and delivery of definitive documentation relating to the Exit Term Loan Facility shall result in any binding or enforceable obligations of any party relating to the Exit Term Loan Facility. The terms and conditions for the extension of credit described herein are dependent upon, among other things, internal authorization and approval by the appropriate credit committees for each of the Exit Term Loan Lenders.

| Summary of Exit Term Loan Facility | |
|---|---|
| **Parties** | **Borrower**: Libbey Glass Inc., a Delaware corporation (the "***Borrower***"). |
| | **Guarantors**: (i) Libbey Inc., a Delaware corporation ("***Reorganized Holdings***"), (ii) each of the Borrower's domestic subsidiaries and (iii) each of the Borrower's subsidiaries organized under the laws of the Netherlands (the "***Foreign Subsidiary Guarantors***"; and collectively with Reorganized Holdings and the subsidiaries of the Borrower referred to in clause (ii), the "***Guarantors***"). The Borrower and the Guarantors are collectively herein referred to as the "***Obligors***". All obligations of the Borrower under the Exit Term Loan Facility will be unconditionally guaranteed on a joint and several basis by the Guarantors. |
| | **Exit Term Loan Lenders**: Initially, they shall include certain DIP Term Lenders (as defined below) and/or their respective affiliates or designees (together with their successors and permitted assigns, collectively, the "***Exit Term Loan Lenders***"). All DIP Term Lenders shall be afforded the right to |

<table>
<tr>
<td></td>
<td>participate in the Exit Term Loan Facility on a pro rata basis up to their respective pro rata share of the New Money DIP Loans (as defined in the DIP Term Facility (as defined below)) pursuant to procedures, terms and conditions and documentation acceptable to the Backstop Exit Term Loan Lenders (as defined below) and the Exit Term Loan Agent.  Certain DIP Term Lenders will backstop the funding obligations for the Exit Term Loan Facility (including committing to convert their respective New Money DIP Loans into Converted Exit Term Loans (as defined below)) (such DIP Term Lenders, the "***Backstop Exit Term Loan Lenders***"; and the commitments of the Backstop Exit Term Loan Lenders to provide the entire Exit Term Loan Facility (whether through funding Exit Term Loans and/or converting their respective New Money DIP Loans into Converted Exit Term Loans, the "***Backstop Commitments***"). If any DIP Term Lender determines not to participate in the Exit Term Loan Facility in an amount equal to its pro rata share of the DIP New Money Obligations, any such amounts otherwise allocable to such DIP Term Lender (collectively, the "***Unallocated Commitments***") shall be allocated to the Backstop Exit Term Loan Lenders on a ratable basis; <u>provided</u> that the Backstop Exit Term Loan Lenders may elect to allocate all or any portion of the Unfunded Commitments to any other financial institutions or legal entities acceptable to the Backstop Exit Term Loan Lenders.

Notwithstanding anything herein to the contrary, each DIP Term Lender or Backstop Exit Term Loan Lender, as applicable, shall be permitted to allocate its respective funding obligation with respect to its Exit Term Loan Commitments or Backstop Commitments, as applicable, to any of its respective affiliate designees, and the rights and obligations with respect to such Exit Term Loan Commitment and/or the Backstop Commitment, as applicable, shall be calculated accordingly.

<u>**Exit Term Loan Agent**</u>:    Cortland Capital Market Services LLC ("***Cortland***"), shall act as administrative agent and collateral agent for the Exit Term Loan Lenders under the Exit Term Loan Facility (in such capacities, the "***Exit Term Loan Agent***").</td>
</tr>
<tr>
<td>**Existing Facilities**</td>
<td><u>**Prepetition ABL Facility**</u>:  That certain Amended and Restated Revolving Credit and Security Agreement, dated as of February 8, 2010 (the "***Prepetition ABL Credit Agreement***"), by and among the Debtors, JPMorgan Chase Bank, N.A., as administrative agent with respect to the US loans thereunder (the "***Prepetition ABL Agent***"), J.P. Morgan Europe Limited, as administrative agent with respect to the Netherlands loans thereunder, the other titled agents party thereto, and the lenders party thereto from time to time (the "***Prepetition ABL Lenders***") (as amended, supplemented or otherwise modified from time to time, and including all exhibits and guarantee, security and other ancillary documentation in respect thereof, the "***Prepetition ABL Facility***"; all payment Obligations (as defined in the Prepetition ABL Credit Agreement) under or related to the Prepetition ABL Facility remaining after giving effect to the DIP ABL Roll-Up (as defined in the DIP Term Facility), collectively, the "***Prepetition ABL Obligations***").

<u>**Prepetition Term Facility**</u>: That certain Credit Agreement, dated as of April 9, 2014 (the "***Prepetition Term Facility Credit Agreement***"), by and among the Debtors, Cortland, as administrative agent (as successor to Citibank, N.A.,</td>
</tr>
</table>

2

| | in its capacities as administrative agent and collateral agent) (Cortland, in its capacities as administrative agent and collateral agent under the Prepetition Term Facility Credit Agreement and related loan documents, the "***Prepetition Term Agent***"), and the lenders (the "***Prepetition Term Lenders***") party thereto from time to time (including all exhibits and guarantee, security and other ancillary documentation in respect thereof, in each case as amended, supplemented or otherwise modified from time to time). |
|---|---|
| | **DIP ABL Facility**:  That certain Debtor-In-Possession Credit Agreement, dated as of June 3, 2020 (the "***DIP ABL Credit Agreement***"), by and among the Debtors, JPMorgan Chase Bank, N.A., as administrative agent thereunder, the other titled agents party thereto, and the lenders party thereto from time to time (the "***DIP ABL Lenders***") (as amended, supplemented or otherwise modified from time to time, and including all exhibits and guarantee, security and other ancillary documentation in respect thereof, the "***DIP ABL Facility***"). |
| | **DIP Term Facility**: That certain Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of June 3, 2020 (the "***DIP Term Loan Agreement***"), by and among the Debtors, Cortland, as administrative agent and collateral agent thereunder, and the lenders (the "***DIP Term Lenders***") party thereto from time to time (including all exhibits and guarantee, security and other ancillary documentation in respect thereof, in each case as amended, supplemented or otherwise modified from time to time the "***DIP Term Facility***"; all payment obligations under or related to the DIP Term Facility, the "***DIP Term Obligations***"). |
| **Exit ABL Facility** | It is contemplated that the Prepetition ABL Facility (to the extent outstanding) and the DIP ABL Facility will be rolled into a single asset-based revolving credit facility in an amount to be agreed (the "***Exit ABL Facility***"), to be provided by the DIP ABL Lenders or such other financial institutions or legal entities as are acceptable to the Backstop Exit Term Loan Lenders. |
| **Exit Term Loan Facility** | The Exit Term Loan Facility shall be a senior secured term loan facility in an aggregate principal amount equal to $150 million (the commitments under the Exit Term Loan Facility, the "***Exit Term Loan Commitments***"; the loans under the Exit Term Loan Facility, the "***Exit Term Loans***"), up to $60,000,000 of which will consist of the New Money DIP Loans (which will be automatically converted into term loans under the Exit Term Loan Facility on a dollar-for-dollar basis) (the "***Converted Exit Term Loans***"), and the remainder of which will consist of new money term loans. The Exit Term Loan Facility and all instruments and documents executed at any time in connection therewith, shall be referred to collectively as the "***Exit Term Loan Documents***". |
| | Amounts repaid or prepaid under the Exit Term Loan Facility may not be reborrowed. |
| | Subject to the terms and conditions set forth herein, the proceeds of the Exit Term Loans will be used to (a) pay all DIP Term Obligations that are due and owing under the DIP Term Facility (other than (x) the Roll-Up Loans and accrued and unpaid interest thereon, which will be exchanged on the effective date of the Plan for preferred equity in Reorganized Holdings having the terms |

3

| | |
|---|---|
| | outlined in the Preferred Equity Term Sheet (the "***Holdings Preferred Equity***") and (y) the Converted Exit Term Loans), (b) pay reasonable out-of-pocket professional fees and expenses (including legal and financial advisor fees and expenses) incurred by the Exit Term Loan Agent and the Exit Term Loan Lenders in connection with, among other things, the preparation, negotiation, documentation and approval of the Plan and the Exit Term Loan Facility, (c) pay certain amounts required to be paid by the Debtors under the Plan, and (d) provide on-going working capital to, and for other general corporate purposes of, the Borrower and its subsidiaries. |
| **Collateral** | The Exit Term Loan Facility shall be at all times secured by perfected liens on substantially all of the Obligors' assets (whether existing as of the Closing Date (as defined below) or after-acquired, tangible or intangible, and comprising real or personal property), including all of the collateral securing the Exit ABL Facility (collectively, the "***Exit Collateral***"), subject to certain limited exceptions to be set forth in the Exit Term Loan Documents, which liens shall have priority over all other liens on the Exit Collateral except as set forth in an intercreditor agreement (the "***Intercreditor Agreement***") to be entered into by and among the Exit Term Loan Agent, the agent under the Exit ABL Facility and the Obligors, and satisfactory in form and substance to the Exit Term Loan Agent and the Majority Exit Term Loan Lenders (as defined below). |
| **Closing Date** | The date on or following the Confirmation Date on which the Exit Term Loan Commitments are made available for borrowings under the Exit Term Loan Facility (the "***Closing Date***"), subject to satisfaction (or waiver by the Majority Exit Term Loan Lenders) of the applicable conditions precedent set forth herein and in the Exit Term Loan Documents; provided that, unless consented to by the Majority Exit Term Loan Lenders, in no event shall the Closing Date occur more than 5 days after the Confirmation Date. |
| **Maturity Date** | The fifth anniversary of the Closing Date (the "***Maturity Date***"). |
| **Amortization** | No amortization shall be required with respect to the Exit Term Loan Facility. The outstanding principal amount of the Exit Term Loan Facility, together with all accrued and unpaid interest thereon, will be due and payable in full on the Maturity Date. |
| **Interest Rate** | The Exit Term Loans will bear interest at (x) the LIBOR Rate (subject to a 1.0% floor) plus 8.0% per annum payable in cash or, subject to certain conditions to be agreed, (y) (A) a cash interest rate equal to the LIBOR Rate (subject to a 1.0% floor) plus 4.0% per annum plus (B) a PIK interest rate of 6.00% per annum, in the case of clauses (x) and (y), payable in arrears at the end of each applicable LIBOR interest period (but not less frequently than every three months) and upon any prepayment of the Exit Term Loans on the amount prepaid; <u>provided</u>, that upon the occurrence of any event of default under the Exit Term Loan Facility the cash pay portion of any such interest rate margin shall automatically increase by an additional 2.0% per annum. A customary alternate base rate option will be available (or required) as an alternative to the LIBOR Rate. |
| | "***LIBOR Rate***" will defined in a manner that is customary and appropriate for financings of this type, and the basis for calculating accrued interest for loans |

4

| | |
|---|---|
| | bearing interest at the LIBOR Rate will be customary and appropriate for financings of this type. |
| **Commitment Fee** | An amount equal to 10% of the Exit Term Loan Commitments (the "***Commitment Fee***"), to be paid to the Exit Term Loan Lenders, allocated ratably. The Commitment Fee shall be paid in the form of original issue discount on the Closing Date. |
| **Backstop Fee** | An amount equal to 20% of the aggregate amount of the Backstop Commitments (the "***Backstop Fee***"), to be paid to the Backstop Exit Term Loan Lenders, allocated ratably on the Closing Date, in the form of Holdings Preferred Equity. |
| **Prepayment Premium** | In the event of (x) any voluntary or mandatory prepayment (other than any excess cash flow prepayment) of the Exit Term Loans occurring prior to the Maturity Date or (y) any acceleration of the Exit Term Loans occurring prior to the Maturity Date as a result of an event of default, the Borrower will pay a prepayment premium in connection with any such prepayment or acceleration in an amount equal to the prepayment premium for the relevant period as set forth on the schedule below: <table><tr><td>Relevant Period</td><td>Prepayment Premium</td></tr><tr><td>Prior to the first anniversary of the Closing Date</td><td>No-call, subject to a T + 50 make-whole</td></tr><tr><td>On or after the first anniversary of the Closing Date but prior to the second anniversary of the Closing Date</td><td>4.0% of the principal amount prepaid</td></tr><tr><td>On or after the second anniversary of the Closing Date but prior to the third anniversary of the Closing Date</td><td>2.0% of the principal amount prepaid</td></tr><tr><td>On or after the third anniversary of the Closing Date but prior to the fourth anniversary of the Closing Date</td><td>1.0% of the principal amount prepaid</td></tr><tr><td>On or after the fourth anniversary of the Closing Date</td><td>0.0% of the principal amount prepaid</td></tr></table> |
| **Conditions to Closing** | The Exit Term Loan Documents will contain such conditions precedent that are customary for financings of this type and those required by the Exit Term Loan Lenders, and in any event, the following conditions precedent shall have been satisfied or waived in accordance with the terms of the Exit Term Loan Documents:<br><br>a. The Bankruptcy Court shall have entered an order in form and substance reasonably acceptable to the Exit Term Loan Agent and the Exit Term Loan Lenders confirming the Plan, and such order (the "***Confirmation Order***"), and Plan shall be in full force and effect, and |

5

shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal. The Obligors shall be in compliance in all respects with the Confirmation Order.

b. All of the conditions precedent to the effectiveness of the Plan shall have been satisfied or waived in accordance with the terms thereof.

c. The Exit ABL Facility shall have been duly executed and delivered by each party thereto, and shall be in full force and effect, and in form and substance satisfactory to the Exit Term Loan Agent and the Exit Term Loan Lenders, and the Obligors shall have at least $50,000,000 of Domestic Liquidity (after giving pro forma effect to all borrowings under the Exit ABL Facility made on the Closing Date); "***Domestic Liquidity***" will be defined in a manner consistent with the definition of "Liquidity" contained in the DIP Term Loan Agreement.

d. The Borrower shall obtain a credit rating of at least B3 or B-, as applicable, from each of Moody's Investors Service, Inc. ("***Moody's***") and Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("***S&P***") for the Exit Term Loan Facility.

e. The Intercreditor Agreement shall have been duly executed and delivered by each party thereto, and shall be in full force and effect, and in form and substance satisfactory to the Exit Term Loan Agent and the Exit Term Loan Lenders.

f. All documented costs, fees, expenses (including, without limitation, reasonable and documented legal fees) and other compensation contemplated by the Exit Term Loan Documents and this Term Sheet to be paid to the Exit Term Loan Agent and the Exit Term Loan Lenders on the Closing Date shall have been paid.

g. The Exit Term Loan Lenders and the Exit Term Loan Agent shall be satisfied that the Obligors have complied with all other customary closing conditions, including, without limitation, execution and delivery of customary loan documentation, guarantees, collateral security documents, the delivery of customary legal opinions, corporate records and documents from public officials, officer's certificates, and UCC and other filings.

h. The Exit Term Loan Agent and the Exit Term Loan Lenders shall have received at least three (3) business days prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act that has been reasonably requested at least five (5) business days in advance of the Closing Date.

i. No event of default shall exist under the Exit Term Loan Documents, and the representations and warranties of the Obligors under the Exit Term Loan Documents shall be true and correct in all material respects (or, if any such representation or warranty is qualified as to materiality or "Material Adverse Effect", in all respects) after giving effect to the funding of the Exit Term Loans.

6

| | |
|---|---|
| | j.  The Debtors, the Debtors' Toledo USW locals, the Debtors' Toledo IAM local, and the Debtors' Shreveport USW local shall have agreed to modify each of their respective collective bargaining agreements with the concessions set forth in the Debtors' proposal presented on August 7, 2020. |
| **Covenants** | Customary for an exit facility of this type, and as may be required by the Exit Term Loan Lenders, including, without limitation:<br><br>Affirmative Covenants<br>• Customary financial reporting for financings of this type, including, without limitation, monthly, quarterly and annual consolidated financial statements of Reorganized Holdings and its subsidiaries.<br>• On or prior to the Closing Date, the Borrower shall obtain a credit rating of at least B3 or B-, as applicable, from each of Moody's and S&P for the Exit Term Loan Facility and shall use commercially reasonable efforts to maintain a credit rating of at least B3 or B-, as applicable, from Moody's and S&P.<br>• Other customary affirmative covenants for an exit financing facility of this type or that are requested by the Exit Term Loan Lenders, including delivery of certificates, notices and other material information (including notices of default, litigation, ERISA events and material adverse change); licenses, permits and approvals; compliance with applicable laws and regulations (including environmental laws); payment of taxes and other material obligations; use of proceeds; preservation of existence; visitation and inspection rights; keeping of books and records; maintenance of properties (subject to casualty, condemnation and normal wear and tear) and customary insurance coverage; covenants to guarantee obligations and give security; and further assurances.<br><br>Negative Covenants<br>• Customary negative covenants for an exit financing facility of this type or that are requested by the Exit Term Loan Lenders, including restrictions on indebtedness; liens; negative pledges; restricted payments; restrictions on subsidiary distributions; investments; fundamental changes, mergers and dissolutions, disposition of assets, acquisitions; disposal of subsidiary interests; prepayment of subordinated indebtedness; sales and lease-backs; transactions with affiliates; conduct of business; permitted activities of Reorganized Holdings; amendments or waivers of organizational documents, related documents, certain indebtedness; and fiscal year.<br><br>Financial Covenants<br>• Reorganized Holdings and its subsidiaries will be required to comply with certain financial covenants, including:<br>  o  a minimum liquidity covenant, applicable during the period from the Closing Date until a date to be agreed; and<br>  o  on and after the date on which the minimum liquidity covenant is no longer applicable, a minimum EBITDA covenant. |
| **Representations and Warranties** | The Exit Term Loan Documents shall contain representations and warranties customary for an exit facility financing and obligors of this type and as |

| | |
|---|---|
| | required by the Exit Term Loan Lenders, including, without limitation, with respect to organization, qualification and existence; power and authority; authorization; execution, delivery and enforceability of the Exit Term Loan Documents; no conflicts with law, organizational documents or material contractual obligations; accuracy and completeness of financial and other information (including pro forma financial information); no material adverse change; compliance with applicable laws and regulations, including margin regulations, money laundering laws, anti-corruption laws, and laws applicable to sanctioned persons and the FCPA; accuracy and completeness of disclosure; material consents and approvals; ownership of property; intellectual property; capitalization; insurance; PATRIOT Act; environmental laws; ERISA and labor matters; no material litigation; inapplicability of the Investment Company Act of 1940; solvency; payment of taxes and other material obligations; no default or event of default; validity, priority and perfection of liens and security interests in the collateral securing the obligations under the Exit Term Loan Documents; and Reorganized Holdings as a holding company . |
| **Prepayments** | **Voluntary Prepayment**:  The Obligors may, at any time prior to maturity, voluntarily repay the Exit Term Loans in full or in part, provided that any such prepayment shall be made with all accrued interest, fees and other amounts outstanding in respect of such prepaid Exit Term Loans.<br><br>**Mandatory Prepayment**: Customary for transactions of this type, including, without limitation, (a) 100% of the net cash proceeds of (i) non-ordinary course asset sales, (ii) insurance/condemnation events and other extraordinary receipts, and (iii) any incurrence of indebtedness not otherwise permitted under the Exit Term Loan Documents, and (b) prepayments in an amount equal to a percentage to be agreed of "excess cash flow" (to be defined in the Exit Term Loan Documents), payable within a period of time to be agreed after each fiscal year-end. |
| **Events of Default** | The Exit Term Loan Documents will contain events of default (and, as appropriate, grace periods) customary for an exit facility financing and obligors of this type and as required by the Exit Term Loan Lenders, including failure to make payments when due; inaccuracy of representations or warranties when made; breach of covenants; cross-default and cross-acceleration to material debt; material judgments; bankruptcy and insolvency events; ERISA; impairment of security interests in collateral; invalidity of guarantees; and "change of control" (to be defined). |
| **Voting** | The vote of Exit Term Loan Lenders holding more than 50% of the aggregate undrawn Exit Term Loan Commitments and outstanding Exit Term Loans (the "***Majority Exit Term Loan Lenders***") shall be required to amend, waive or modify the Exit Term Loan Facility; <u>provided</u> that certain matters shall be subject to an "all lender" or "all affected lender" consent. |
| **Assignments and Participations** | The Exit Term Loan Documents shall include customary rights of assignment, subject to the Exit Term Loan Agent's consent (not to be unreasonably withheld or delayed). |
| **Fees and Expenses** | The Exit Term Loan Facility shall provide for the customary reimbursement of the fees and expenses of the Exit Term Loan Agent and the Exit Term Loan Lenders, including the fees and expenses of their financial and legal advisors. |

8

| **Indemnification** | The Obligors shall, jointly and severally, be obligated to indemnify and hold harmless the Exit Term Loan Agent (and any sub-agent thereof), each of the Exit Term Loan Lenders and each of their respective affiliates, equityholders, partners, managers, members investors, officers, directors, fiduciaries, employees, agents, trustees, advisors, attorneys and representatives (each in their respective capacities as such, an "***Indemnified Person***") from and against all losses, claims, liabilities, damages, and expenses (including, without limitation, as to (x) the Exit Term Loan Agent and (y) the Exit Term Loan Lenders (taken as a whole), in each case, the reasonable and documented out-of-pocket fees and disbursements of one primary counsel and one local counsel in each applicable jurisdiction to each of the Exit Term Loan Agent and the Exit Term Loan Lenders and, if necessary, a single special counsel for each relevant specialty and, in the case of other Indemnified Persons, the reasonable and documented out-of-pocket fees and disbursements of one primary counsel and one local counsel in each applicable jurisdiction) in connection with any investigation, litigation or proceeding, or the preparation of any defense with respect thereto, arising out of or relating to the Exit Term Loan Facility or any other transactions contemplated hereby and/or thereby, except to the extent arising from any dispute solely among Indemnified Persons which does not arise out of any act or omission of the Obligors (other than any proceeding against any Indemnified Person solely in its capacity or in fulfilling its role as Exit Term Loan Agent or similar role); provided that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnified Person. |
|---|---|
| **Governing Law** | New York |
| **Miscellaneous** | The Exit Term Loan Documents will contain provisions regarding yield protection, taxes, expense reimbursement, waivers and forum customary for transactions and obligors of this type and as required by the Exit Term Loan Lenders and Exit Term Loan Agent. |
| **Counsel to the Exit Term Loan Agent and Exit Term Loan Lenders** | Arnold & Porter Kaye Scholer LLP and local counsel. |
| **Counsel to the Obligors** | Latham & Watkins LLP and local counsel. |

9

# EXHIBIT G

New Preferred Equity Interests Term Sheet

US-DOCS\115812051.19

**Libbey, Inc.**
**Preferred Stock Term Sheet**

| Summary of Principal Terms | |
|---|---|
| **Preferred Stock** | Convertible preferred stock (the "**New Preferred Stock**") issued by Libbey, Inc. ("**Reorganized Holdings**"). |
| **Maturity** | The New Preferred Stock shall have no stated maturity. |
| **Rank** | The New Preferred Stock shall rank senior to, and have a preference as to payment of dividends and distributions and rights upon liquidation and otherwise over, any other class of capital stock issued by Reorganized Holdings, including the common stock to be issued by Reorganized Holdings (the "**New Common Stock**"). |
| **Dividend Rate** | Dividends shall accrue and accumulate at a rate of thirteen (13.0%) per annum, compounding semi-annually. Dividends will accrue daily whether or not Reorganized Holdings has earnings, whether or not there are funds legally available for the payment of such dividends and whether or not such dividends are declared or set aside. <br><br> Any dividend payable on the New Preferred Stock for any partial dividend period will be computed on the basis of a 360-day year consisting of twelve 30-day months. |
| **Participation** | The New Preferred Stock shall participate on an as-converted basis (other than as a result of a Default Conversion), giving effect to any accrued and unpaid dividends, with the New Common Stock in dividends or distributions (whether in cash, securities, debt or assets), and any payment in connection with a liquidation event, payable on the New Common Stock. |
| **Liquidation Preference** | The New Preferred Stock shall have a liquidation preference equal to $1,000 per share (the "**Initial Liquidation Preference**"), plus any accrued and unpaid dividends (including dividends as and when declared in respect of the New Common Stock) through, but not including, the date of liquidation or other determination (whether or not declared, prorated for any partial dividend period) (the "**Liquidation Preference**"). |
| **Share Amounts** | Each DIP Term Lender (as defined in the Exit Term Loan Facility Term Sheet) shall receive a number of shares of New Preferred Stock equal to the quotient of (i) such DIP Term Lender's Roll-Up Loans (as defined in the Exit Term Loan Facility Term Sheet) and accrued and unpaid interest thereon, divided by (ii) the Initial Liquidation Preference. Each Backstop Exit Term Loan Lender (as defined in the Exit Term Loan Facility Term Sheet) shall receive a number of shares of New Preferred Stock equal to the quotient of (i) 20% of the amount of such Backstop Exit Term Loan Lender's Backstop Commitment (as defined in the Exit Term Loan Facility Term Sheet), divided by (ii) the Initial Liquidation Preference. |
| **Liquidation** | Upon a Liquidation Event (to be defined in the definitive documentation) or Deemed Liquidation Event (to be defined in the |

1

|  | definitive documentation), holders of New Preferred Stock will receive cash in an amount equal to the greater of (i) the sum of (A) the Liquidation Preference per share (as adjusted for stock splits, recapitalization and similar events) and (B) in the event such Liquidation Event or Deemed Liquidation Event occurs prior to the 3rd anniversary of the initial issue date of the New Preferred Stock, the Make-Whole Premium and (ii) the amount such holder would have received had such holder converted its shares of New Preferred Stock into shares of New Common Stock pursuant to the Holder Optional Conversion (as defined below) immediately prior to (and subject to the consummation of) the liquidation event or Deemed Liquidation Event and shared in the proceeds and other consideration of the liquidation event or Deemed Liquidation Event as a holder of shares of New Common Stock. "Make-Whole Premium" shall mean, with respect to a share of New Preferred Stock, as of any time of determination, the amount by which (i) the present value as of such time of determination of the Liquidation Preference that would be applicable on the 3rd anniversary of the initial issue date of the New Preferred Stock (including, without duplication, all dividends that would accrue thereon through such 3rd anniversary pursuant to the terms hereof), computed using a discount rate equal to the Treasury Rate plus 35 basis points, exceeds (ii) the Liquidation Preference as of such time of determination. |
|---|---|
| **Conversion at the Option of the Holder** | The New Preferred Stock (including any dividends accrued and unpaid to the holder thereof) shall be convertible, at any time and from time to time at the option of the holder thereof, into shares of New Common Stock at the Conversion Price (subject to adjustments including to reflect accrued but unpaid dividends) (the "**Holder Optional Conversion**"). |
| **Conversion Price** | The initial Conversion Price per share (which will be subject to customary anti-dilution adjustments) will be equal to the share price calculated based on the equity value and number of shares outstanding, prior to issuance of the New Preferred Stock, and on a total enterprise value of $[●] million. |
| **Redemption at the Option of Reorganized Holdings** | The New Preferred Stock may be redeemed by Reorganized Holdings at any time for cash in an amount equal to the sum of (i) the Liquidation Preference per share (as adjusted for stock splits, recapitalization and similar events) and (ii) in the event such redemption occurs prior to the 3rd anniversary of the initial issue date of the New Preferred Stock, the Make-Whole Premium. Any partial redemption shall be pro rata among all holders of New Preferred Stock. |
| **Failure to Redeem** | In the event Reorganized Holdings has not redeemed all of the New Preferred Stock by the date that is 4 years and 6 months from the initial issue date of the New Preferred Stock (the "**Default Conversion Trigger Date**"), then at any time from and after the Default Conversion Trigger Date, any holder of New Preferred Stock may, at its option, convert its shares of outstanding New Preferred Stock into such amount of New Common Stock equal to the Default Amount (a "**Default Conversion**"); *provided*, *that*, if holders of more than 50% of the then outstanding shares of New Preferred Stock elect to convert their shares |

2

| | |
|---|---|
| | in a Default Conversion, then all outstanding shares of New Preferred Stock will be converted automatically into such amount of New Common Stock equal to the Default Amount.<br><br>The "**Default Amount**" shall mean, with respect to any holder of New Preferred Stock, the number of shares of New Common Stock equal to such holder's pro rata share, based on the number of shares of New Preferred Stock held as of the Default Conversion Trigger Date, of 90% (which percentage, in the event Reorganized Holdings has redeemed some, but not all, of the New Preferred Stock by the Default Conversion Trigger Date, shall be reduced proportionally based on the proportion of New Preferred Stock so redeemed) of Reorganized Holdings' outstanding New Common Stock on a fully diluted basis as of the Default Conversion Trigger Date (subject to dilution by management, and excluding any prior issuances of shares of New Common Stock to such holder in connection with such holder's prior Holder Optional Conversion). |
| **Breaches** | In the event of a Breach, the dividend rate on the New Preferred Stock shall increase by an increment of 2.50% per annum (such increment payable in shares of New Preferred Stock) which amount shall compound semi-annually and accrue on a daily basis during the period starting from the date of occurrence through and including the date that the Breach is cured, if such Breach is cured within 30 days of occurrence.<br><br>"**Breach**" means any of the following events: (i) Reorganized Holdings' failure to make any payment pursuant to a liquidation event or Deemed Liquidation Event, (ii) Reorganized Holdings' failure to convert New Preferred Stock pursuant to the Holder Optional Conversion 5 days after receipt of notice of such failure where such failure has not been cured, (iii) any action undertaken by Reorganized Holdings in violation of the New Preferred Stock's voting and governance rights as set forth under "Voting and Governance Rights" below, (iv) to the extent not set forth in clauses (i) through (iii) of this definition, breaches of any covenants set forth in the definitive documentation, or (v) Reorganized Holdings' becoming the subject of a petition in bankruptcy or any proceeding related to insolvency, receivership, liquidation or comparable proceeding or any assignment for the benefit of creditors. |
| **Voting and Governance Rights** | The New Preferred Stock will vote with the New Common Stock as a single class (on an as-converted basis (other than as a result of a Default Conversion)) on all matters submitted to the holders of New Common Stock for a vote, consent or approval (including without limitation, the election of directors).<br><br>So long as any shares of New Preferred Stock are outstanding, Reorganized Holdings shall not, without the affirmative vote of holders of at least 66-2/3% of the shares of New Preferred Stock outstanding at the time, issue any dividend, distribution or other payment with respect to the New Common Stock or any other equity interests junior to the New Preferred Stock.<br><br>Other voting and governance rights of the New Preferred Stock to be |

3

| | |
|---|---|
| | agreed in the definitive documentation. |
| **General** | The New Preferred Stock will have transfer rights and restrictions and information rights that are typical for holders of securities of this type, and such other rights, including consent rights, preferences, privileges, powers, qualifications, limitations, restrictions, and relative, participating, optional and other special rights as reasonably agreed upon by the Debtors, the DIP Term Lenders and the Backstop Exit Term Loan Lenders. |

4